UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

WINE & SPIRITS RETAILERS, INC., *et al.*
*Plaintiffs,*

*v.*

STATE OF RHODE ISLAND, *et al.*,
*Defendants.*

Civil Action No. 04-418-T

**MEMORANDUM IN SUPPORT of PLAINTIFFS' MOTION for a PRELIMINARY INJUNCTION**

The Plaintiffs provide business advice to separately owned liquor stores across Rhode Island through a franchise relationship that has been approved by the Rhode Island Department of Business Regulation. The individual storeowners (the Franchisees) receive marketing and management advice from Wine & Spirits Retailers, Inc. (W&SR or the Franchisor) in exchange for a franchise fee. The Franchisor, while headquartered in Rhode Island, does not own any Rhode Island liquor stores. The Franchisor does not operate the independently owned stores or participate in the actual management, staffing, or purchasing of alcohol for these stores. As set forth in the franchise agreement, the Franchisor's role is limited, to one of paid advisor.

## I. Facts

### A. Instant Case

Currently eleven stores in Rhode Island and three in Massachusetts are franchisees of

SCANNED

12

W&SR and operate under the names Douglas Wine & Spirits and Peoples' Liquor Warehouse.[1] Rhode Island's Liquor Control Statute was amended to deprive the franchisees of the benefits of the franchise relationship. This amendment takes effect on April 1, 2005.

The Rhode Island General Assembly also amended the Liquor Control Statute to further define what constitutes a chain store. Chain stores have been prohibited from owning Class A liquor licenses (package store licenses) since the Liquor Control Statute was adopted following the repeal of prohibition. Determining what constitutes a chain had been delegated to the Department of Business Regulation, which defined a "chain store organization" as comprised of two or more stores with "common ownership." *M.C. Woonsocket, Inc. v. Hittner*, 1998 R.I. Super. LEXIS 62, *9. The new statutory definition in the amended R.I. Gen. Laws §3-5-11, goes beyond barring an entity from owning an interest in more than one Class A license. As of April 1, 2005, §3-5-11 also bars sharing marketing and management advice by two or more stores. *See* §3-5-11(b)(1)(d) (prohibited activities include: "coordinated or common planning or implementing of marketing strategies").

The Franchisor will be irreparably harmed if its contracts with the eleven Franchisees are abrogated on April 1, 2005. The good will and name recognition developed by W&SR will be irretrievably lost if its Rhode Island franchises are terminated during the pendency of this litigation.

---

[1] A twelfth franchisee has already signed a franchise agreement with W&SR and is currently awaiting approval of the Pawtucket Licensing Board to begin operations under the Douglas Wine & Spirits business model.

## B. History of Liquor Control in Rhode Island

The development of liquor control in Rhode Island pre-dates the birth of this nation by over a century. Despite the long history of control, the governmental interest has never changed; the goal has always been temperance. A brief history of Rhode Island liquor laws is offered to set the stage for reviewing the reasonableness of the relationship between the new statutory language and the State's goal of promoting temperance.

The settlements of Portsmouth and Newport banded together to form a common government in 1640. Two years prior, there is record of punishment for a "Riott of drunkenness" by several individuals. The problem has always been temperance. Subsequent laws concerning alcohol in the 1600's all centered on keeping the town folk sober. **Exhibit A** – Stiness, RHODE ISLAND LEGISLATION AGAINST STRONG DRINK (Sidney S. Rider 1882) at p.5.

Roger Williams himself was one of the first individuals to acquire a license to sell alcohol. In 1649, "It is granted unto Mr. Roger Williams to have leave to sell a little wine or stronge water to some natives in theare sickness." Just five years later, the citizens of Rhode Island had had enough of this practice:

> It is ordered, that no liquors shall be sold to any Indians by any one within this Colonie, under ye penalty of five pounds for every default, one halfe to ye complainer and ye other halfe to ye Town Treasurie; * * * And it shall be lawful for any one of this Colonie to take away any liquor from any Indians that they shall finde havinge any within any of ye precinques of ye several Townes.

Again, the concern was temperance, or the lack thereof. **Exhibit A**, pp.6-7.

Rhode Island has long recognized that many a virtuous man will expound upon the evils of "stronge water" when called upon, but that same person will rationalize that he can handle it. So the focus has always been on how to protect the weak from their own infirmities. Restrictions on sale of alcohol to women and minors is an example. In the past, Sailors were not responsible

for any drinking debts incurred over five shillings during the time of their service and any innkeeper that caused a sailor to be detained for collection of this debt was responsible to his master for "all damages arising from the detention." **Exhibit A**, p.16, *citing*, Laws of Col. of R.I., 1730, p.28. In 1718, Indians were exempted from repayment of debts incurred in purchasing intoxicating liquors because "several persons in this colony out of Wicked, covetous and Greedy designs often Draw Indians into their Debt and take advantage of their Inordinate love of Rum and other Strong Liquors. . ." **Exhibit A**, p.19.

There were laws prohibiting an innkeeper from allowing a patron to stay at the bar for more than one hour. Laws to proscribe the proper times for the sale of alcohol ("It is ordered, that no house of entertainment shall suffer any person to tipple after nine of ye clock at night; except they can give a satisfactory reason to ye constable of magistrate." **Exhibit A**, p.11, *citing*, R.I. Col. Rec., I., p.330, March, 1656). Other laws prohibited the amount of alcohol that can be sold to particular classes of people, *e.g.,* Indians were limited to a quarter of a pint per day. *Id.*

In fact, the first Sunday sales prohibition was enacted in 1673, not for reasons of religious conviction, but to keep people from drinking too much on a day that most people did not work. Because most people considered Sunday a holy day and therefore gave their employees and family this day off, they "soe spend it in debaistness or tipplinge and unlawful games and wantonness . . ." **Exhibit A**, p.15, *citing*, R.I. Col. Rec., II., pp.500-504, September, 1673.

This does not mean, however, that Rhode Islanders sought to bar this activity. Such a prospect was thought impractical and history supports this thinking. Indeed, the idea was to license alcohol-related activity and thereby subject it to control in order to promote temperance. The establishment of purveyors of fine drink was actually ***encouraged.*** In 1654, Towns were

ordered to license "one or two howses for ye entertainment of strangers, and to encourage such as shall undertake to keepe such howes." **Exhibit A**, p.9, *citing*, R.I. Col. Rec., I., p.280.

By the early 1700's, the cost of a license was increased "as the creating of many unnecessary public houses is rather a nuisance than a benefit." **Exhibit A**, p.18, *citing*, R.I. Col. Rec., IV, p.64. This does not mean that Rhode Islanders sought to restrict the methods or locations of dispensing. In June 1719, ferrymen were allowed to sell alcohol based on the rationalization that "it being very convenient for them to sell strong liquors to refresh travelers." **Exhibit A**, p.18, *citing*, R.I. Col. Rec., IV, p.250.

By the time the Prohibition debate rolled around, Rhode Island had already tried prohibition and determined that it does not work. In 1852, the Rhode Island Legislature passed "An Act for the suppression of drinking houses and tippling shops." **Exhibit A**, p.34. This statewide prohibition was repealed at the outset of the Civil War in 1863. **Exhibit A**, p.38. As a result of this failed experiment, Rhode Island "did not ratify the Eighteenth Amendment, and was among the earliest to ratify the Twenty-First that repealed it." *44 Liquormart, Inc. v. State of R.I.*, 39 F.3d 5, 5-6 (1st Cir 1994).

Before Prohibition, the alcoholic beverage industry was divided essentially into suppliers and retailers. There were essentially no wine and spirits wholesalers and beer was treated differently because of its bulk and perishability.[2] The suppliers were able to exercise tremendous influence over those retailers that they did not directly control though extending credit and financial incentives. The result was fierce competition that was perceived as forcing drastic

---

[2] For a general overview, see Denning, Brannon P., "A Brief History of the Creation of the Three-Tier System," located at http://www.nbwa.org/public/gov_industry_issues/3_tier_sys/index.aspx.

increases in consumption, which led to drunkenness and financial ruin, impoverishing the working man and his family. In an era of debtor's prisons, when women were unable meaningfully to enter the workforce, the family of a drunkard quickly became a public charge. The supplier/retailer combine used its financial strength to corrupt political power to protect itself from building public outrage. This was the "tied-house evil" that Prohibition sought to sweep away. **Exhibit B** – Fosdick and Scott, TOWARD LIQUOR CONTROL (Harper & Brothers 1933) at pp.43-44.

After Prohibition was lifted, Rhode Island enacted the Liquor Control Act. The Act contained a prohibition against chain stores but specifically exempted "tavern-keepers, victualers or druggists" from this chain store prohibition. This allowed chain restaurants to use their purchasing power in negotiating lower prices with wholesalers. Liquor stores are deprived of this ability. There is no rational basis for this distinction. The greater threat to society is the drunk driver who leaves a bar, not the consumer who purchases alcohol and brings it home. *See* http://www.madd.org/stats/1,1056,1789,00.html (Nationally, "[I]n 2002, an estimated 17,419 people died in alcohol–related traffic crashes—an average of one every 30 minutes"); http://www.madd.org/stats/1,1056,8716,00.html (55% of Rhode Island's traffic deaths in 2003 were related to drunk driving).

The amended statute at issue returns all of the power to the wholesalers and marks a complete about-face in the direction of alcoholic beverage control in Rhode Island. When the statutory scheme was devised in 1933, the stated purpose of the Legislature was to limit the power of the wholesalers. *See* **Exhibit C** – Report of the Commission to the General Assembly, April 6, 1933, pp. 9-10. The "three features of the proposed law" were described as follows:

> First: The law is drawn so as to prohibit any connection, directly or indirectly, between manufacturer and wholesaler and the retail trade; second: The law

> prohibits the sale of anything but non-intoxicating beverages over a bar, and, in addition, prohibits the consumption of hard liquors on any premises where sold; and third: The law limits the profit of the wholesale dealer in the sale and distribution of alcoholic beverages.

*See* **Exhibit C** – Report of the Commission to the General Assembly, April 6, 1933, p. 12. There is no indication that the Legislature intended to keep the retailers from improving their individual operations or limit their profits in any way.[3]

Currently in Rhode Island, there are two hundred and fifty-three (253) retailers and over sixteen hundred (1600) other establishments licensed to sell alcohol, e.g., taverns, restaurants. **Exhibit D**. The franchisees represent only 12 of those licenses.

## II. Argument

### A. Standard For A Preliminary Injunction

The standard for issuing a preliminary injunction is, "whether the plaintiff is likely to succeed on the merits, whether the plaintiff will otherwise suffer irreparable harm, whether the benefits of an injunction will on balance outweigh the burdens, and whether an injunction is consistent with the 'public interest.'" *Coastal Fuels of Puerto Rico, Inc. v. Caribbean Petroleum Corporation*, 990 F.2d 25, 26 (1st Cir. 1993). *See also, Gately v. Comm. of Mass.*, 2 F.3d 1221, 1224 (1st Cir. 1993), *cert. denied*, 511 U.S. 1082 (1994).

"The purpose of a preliminary injunction is to preserve the status quo, freezing an existing situation so as to permit the trial court, upon full adjudication of the case's merits, more

---

[3] Where the General Assembly has desired to limit profits within the liquor industry, they have clearly stated that objective. *See* R.I. Gen. Laws §3-10-11 ("Every holder of a wholesaler's license is entitled only to retain for himself or herself those profits in his or her business as are necessary to repair loss or shrinkage in his or her capital invested in the business plus nine percent (9%) per annum cumulatively upon the amount of capital actually invested in the business. All profits in excess of that amount shall be paid annually by the wholesaler to the treasurer of the state for its own use"). All indications are that §3-10-11 is not enforeced.

effectively to remedy discerned wrongs." *CMM Cable Rep., Inc. v. Ocean Coast Props., Inc.*, 48 F.3d 618, 620 (1st Cir.1995). *See also, Ashcroft v. A.C.L.U.*, 542 U.S.__, 124 S.Ct. 2783, 2791, 159 L.Ed.2d. 690 (2004) (sustaining the granting of a preliminary injunction issued against the enforcement of a statute, where the defendant failed to show that the restriction on speech did not encompassed more speech than was necessary to achieve the offered governmental interest); Unless the Court grants preliminary injunctive relief, the contracts of the franchisees will be abrogated on April 1, 2005. The store owners will have no choice but to change their names and marketing strategy and the Plaintiffs' reputation within the liquor retail industry will be severely damaged. The name recognition and good will associated with the name Douglas Wine & Spirits will be lost. No relief granted by this Court at the end of this litigation will fully restore the Plaintiffs to their current circumstances.

**B. Likelihood of Success**

**1. The Plaintiffs have a Strong Likelihood of Success on Their First Amendment Claims**

a. The speech at issue is not commercial speech

Protected speech under the First Amendment is divided into two categories: commercial speech and non-commercial speech. *Central Hudson Gas & Electric Corp. v. Public Service Comm'n.*, 447 U.S. 557 (1980). Commercial speech is subject to a lower, yet still stringent level of scrutiny. *Lorillard Tobacco Co. v. Reilly/Altadis U.S.A. Inc. v. Reilly,* 533 U.S. 525, 555 (2001).[4] However, not all "speech for profit" is considered commercial speech. Providing paid

[4] Five current Justices of the Supreme Court have suggested that the *Central Hudson* test should be abandoned and that strict judicial scrutiny should be the applicable standard for content-based restriction on truthful, nonmisleading commercial speech. *See 44 Liquormart, Inc. v. Rhode Island,* 517 U.S. 484, 501, 510-514, (1996) (joint opinion of Stevens, Kennedy, and Ginsburg, JJ.); *id.,* 517 U.S. at 517 (Scalia, J., concurring in part and concurring in judgment); *id.,* 517 U.S. at 518 (Thomas, J., concurring in part and concurring in judgment). *See also, Lorillard*

marketing and management advice, is not commercial speech and entitled to full First Amendment protection.

Commercial speech is "speech which does 'no more than propose a commercial transaction.'" *Virginia Pharmacy Board v. Virginia Citizens Consumer Council*, 425 U.S. 748, 762 (1976). The Supreme Court has found that not all speech of a commercial nature falls within the classification of "commercial speech." Addressing a prohibition on commercial activities in state university dormitory rooms, the Supreme Court noted that the regulation "would prohibit tutoring, legal advice, and medical consultation provided (for a fee) in students' dormitory rooms. While these examples consist of speech for a profit, they do not consist of speech that ***proposes*** a commercial transaction, which is what defines commercial speech." *Board of Trustees of State University of New York v. Fox*, 492 U.S. 469, 482 (1989) (emphasis in original).

The marketing and management advice provided by the Franchisor to the Franchisees is indistinguishable from "tutoring, legal advice, and medical consultation provided (for a fee)" used by the Court as examples of speech for profit that is accorded full First Amendment Protection. That the business in issue concerns the sale of alcoholic beverages provides the State with no greater power to regulate speech. *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 505 (1996).

---

*Tobacco Co. v. Reilly/Altadis U.S.A. Inc. v. Reilly,* 533 U.S. 525, 272 (2001) (concurring opinion of Thomas, J.) ("I continue to believe that when the government seeks to restrict truthful speech in order to suppress the ideas it conveys, strict scrutiny is appropriate, whether or not the speech in question may be characterized as 'commercial'"); *id.*, 533 U.S. at 571-72 (concurring opinion of Kennedy, J., joined by Scalia, J.) ("the [*Central Hudson*] test gives insufficient protection to truthful, nonmisleading commercial speech").

b. The State Has the Burden of Justifying its Restriction of Non-Commercial Speech

In order for its restriction on speech to survive strict judicial scrutiny, the State must meet a heavy burden of justification.

> "It is firmly established that a significant impairment of First Amendment rights must survive exacting scrutiny . . . Thus encroachment 'cannot be justified upon a mere showing of a legitimate state interest.' The interest advanced must be paramount, one of vital importance, and the burden is on the government to show the existence of such an interest . . . Moreover, it is not enough that the means chosen in furtherance of the interest be rationally related to that end. The gain to the subordinating interest provided by the means must outweigh the incurred loss of protected rights, and the government must 'emplo(y) means closely drawn to avoid unnecessary abridgment. . . .' '(A) State may not choose means that unnecessarily restrict constitutionally protected liberty. 'Precision of regulation must be the touchstone in an area so closely touching our most precious freedoms.' If the State has open to it a less drastic way of satisfying its legitimate interests, it may not choose a legislative scheme that broadly stifles the exercise of fundamental personal liberties.'" *Elrod v. Burns*, 427 U.S. 347, 362-63 (1976) (internal citations and footnote omitted).

The restriction on speech in this case is not content neutral. It prohibits a specific type of speech – paid marketing and management advice. Therefore, the State must prove that its ban is narrowly tailored to accomplish a compelling governmental interest. As discussed below, price fixing and administrative convenience, the interests identified in §3-5-11.1, are not compelling interests. Nor does the State's general interest in temperance justify limitations on speech.

In *44 Liquormart*, Rhode Island argued that a ban on advertising advanced the State's interest in promoting temperance by limiting competition between liquor retailers. *44 Liquormart*, 517 U.S. at 505-07. The Supreme Court rejected that argument, holding that, even assuming higher prices would promote temperance, higher prices can be achieved without restricting speech. *44 Liquormart*, 517 U.S. at 508.

In *Discovery Network* (a commercial speech case applying a less stringent standard than is applicable here), the Supreme Court struck down a ban on commercial newsracks, citing lack

of a "reasonable fit" between the ends and means of the city ordinance. Cincinnati had banned some newsracks but not others; those containing commercial bills rather than newspapers were banned from public sidewalks. It did this in the interest of safety and the attractive appearance of its streets. The Court noted that, "[i]t was the city's burden to establish a 'reasonable fit' between its legitimate interests in safety and aesthetics and its choice of a limited and selective prohibition of newsracks as the means chosen to serve those interests." *Discovery Network*, 507 U.S. at 416. The Supreme Court did not consider Cincinnati's ban on only some newsracks to be narrowly tailored to achieve the interest of safety and aesthetics because the newsracks banned were no more harmful to the stated goals than the newsracks left in place. Similar to this case, the State cannot establish that banning business advice through franchising, but not advice from the United Independent Liquor Retailers Association of Rhode Island, Inc., or an accounting firm or a law firm, is a reasonable fit to the objective of temperance.

The Court has been equally adamant in rejecting administrative convenience as a justification for a restriction on constitutional rights. *City of Richmond v. Croson*, 488 U.S. 469, 508 (1989) (administrative convenience and cost cannot justify an otherwise unconstitutional policy); *Frontiero v. Richardson*, 411 U.S. 677, 690 (1973) (plurality opinion) ("when we enter the realm of 'strict judicial scrutiny,' there can be no doubt that 'administrative convenience' is not a shibboleth, the mere recitation of which dictates constitutionality"); *Stanley v. Illinois*, 405 U.S. 645, 656 (1972) ("the Constitution recognizes higher values than speed and efficiency. Indeed, one might fairly say of the Bill of Rights in general, and the Due Process Clause in particular, that they were designed to protect the fragile values of a vulnerable citizenry from the overbearing concern for efficiency" (footnote omitted)). The stated goal of "promot[ing] the

effective and reasonable control and regulation of the Rhode Island alcoholic beverage industry" simply cannot justify the restriction of speech.

### 2. Even Under The Less Stringent Commercial Speech Standard, the Plaintiffs Have A Strong Likelihood Of Success

In 1980, the Court developed a balancing test for commercial speech. *Central Hudson Gas & Electric Corp. v. Public Service Comm'n.*, 447 U.S. 557 (1980). Under *Central Hudson,* a government restriction on advertisements or other commercial speech is permissible only on a showing that (1) the advertising is misleading, (2) the government interest in regulation is substantial, (3) the regulation directly advances that interest, and (4) the regulation is not more extensive than necessary to serve the interest. *Central Hudson*, 447 U.S. at 566. The State has the burden of justifying its restriction on speech.

The State cannot meet its burden under the third and fourth prongs of the *Central Hudson* test.

> "The third step of *Central Hudson* concerns the relationship between the harm that underlies the State's interest and the means identified by the State to advance that interest. It requires that 'the speech restriction directly and materially advanc[e] the asserted governmental interest. 'This burden is not satisfied by mere speculation or conjecture; rather, a governmental body seeking to sustain a restriction on commercial speech must demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree.''" *Lorillard Tobacco Co. v. Reilly/Altadis U.S.A. Inc. v. Reilly,* 533 U.S. 525, 555 (2001), *quoting, Greater New Orleans Broadcasting Assn., Inc. v. United States*, 527 U.S. 173, 188 (1999).

Addressing a height restriction on tobacco advertising, the *Lorillard Tobacco* Court held that, "[a] regulation cannot be sustained if it 'provides only ineffective or remote support for the government's purpose . . . or if there is 'little chance' that the restriction will advance the State's goal." *Lorillard Tobacco*, 533 U.S. at 566, *quoting, Edenfield v. Fane*, 507 U.S. 761, 770 (1993)

and *Greater New Orleans*, 527 U.S. at 193. The State simply cannot show that its restriction on giving advice advances its interest in temperance, price fixing or administrative convenience.

Equally problematic is the fourth prong of the *Central Hudson* test, which requires, "a reasonable fit between the means and ends of the regulatory scheme." *Lorillard Tobacco*, 533 U.S. at 561. In *Lorillard* the Court held that, "[t]he broad sweep of the regulations indicates that [Massachusetts] did not 'carefully calculate the costs and benefits associated with the burden on speech.'" *Lorillard Tobacco*, 533 U.S. at 561, *quoting, City of Cincinnati v. Discovery Network*, 507 U.S. 410, 417 (1993). At issue in *Lorillard Tobacco* were broad restrictions adopted by Massachusetts on advertising that were not based on any local analysis of the problem addressed by the regulation or the effect of the regulations on speech. Rhode Island will have to demonstrate that the acts are calculated to advance their purpose and that they only burden speech to the extent necessary to achieve that purpose, a burden the State cannot meet. *Lorillard Tobacco*, 533 U.S. at 563 ("the range of communications restricted seems unduly broad. For instance, it is not clear from the regulatory scheme why a ban on oral communications is necessary to further the State's interest").

Accordingly, even under the less stringent test applied to commercial speech, the amendment to §3-5-11 and the new §3-5-11.1 do not satisfy constitutional requirements for prohibiting selling business advice to liquor store owners. *See* §3-5-11(b)(1)(d) (prohibited activities include: "Coordinated or common planning or implementing of marketing strategies), §3-5-11.1 (franchise agreements involving liquor stores prohibited).

### 3. The Pre-Amendment Version of §3-5-11 Allows an Unconstitutional Level of Unfettered Discretion in the Suppression of Activities Protected by the First Amendment.

Under the pre-amendment version of §3-5-11, chain stores are prohibited from owning Class A liquor licenses. The statute does not define what constitutes a chain, leaving it to the Department of Business Regulation to set a definition of a chain store operation. The DBR has applied this ban on chain stores haphazardly, permitting stores that share common owners to operate without interference from the DBR. *See e.g.,* **Exhibit E**, **F** and **G** (Complaints to the DBR concerning the existence of chain stores holding Class A licenses) and **Exhibit H** (*Affidavit of Robert J. Roughsedge* stating that no action has been taken by the DBR in response to the complaints).

An ordinance cannot provide unfettered discretion to the enforcement agency, because of the "ever-present potential for arbitrarily suppressing First Amendment liberties, that kind of law bears the hallmark of a police state." *Shuttlesworth v. City of Birmingham*, 382 U.S. 87(1965); *Kunz v. New York*, 340 U.S. 290, 315 (1951) ("we have consistently condemned licensing systems which vest in an administrative official discretion to grant or withhold a permit upon broad criteria unrelated to proper regulation of public places"). The current version of §3-5-11 leaves it entirely within the discretion of the Department of Business Regulations to determine what business relationships are permissible under the State's chain store rule. In doing so, the current §3-5-11 impermissibly allows the DBR to restrict speech without a clear standard.

Addressing a regulation that left officials free to determine which permits to grant and which to deny without providing precise guidance, the Supreme Court held:

> "The situation is thus the same as if the statute itself expressly provided that there could only be peaceful parades or demonstrations in the unbridled discretion of the local officials ... This Court has recognized that the lodging of such broad discretion in a public official allows him to determine which expressions of view

> will be permitted and which will not. This thus sanctions a device for the suppression of the communication of ideas and permits the official to act as a censor." *Cox v. Louisiana*, 379 U.S. 536, 557 (1965) (footnotes omitted).

The DBR has been very selective in its enforcement of §3-5-11. Several liquor chain stores currently operate within Rhode Island. As currently defined by the DBR, a "chain store organization" is comprised of two or more stores with "common ownership." *M.C. Woonsocket, Inc. v. Hittner*, 1998 R.I. Super. LEXIS 62, *9. Currently, several liquor stores with common ownership operate in Rhode Island. *See e.g.,* **Exhibit E**, **F** and **G** (Complaints to the DBR concerning the existence of chain stores holding Class A licenses). Despite complaints having been filed against these chain stores, the DBR has taken no action against them. **Exhibit H.**

#### 4. The Plaintiffs have a Strong Likelihood of Success on Their Associational Claims

"[I]t is immaterial whether the beliefs sought to be advanced by association pertain to political, economic, religious or cultural matters, and state action which may have the effect of curtailing the freedom to associate is subject to the closest scrutiny." *NAACP v. Alabama ex rel. Patterson,* 357 U.S. 449, 460-461 (1958). The franchisees of W&SR associate with the franchisor so that they can benefit from the marketing and management advice provided by W&SR. It is this management and marketing advice that §§3-5-11 and 3-5-11.1 target. These statutes do not have an incidental effect on association for purposes of speech. Their purpose and effect is to eliminate marketing and management advice for fee in the liquor retail industry. In the present case, the State cannot show that the statutes are narrowly tailored to achieve the interest that motivated their adoption. *Roberts v. United States Jaycees*, 468 U.S. 609, 623 (1984) ("Infringements on that right may be justified by regulations adopted to serve compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms").

### 5. The Plaintiffs have a Strong Likelihood of Success on Their Equal Protection Claim

While Rhode Island prohibits businesses that sell alcohol for off-premises consumption from owning more than one license or from entering into franchise agreements, Rhode Island does not prohibit sellers of alcohol for on-premises consumption from doing the same. In fact, many chains and franchises are allowed by the State of Rhode Island to engage in the business of selling alcohol to the public for on-premises consumption, including TGI Fridays, Hooters, Applebees Neighborhood Grill & Bar, 99 Restaurant & Pub, Boston Billiards, and Chelos. Because Rhode Island's amended legislation gives an unfair competitive advantage to sellers of alcohol for on-premises consumption with no rational basis, the legislation violates plaintiffs' Equal Protection rights.

"The Equal Protection Clause requires 'that cities, states and the Federal Government must exercise their powers so as not to discriminate between their inhabitants except upon some reasonable differentiation fairly related to the object of regulation." …'[E]qual protection of the laws means that no person or class of persons shall be denied the same protection of the laws which is enjoyed by other persons or classes in the same place and under like circumstances (citations omitted).'" *Mills v. State of Maine*, 118 F.3d 37, 46-47 (1st Cir. 1997). Rhode Island's amended legislation denies equal protection of the law to franchises selling alcohol for off-premises consumption by arbitrarily denying them certain business advantages that can be gained from entering into franchise agreements, while allowing chains selling alcohol for on-premises consumption to benefit from such arrangements.

A statute that does not restrict fundamental rights or adversely affect members of a protected class must nevertheless bear a rational relationship to a legitimate governmental

interest. *See Hill v. Gill*, 703 F.Supp. 1034, 1037 (D.R.I. 1989) (regulation prohibiting convicted felons from operating school busses bears a rational relationship to protecting children).[5]

W&SR's franchisees entered into their franchise agreements to benefit from certain competitive advantages designed to attract existing business from competing stores. These advantages include name recognition and access to marketing and advertising expertise. The provisions of the amended legislation prohibiting coordinated marketing efforts through franchise arrangements does nothing to further temperance where advertising content is not regulated and store owners are not prohibited from launching individual campaigns to create new business or increase sales. Additionally, there is no basis for the proposition that people who abstain from drinking alcoholic beverages will be compelled to start merely because a package store name is familiar to them, or that name recognition alone induces customers already in the store to buy more than they otherwise intended. This is akin to the ridiculous notion that people who do not smoke cigarettes are more likely to start smoking if they pass by a chain convenience store selling cigarettes than if they pass by an individually owned convenience store selling cigarettes. As a result, Rhode Island's amended legislation does not bear a rational relationship to its goal of seeking moderation in the consumption of alcoholic beverages.

For the same reasons, the legislation does not bear a rational relationship to public health or welfare. Quite the contrary, it allows retailers of alcohol for on-premises consumption to benefit from increased business due comprehensive marketing schemes coupled with lower prices made possible by collective bargaining power and economies of scale. This, in turn,

---

[5] In the present case, the statutes do restrict fundamental rights to speech and assembly as discussed above. This Court need only reach the Equal Protection issue if it concludes that the First Amendment rights addressed above are not implicated in this case.

induces people to consume alcohol outside the home thereby increasing the likelihood of drinking and driving and creating a greater public safety issue. Since the franchise arrangement created by plaintiffs does not induce people to initiate or increase consumption of alcoholic beverages, it does not create a health and welfare issue. As a result, the amended legislation bears no rational relationship to public health and welfare either.

Moreover, the actions of the General Assembly are not rationally related to the stated purposes when considering wholesalers of alcoholic beverages. The amended statute prohibits any discussions or negotiations with the wholesalers on price while providing absolutely no mechanism for the state to monitor those prices. This provides the wholesalers with unfettered power to charge any price they want to the retailers and, accordingly, the consumers. It is important to note that wholesalers have exclusive rights from manufacturers to distribute products within the State of Rhode Island. There would be no pressure from any source for wholesalers to seek competitive prices. Massachusetts' prices and sales would not place any pressure or control on these prices because most of the Rhode Island wholesalers also do business in Massachusetts and/or are based in Massachusetts. It does not matter to the wholesalers if Rhode Island consumers travel to Massachusetts to purchase alcohol because they wholesaled the product to the Massachusetts retailers.

There are currently only seven (7) wholesalers operating in the State of Rhode Island. The wholesale business has contracted over the years, thereby consolidating power in a handful of wholesalers. Three wholesalers doing business in Rhode Island control approximately seventy percent (70%) of all alcoholic beverages sold in the State of Rhode Island. In contrast, there are two hundred and fifty-three (253) Class A license holders (retailers). It is ridiculous to

assert that the twelve franchisees can affect the price of alcohol more than these few powerful wholesalers with whom all retailers must deal.

Based on the foregoing, the Rhode Island legislation bears no rational relationship to any conceivable governmental interest and the plaintiffs have demonstrated a likelihood of success on the merits of their equal protection claim.

### C. The Constitutional Injuries the Plaintiffs Will Suffered will be Irreparable

Violations of fundamental constitutional rights always constitute irreparable harm. *Dunn v. Blumstein*, 405 U.S. 330, 351 (1972). No constitutional injury is a minor injury. The constitutional injuries suffered by the Plaintiffs are, as a matter of law, irreparable. *See Elrod*, 427 U.S. at 373 ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury"). Should this Court not grant the injunction, the Plaintiffs' business will be illegal as of April 1, 2004. The Plaintiffs' franchise agreements will become null and void. This will cause obvious irreparable harm to the Plaintiff Franchisor.

### D. The Harm to the Plaintiffs Outweighs Any Conceivable Harm to the State by Delaying Enforcement of the Amendments

In comparison to the prohibition of the Plaintiffs' very business, the State will suffer no irreparable effects if the enforcement of the amendments is delayed. Rhode Island has had liquor franchises since 1991. A postponement in the application of the amendments during the duration of this lawsuit will not harm the State's interest.

Where plaintiffs have demonstrated such a strong likelihood of success, the court should give less weight to any harm defendants might suffer. "[W]here the likelihood of plaintiff's success on the merits is great, 'the less weight is to be given to the defendant's loss.'" *TEC*

*Engineering Corp. v. Budget Molders Supply, Inc.*, 927 F.Supp. 528, 535 (D.Mass. 1996), *quoting*, *FDIC v. Elio*, 39 F.3d 1239, 1248 (1st Cir. 1994).

**E. Consistent with the Public Interest**

The public interest is "ill-served by the continued existence of unconstitutional ordinances, nor is it served by failure to enjoin defendant's discriminatory conduct." *Rubin v. City of Berwyn*, 553 F.Supp. 476, 481 (N.D. Ill 1982) (holding potential First Amendment violations should be enjoined pending litigation). The vindication of constitutional rights is always in the public interest. *See Cohen v. Brown University*, 809 F.Supp. 978, 1001 (D. R.I. 1992), *aff'd* 991 F.2d 888 (1st Cir. 1993).

**CONCLUSION**

A finding that the plaintiffs' constitutional rights have probably been violated "necessarily entails a decision as to the other preliminary injunction criteria." *Planned Parenthood v. Bellotti*, 641 F.2d 1006, 1022 (1st Cir. 1981).

Dated: January 14, 2005

Respectfully submitted,
WINE & SPIRITS RETAILERS, INC., *et al.*
By their Attorneys,

Robert J. Roughsedge (#5876)
Evan T. Lawson (*pro hac vice*)
Michael Williams (*pro hac vice*)
Lawson & Weitzen, LLP
88 Black Falcon Avenue, Suite 345
Boston, MA 02210-1736
Telephone: (617) 439-4990
Facsimile: (617) 439-3987

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

WINE & SPIRITS RETAILERS, INC., *et al.*

*Plaintiffs,*

*v.*

STATE OF RHODE ISLAND, *et al.*,

*Defendants.*

Civil Action No. 04-418-T

**CERTIFICATE OF SERVICE**

The undersigned attorney for the Plaintiffs hereby certifies that a true copy of this document was served upon the attorney of record for the plaintiff by Unites States first class mail addressed to Rebecca Partington, Assistant Attorney General, Deputy Chief, Civil Division, Office of the Attorney General, 150 South Main Street, Providence, RI 02903, this 24th day of January, 2005.

Robert J. Roughsedge #5876

15: 38

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

WINE & SPIRITS RETAILERS, INC., *et al.*
*Plaintiffs,*

*v.*

STATE OF RHODE ISLAND, *et al.*,
*Defendants.*

Civil Action No. 04-418-T

RECEIVED FEB 03 2005 U.S. DISTRICT COURT DISTRICT OF RHODE ISLAND

**EXHIBITS IN SUPPORT of PLAINTIFFS' MOTION for a PRELIMINARY INJUNCTION**

A. Stiness, RHODE ISLAND LEGISLATION AGAINST STRONG DRINK (Sidney S. Rider 1882)

B. Excerpts from Fosdick and Scott, TOWARD LIQUOR CONTROL (Harper & Brothers 1933)

C. Report of the Commission to the General Assembly, April 6, 1933

D. Summary of Rhode Island Retail Liquor Licenses (Dept. of Business Regulation, 2000)

E. Complaint to the Department of business Regulation.

F. Complaint to the Department of business Regulation.

G. Complaint to the Department of business Regulation.

H. Affidavit of Robert J. Roughsedge.

Respectfully submitted,

WINE & SPIRITS RETAILERS, INC., *et al.*

By their Attorneys,

Robert J. Roughsedge (#5876)
Evan T. Lawson (*pro hac vice*)
Michael Williams (*pro hac vice*)
Lawson & Weitzen, LLP
88 Black Falcon Avenue, Suite 345
Boston, MA 02210-1736
Telephone: (617) 439-4990
Facsimile: (617) 439-3987

# A
# SKETCH
OF
# RHODE ISLAND LEGISLATION AGAINST STRONG DRINK.

BY
JOHN H. STINESS,
ASSOCIATE JUSTICE OF THE SUPREME COURT OF RHODE ISLAND.

A PAPER PRESENTED TO THE LEGISLATIVE COMMITTEE ON A PROHIBITORY LAW, JANUARY SESSION, 1881.

---

PROVIDENCE
SIDNEY S. RIDER
1882.

RI
344.0541
S854

ANGELL & CO., PRINTERS, PROVIDENCE, R. I.

## PUBLISHER'S NOTE.

The paper herewith presented is the fruit of so much research and is so full of instruction, that the publisher felt unwilling to let it remain lost in the columns of the newspaper in which it appeared, and where it was practically useless as a work of reference. Here at a glance can be seen the Legislation against Strong Drink in Rhode Island for upwards of two centuries. Any such comparative survey of legislation must be of the utmost service either as a warning or a guide; and the desire to have this admirable summary answer these purposes has induced the publisher to issue this edition. Herein can be found certain laws which now for the first time appear in print.

## RHODE ISLAND LEGISATION AGAINST STRONG DRINK.

After the settlement of Providence, Portsmouth and Newport, from 1636 to 1639, the inhabitants organized as colonies or towns, Portsmouth and Newport uniting in a common government in 1640. Each town doubtless made rules and laws as occasion required, but we have no means of determining exactly what they were. As early as September, 1638, we find that seven persons were brought before the town meeting of Portsmouth for a "Riott of drunkenness by them committed on the 13th of the seventh month" — two days before — all of whom were fined and some compelled to sit in the stocks. But for the record we could hardly believe that this evil would so soon make its appearance among those sturdy zealots, who, like the founders of Providence, fled from Massachusetts that they might have full liberty in their practice and beliefs of religious doctrine.

In May, 1647, the three towns united under a charter granted in 1644, and Warwick, whose inhabitants had hitherto denied the authority of the self-constituted governments, organized as a town and joined them.

The first General Assembly was held at Portsmouth on the 19th, 20th and 21st of May, 1647, and adopted a code of laws, concise but comprehensive, embracing all that was deemed to be necessary in civil and crimi-

nal jurisprudence. Therein it is agreed, "to prevent poverties, * * * that such Lawes be made and produced as concernes ye ordering of Alehouses and Taverns, Drunkenness and unlawfull gaming therein." (R. I. Col. Record, I., p. 160.)

It is then subsequently provided (do., pp. 185, 186,) that no tavern, alehouse or victualling house shall be kept throughout the colony without license, under a penalty of twenty shillings to the use of the poor; and that every keeper of such tavern, &c., shall give recognizance, with two sufficient sureties, to keep good order in his house; not to use such games as are judged by the laws of England to be unlawful, in such common houses, as carding, dicing, slide, groat, &c.; and not to suffer any townsman to remain tippling therein for one hour's space, under a penalty of ten shillings, and every townsman so taken shall forfeit for every time three shillings and four pence for the use of the poor. Drunkenness is also punishable by a fine and by sitting in the stocks.

In May, 1649, appears the following interesting entry: "It is granted unto Mr. Roger Williams to have leave to sell a little wine or stronge water to some natives in theare sickness." (R. I. Col. Rec., I., p. 219.)

If no license were granted except to such men as he, and the privilege should be exercised as we must believe it was by him, there could be little or no objection to license laws.

At the August session of the Assembly in 1654, the following act was passed, in which we find the first sign of prohibition:

"It is ordered, that no liquors shall be sold to any Indians by any one within this Colonie, under ye penalty



of five pounds for every default, one halfe to ye complainer and ye other halfe to ye Town Treasurie; * * * And it shall be lawful for any one of this Colonie to take away any liquor from any Indians that they shall finde havinge any within any of ye precinques of ye severall Townes."

Surely this is a marvellous law!

No one shall sell liquor to an Indian and any one may take it away from him, if he is found to have any. Was this an early announcement that the rule to be applied to red men was that which was afterwards popularly supposed to have been applied to black men by the Dred Scott decision, that they had no rights which white men were bound to respect? Was this intended simply as a tyrannical exercise of power? Did it mean that the Indians had no rights within the limits of this colony; that they might be deprived of their property at will; that a thing which they had come by honestly, perhaps bought and paid for, could be taken from them at the pleasure of the colonists; that they were slaves and the whites were masters.

We cannot believe that the law was founded in any such principle as this, when we remember how scrupulous the settlers of this colony were in their dealings with the natives; when we remember that prior to King Philip's War they never took a foot of Indian ground by the aggressive arm of force, but always with the friendly hand of purchase.

No! the reason for the law is plainly apparent. They saw that when the fierce nature of the red man was inflamed by intoxicating drink, he was a dangerous neighbor; he would do many things, both wrong and cruel, that in his sober moments he would not do; and hence

protection to the community required that the sale of liquor to him should be prohibited.

But how much difference is there between the white man and the red man in this respect, after all? When "men put an enemy into their mouths to steal away their brains," does it matter much whether they are red, white or black? Have there not been committed by white men, crazed by intoxicating drink, deeds as savage and cruel as ever were done by Indians? and does not reason require that one should be kept from the danger of arousing barbarous passions as much as the other?

To my mind this act presents an epitome of the principle and argument of proper legislation. Our fathers recognized a present evil and danger. They did not wait for missionaries to enlighten the natives and to convert them from the error of their ways; nor stop to persuade them to give up the habit of drinking to excess; they did not put off action till they could discuss and settle the questions of abuse and use, individual rights, probability of enforcement, etc. No, they went to work like sensible men and did the only sensible thing they could do. They saw that the only way to prevent the evils of intemperance among the Indians was to forbid the sale of liquor to them; and of course it is equally apparent that the way to prevent the evils of intemperance among white men is to do the same thing.

The many people among us who claim to be temperance people and ready to do anything to abolish this public curse, will here find that the true remedy was well understood more than two centuries ago, and that it is not a modern invention of radicals and fanatics.

The real difficulty in the case, however, is the same today that it was then. People are not willing to deny



themselves for the public good. They are willing enough that others should be under the law, but they themselves wish to be free. Our forefathers were ready enough to make a law forbidding the sale of liquor to the Indians, because they saw the evil that flowed from it; but recognizing the same evil — if not in the same degree — from the sale of liquor among themselves, as appears from numerous passages in their laws, they were not ready to have the same law applied to themselves.

And this, I suspect, is the controlling reason with many men for opposing a prohibitory law. They think it will sometimes interfere with themselves and they are not willing to sacrifice anything of personal right or pleasure for the sake of keeping others out of danger; they do not want a prohibitory law, for fear it will be so enforced, as possibly to cause them some trouble. They say if there could be a law that would prevent the sale to those weak ones, who can not use liquor as it should be used, it would be a very good thing, but no such law for *us*. Therefore they say, we cannot reach this evil by law; we must look upon it as a necessary evil — one that must be endured — and endeavor to regulate it by a law that will enable us to get what we want, and keep those others, the weak ones, from getting what they want, as best we can.

At the same session, August 1654, each town was ordered to "forthwith appoynt or license one or two howses for ye entertainment of strangers, and to encourage such as shall undertake to keepe such howses. And all others that are not licensed, do not retaile either wine, beere or strong liquors, uppon ye penaltie of five poundes. And ye former laws for ale-howses and liquers be repealed."[1]

1. R. I. Col. Rec., I., p. 280.

The following year in May, a committee was appointed to "ripen against morning some way for suppressing of sellinge liquers." At the same session, and probably the report of this committee, a law was passed which was remarkable in many of its features.

It began "For ye preventinge of ye great mischiefe of ye Indian drunkenness, it is thought meet in ye first place that there be two ordinarie keepers appoynted in each Towne and that none but these shall sell any sort of strong drink either to English or Indian by retaile; that is to say, under a gallon." Neither of these ordinary keepers should sell to Indians above a quarter of a pint of liquor a day to a person. In case an Indian was found drunk, the ordinary keeper by whose means he was made drunk, should pay a fine of 20s, and the Indian 10s, or be whipped "or laide necke and heels." The magistrates might authorize the constable and ordinary keepers "to search any man's house to see what quantities of liquers or wine they have." The price at which liquors should be sold should not exceed four shillings per quart. Every person having liquor in his possession was to cause it all to be recorded in the town records, and all "that shall afterwards be anywayes brought into ye precinques of any town in this colonie, from time to time, shall be recorded as aforesaid in ye saide respective Towne booke or bookes; and if any person, upon search, shall be found to have concealed any such drink, and not recorded ye same within two days after ye bringing ye same as afore prescribed, that person or persons, whoever he or they bee, shall forfeit all such liquors" and be fined — one-half of the fine going to the informer. An excise was also laid on liquors by this act.[1]

1. R. I. Col. Rec., I., p. 307.



In March, 1656, "It is ordered, that no house of entertainment shall suffer any person to tipple after nine of ye clock at night; except they can give a satisfactorie reason to ye constable or magistrate."[1]

An illustration of the difficulty of enforcing "stringent license laws," even in those days, is afforded by the following act passed at the same session:

"Considering ye grievances presented by divers of the ordinarie keepers concerninge theire losse and damage by beinge bound to sell liquor at four shillings per quart, which damage doth arise from persons unlicensed there severall retailinge of liquors, &c., by which ye ordinarie keeper is hindered both in buying and selling that commoditie,

Be it therefore enacted that ye ordinarie keepers established by ye General Court in each Town, shall, by virtue of this order, have toleration to sell as they can afford it, till ye General Court of Commissioners, holden in May next, at Portsmouth; at which Court, further order shall be taken to prevent their discouragements; for-as-much as it is already conceived how it may be affected, but ye Court cannot now put it in compleate forme by reason of ye (shortness) of time, any former law notwithstandinge."[2]

The only relief adopted at the May Session, though it can hardly seem to have been that intimated in the above order, was the repeal of that clause of the law limiting the sale of liquor to an Indian to a quarter of a pint in a day.[3]

In March, 1658, it is forbidden to bring liquor into the colony without the payment of the excise, and vessels may be searched, and liquors seized, in its enforcement.[4]

The sale of liquor to Indians proved to be unsatisfactory to the colony even under their license law. We

1. R. I. Col. Rec., I., p. 330. 2. p. 335. 3. p. 338. 4. p. 381.

Case 1:04-cv-00418-T Document 12 Filed 02/03/2005 Page 29 of 146



have seen that in August, 1654, it was prohibited; in May, 1655, the ordinary keepers were allowed to sell a quarter of a pint a day to an Indian; in May, 1656, this restriction was repealed, and the sale to Indians was without limitation till May, 1659, when, after a trial of three or four years, the colony returned to the original policy of prohibition, by the following curious order:

"It is ordered, that noe person in the collony, after the 29th of September next ensuinge, presume to sell or give wine or stronge liquors, directly or indirectly, to any Indian whatsoever, upon the penalty of forty shillings for the first offence, and upon the penalty of five pounds for every offence succeedinge; and that the informer shall have halfe the fine for his paynes; also the informer's testimony, upon his knowledge with one witness more, shall be effectuall for the magistrate, after the examination of the party accused, to graunt forth warrant for the constable or serjant to distrayne; only provided, any man that keeps an Indian servant for refreshment may give him a dram, if he can make it appeare he is his hyred servant. It is also ordered that it shall be lawfull for any person, in case they spie an Indian convayinge or havinge of liquors, to seize of it for their owne proper use. It is further declared, that Indian witness may not pass in the premises."[1]

In March, 1663-4, the charter from Charles the II. was received and accepted, and all existing laws not inconsistent with its provisions were declared to be in force until some other course should be taken.[2]

There was no further legislation on this subject until September 1666, when all former laws appear to have been practically repealed by the following vote:—

1. R. I. Col. Rec., I., p. 413. 2. II., p. 27.



"Ordered that noe victualling house or victualler sell liquors without lycense from the Magistrate, who also shall give security to keepe good order according to the law in that case provyded, under the penalty imposed by the law. And that none sell liquors on the first day to English Indians, but shall lose twenty shillings for every such offence, any law, order or allowance to the contrary notwithstandinge."[1]

In September, 1673, the following votes were passed, which, though considerably mixed, are forcible, and the last one presents a picture of the habits of the people somewhat different from that which our fancy has been accustomed to paint.

"Voted that the Assembly being senceable of the abominable filthynes by sellinge stronge liquor to the Indians, which by some is practised, and although in this Collony by former Assemblys there hath been great care to prevent it, some, as there is great cause to creditt, have been so filthy have been eager to have such lawes established that others might be in awe thereby, and themselves have the more custom in such filthy tradeinge, that it is manifest if they could steale the Indians' money that they take of them for strong liquors and not let them have liquors for it, that would not be soe much harme to them; for by their havinge liquors, very many murthers have been committed, and many other of the most mischiefs and thereby hath been great likely hood and danger of war between the English and them; and it is the King's express desire in our charter (and our profession alsoe), for us to be beneficial to them and by our couversation to make it appear; and the Indian Kings, by us beinge desired to come to advise to prevent such drunk-

1. R. I. Col. Rec., II., p. 174.

Case 1:04-cv-00418-T Document 12 Filed 02/03/2005 Page 30 of 146



enness did freely come and desire liquors might not be sold to Indians, and that they could discover the liquot sellers but the English slighted their witnessinge, and they consented it was for the Indians buyinge liquors to be punished and desired the English to be carefull thar the sellers of liquors to the Indians might be punished alsoe."

Therefore it was enacted that all former laws against ...ing liquor to Indians be dilligently enforced; penalties were imposed upon Indians for being drunk; when found drunk they were to be taken before a magistrate to inform of whom they had the liquors, with additional penalties for refusal to inform and for false accusations, &c., the magistrate was forthwith to cause the arrest of the persons so accused, and upon his failure to pay the penalty, to present him to the next Grand Jury; masters of vessels were to give account of all liquors brought to the colony under penalty of forfeiture, and the testimony of an Indian was to be in no way invalid, "Except the party accused doe, in the manner of a wager in law, produce six freemen of the towne to testify that they have been intelligable concerninge such reports, and in their conscience, judge that within a twelve-month of that ...e, he hath not seen cause to be justly so accused." (This is the only place that I know in our records where the peculiar trial called "wager-in-law" is recognized.)

"Voted, this Assembly consideringe that the King hath granted us that not any in this Collony are to be molested in the liberty of their consciences, who are not disturbers of the civill peace, and wee are perswaded that a most flourishing civil government with loyalty may be best propagated where liberty of conscience by any corporall power is not obstructed that is not to any unchasteness of body, and not by a body doeinge any hurt to a body, neither endeavoring soe to doe; and although wee know by man not any can be forced to worship God or for to keep holy or not to keep holy any day; but forasmuch as the first dayes of weeks it is usual for parents and masters not to imploy their children or servants as upon other days, and some others alsoe that are not under such government, accountinge it as a spare time, and soe spend it in debaistnes or tipplinge and unlawfull games and wantonness, and most abominably there practiced by those that live with the English at such times to resort to townes. Therefore, this Assembly, not to oppose or propagate any worship, but as by preventing debaistnes, although wee know masters or parents cannot and are not by violence, to indeavor to force any under their government, to any worshipper from any worshipp, that is not debaistnes or disturbant to the civill peace, but they are to require them, and if that will not prevaile, if they can they should compell them not to do what is debaistnes, or uncivill or inhuman, not to frequent any immodest company or practices.



Therefore, by his Majesty's authority it is enacted, that on the first dayes of the weeks whoever he be that doth lett any have any drink, that he or any other is drunk thereby, besides all other forfeitures therefor, for every one soe drunk they shall forfeit six shillings; and for every one that entertaines in gameinge or tipplinge upon the first daye of the week, he shall forfeitt six shillings; and by his Majesty's authority thereby it is enacted, that for to prevent any such misdemeanures, if any are soe guilty to discover them that every first day of the week in every towne in this collony there shall be a constables watch, for every inhabitant fitt to watch to take

his turne that belongeth to the towne, or pay for hyringe of one, soe for one or more to watch in a day as the Towne Councill judge necessary to restraine any debaistnes or immodesty or concourse of people tipplinge or gaminge or wantonness, that all modest assemblys may not be interrupted; especially all such as profess they meet in the worshipp of God, if some of them will be mosr false worshippers, they should only be strove against therefore with spirituall weapons; if they do not disowne that they should not be condemned whoever they be that be unchaste with their bodys, or with their bodys oppress or doe violence to what is mortall of any man; but as they should be subject to such to suffer for such transgressions, parents may therefore correct their children, and masters their servants; and magistrates should be a terror to such evil doers."[1]

In May, 1679, in case a tavern-keeper, &c., should trust a sailor for more than five shillings for liquors, the suit was to be barred during his service, and in case of an arrest of the sailor on any such action, the tavern-keeper was to be liable to the master for all damages arising from the detention.[2]

In May, 1680, the Town Councils were authorized to grant licenses,[3] and in May, 1686, all acts relating to liquors and public houses were repealed except this, and one stated to have been passed May 7, 1673, though there is no record of any act of that date.

From June, 1686, to February, 1689, the colony was under the administration of Sir Edmund Andros, and no sessions of the General Assembly were held. Andros and his council at their first meeting ordered that "the

1. R. I. Col. Rec., II., p. 500-504. 2. Laws of Col. of R. I., 1730, p. 28.
3. R. I. Col. Rec., III., p. 89.



colonies should be, and observed during his Excellency's pleasure." All local orders emanated from the Court of "General Quarter Sessions and Inferior Court of Common Pleas," among which under date of June 16, 1687, is the following: "Ordered that the Clerke write Prohibitions to prohibit the selling of all sorts of strong drinks in the King's Province," now Washington county.[1]

This was the first prohibitory enactment extending to both Indians and white men, but the order of December 14, 1687, six months later, "that William Palmer and Daniel Mackinces, both of Rochester, (Kingston,) victuallers, have misbehaved themselves, and otherwise not being fitly qualified for that employment be suspended from keeping victualling houses or selling ale, beer, cider or any other strong drink by retail," would seem to be somewhat inconsistent with a strict interpretation or rigid enforcement of this law, or else to imply that our fathers were no more disposed to give a reasonable trial to absolute prohibition than many law makers of modern days. It is probable that the "prohibitions" meant except with the permission of the Court.[2]

In September, 1687, John Whipple and William Turpin, of Providence, were forbidden to sell any strong drink by retail, "except they give bond according to law,"[3] and in December, Turpin, not appearing "for the taking of a license," was suspended from selling; at the same time all persons, except his keepers, were forbidden to harbor or to sell or give to one James Herbert, a prisoner, any strong drink.[4]

Tippling and gaming in any victualling house on the first day of the week were strictly forbidden.

In March, 1687–8, one William Palmer, of Rochester,

1. R. I. Col. Rec., III., p. 231. 2. p. 234. 3. p. 332. 4. p. 235.

Case 1:04-cv-00418-T Document 12 Filed 02/03/2005 Page 32 of 146



was tried "for selling of rum by retail and suffering the same to be drank in his said house," found guilty and sentenced. The informer forgave his half of the fine, and thereupon Palmer was licensed to keep an ordinary ale house for one year.[1]

Similar proceedings for the purpose of forcing a similar result have been more recently reported.

A license was continued to John Eldred, of Rochester, probably for the sale of liquor, and in 1688, one Francis Drayton, of Portsmouth, was convicted of selling drink to Indians on the first day of the week.[2] This comprises all that is recorded during the Andros government.

In February, 1689, on the accession of William of Orange, Andros, who had but executed a royal commission, was seized and imprisoned in Boston as a usurper with members of his council, and upon receipt of the news in Rhode Island, the Assembly resumed its sessions, continuing "all former acts and orders which were our former method."[3]

In July, 1696, an impost was again laid on all liquors brought to the colony,[4] and in July, 1698, magistrates were enjoined to take care that the laws against the sale of liquor without license be enforced.[5]

In March, 1709, the town councils were authorized to raise the price of licenses to ten pounds, "as the creating many unnecessary public houses is rather a nuisance than a benefit," and also to raise or abate the fine for selling without license,[6] and in June, 1719, they were further empowered to license ferrymen, for such sums as they might think fit, "it being very convenient for them to sell strong liquors to refresh travellers.[7]"

1. R. I. Col. Rec., III., p. 239-240. 2. p. 242-244. 3. p. 263. 4. p. 318. 5. p. 350. 6. IV., p. 64. 7. p. 250.



At the May session, 1718, an act was passed "to prevent Indians being sued for debt," providing that no process shall be granted, nor suit be against any Indian for debt.* An explanatory act was passed in June, 1724, limiting the exemption to the family and race of Ninigret and to none others, "excepting for strong liquors and Tavern scores."[1]

In 1728, the original act was repealed[2] though the explanatory act appears as a law in the digest of 1744, p. 92.

In June, 1720, an act was passed prohibiting the sale of liquor to Indians who had shipped on a whaling voyage, because they were "often drunk and out of the way when most wanted."* This was also repealed in 1728.[2]

*As these two acts have never been printed to my knowledge, the following copies are here inserted from the manuscript records in the office of the Secretary of State.

MAY SESSION, 1718.

"AN ACT to Prevent Indians being sued for Debt.

Whereas several persons in this colony out of Wicked, covetous and Greedy designs often Draw Indians into their Debt and take advantage of their Inordinate love of Rum and other Strong Liquors by selling the same to them or otherwise to take advantages by selling them other Goods at Extravagant Rates upon Trust, whereby sd. Indians have been Impoverished to the Dishonour of the Government.

For the preventing thereof for the future, be it Enacted by ye Gen'l Assembly of this Colony and it is hereby Enacted that from and after the publication of this Act no process shall be Granted nor suit be received or lye before any Justice or Justices of Peace Asst's. or Court of Tryals in this Colony, ag'st any Indian or Indians for Debt to be made or contracted by such Indian at any time or times after ye publication hereof; and that no Indian shall be bound an apprentice or servant to any of his Majesty's Subjects without the consent, allowance and approbation of two Justices of Peace of this Colony; and for good consideration thereof; and Testified too, under the hands of such Justices, any Law, Custom or Usage to the contrary in any ways notwithstanding."

1. Laws of Col. of R. I., 1730, p. 133. 2. p. 168.

May, 1721, a law was passed "for the better preventing of drunkenness," which recited: "Whereas it doth manifestly appear to this Assembly that many inhabitants of this Colony spend much of their time and money at Taverns, Ale-Houses, &c., which tends not only to the utter ruin of themselves, but also exposes their families

---

JUNE SESSION, 1720.

"AN ACT prohibiting the selling of Strong Drink to Indians during the time of their being on a Whaling Voyage.

Whereas compl't has been made unto this Assembly by several Inhabitants of this Colony (who have been at great charges in providing Whale-boats, Irons, Warfs, Cask, &c., in order for ye Whale fishing,) that they have sustained great damage in having strong drink sold to such Indians as they have shipt on a Whaling Voyage, who are often Drunk and out of the Way when most Wanted, whereby their voyages have been Entirely Ruined.

For the preventing whereof for the future,

Be it Enacted by the Gen'l Assembly and by the authority of the same it is Enacted that no person whatsoever shall sell any strong drink of any quantity whatever (be it ever so small) to any Indian whaleman without Leave or consent of him or them in whose employ he is shipped, during ye time he is shipped as afores'd, and if any person or persons whatsoever shall sell any strong drink to any Indian whaleman during such time as afores'd, and be thereof lawfully convicted before the Assistants or Justices of the Peace of such Town where such offence shall be committed or any two of them (who are hereby fully authorized and Impowered to hear, Try and Determine the same) shall forfeit for every such offence the sum of Five Pounds the one moiety or halfe part thereof to the Informer and the other moiety or halfe part thereof to the use of the Poor of such Town where such offence shall be committed to be taken by a Warrant of Distress as in other cases of Tryals before Justices.

Provided always anything above specified in this act to the contrary hereof notwithstanding that whosever shall ship any Indian on a voyage of whaling as abovesd, shall set up notifications at some Publick places as he shall think fit and in so many Towns of this Colony as he shall think fit, with the name or names of ye Indian or Indians shipped, and that this act be of no force in any Town of this Colony until such notifications be therein given as abovesd."



to penury and misery and brings considerable charges upon the Towns to which they respectively belong," therefore the Town Councils were authorized to post notices prohibiting the sale of liquor to the persons named, upon complaint made to them to that effect; and in October, 1725, it having appeared that "several persons so posted go into the neighboring Towns and there consume and waste their substance and impoverish their Families," the postings and prohibitions were extended to cover such towns, as well as those "where such posted persons live."[1]

February, 1728-29, a license law for the retailing of liquors in quantities less than a gallon was adopted, similar in its general features to the acts previously passed, (Dig. 1730, p. 179,) with the addition of an appeal to the General Court of Trials on payment of cost and giving bonds to prosecute.

By reason of the excesses at Indian dances in Westerly and South Kingstown, the Town Councils in June, 1729, were authorized to prohibit the selling or giving of liquor on such occasions both to Englishmen and Indians.[2]

In May, 1731, a duty was laid on beer for the reason that "great quantities of strong Beer are brought into this Colony from New York and the neighboring provinces, which is hurtfull to this Colony, where the making the same by Industry and Care may be brought to perfection."

At the June session, 1732, upon the petition of "several of the Innholders or Vitners, setting forth the many Inconveniences that many persons in this Government have labored under by their extravagant expenses at Taverns and other ale-houses," it was enacted that if any

1. Laws of Col. of R. I., 1730, p. 189. 2. R. I. Col. Rec., IV., p. 425.

Case 1:04-cv-00418-T Document 12 Filed 02/03/2005 Page 34 of 146



retailer "trust any inhabitants of this Colony for Liquor above the sum of twenty shillings, all actions brought for the same shall be barred."

This petition indicates a care for the customer's interests which has seldom been exhibited by those engaged in the sale of liquor; or else it was a device on the part of those who did not sell as much as others to equalize trade somewhat by compelling a man who had run up his score to 20s at one place to resort to another. At the May session, 1744, this act was repealed upon the ground that "the Good Design and Intent of said act hath ever been defeated and the same oft pleaded to defraud the Innholders and Victuallers of debts justly due to them, so that the same now seems to be rather a Public Grievance than a Remedy."

An honest entry appears in the record of the August Session, 1740, which, in modern times, would probably have been accounted for by a committee, under the head of "sundries." "Voted, That the commissioned officers of the two companies raised to go on an expedition against the Spaniards be invited by the Deputy Governor and Speaker to dine with the Court, and that the other officers, together with the soldiers, be treated by the Sheriff with liquor to the value of £15, both at the charge of the Colony.[1]

In February, 1747-8, the license act of 1728 was amended, for the reason that "said act hath heretofore been much violated and likely hereafter to be so; by Reason the Method for convicting of Persons guilty of selling Strong Liquors contrary to said act is too loose and uncertain and the Fine of those Persons convicted so small that Persons usually guilty of said offence do

1. R. I. Col. Rec., IV., p. 579.



not regard the same," therefore the fine was increased from four to twenty pounds (old tenor); and the provision for conviction "on good evidence," was changed to the "Testimony of one or more creditable witness or witnesses."

In March, 1750-1, because "great Disorder and Burglaries are oftentimes raised and committed by free Negroes, Indians and other imprudent persons, entertaining such Indians, Negro and Mulatto Servants and Slaves and selling them Strong Liquors," a penalty was imposed for selling them "any Strong Beer, Ale, Cider, Wine, Rum, Brandy or other strong Liquor, by what Name or Names soever called or known."

At the same session an Excise for the space of five years was granted to the town of Newport upon the liquors retailed there, and every licensed dealer was required to render an account of his sales under oath. This act was amended at the following May Session by adding penalties for selling without license.

A law was passed in October, 1749, to prevent gaming, which provided that any tavern-keeper, &c., who should keep in his house any Billiard Table or Shuffle-board Table, should lose his license and be incapable of keeping a public house thereafter; but at the May Session, 1751, the penalty was changed to a fine for the first offence and the former penalty for the second.

In an act proposed to the several towns by the General Assembly at its February Session, 1753, entitled "An act to prevent keeping Disorderly Houses," the following preamble occurs: "To encourage Virtue and suppress Vice is the End of Government; and nothing tends more directly to obstruct it than the Owners or Possessors of Houses permitting any evil Practices to be there carried on, such

as destructive Gaming, excessive drinking, shameful Lewdness, Debauchery and Uncleanness or dishonest receiving and concealing stolen Goods. And to prevent such mischiefs" the law provided that no tavern-keeper or retailer should receive a license until he had given bond not to permit "any unlawful Gaming or Drinking in their Houses, or any Company to be there sitting at unreasonable hours in the night, or sell any sort of Strong Drink to known Drunkards or common Tipplers, or Gamesters, nor entertain Lads, Children or Servants, without their Father's, Guardian's or Master's knowledge," &c. Heavy fines were to be imposed upon all who should undertake to sell without such license. The grand jurymen were to be elected, instead of drawn, by their respective towns, and were to be "Standing Officers for the taking Notice of all Disorders and Breaches of the Law, and for making due Information thereof to the Court of Sessions," under oath. They were also "to make Information of all common Drunkards and Tipplers," in order that they might be declared such in the records of the Court, and all retailers receive notice "to avoid selling to or letting such Persons have any Strong Drink."

As nothing further appears with reference to this act, it is to be presumed that it did not receive the assent of the towns.

This bill is not to be found in the Schedules, but in printed sheets sent to the towns.

The preamble of an act passed in February, 1759, discloses something of the character of the liquor sellers of that time: "Whereas this Assembly hath received Information, that notwithstanding the aforesaid Acts, (to prevent purchasing and detaining the apparel and arms



On page 25, before the last two paragraphs:

In August, 1777, an act was passed "to permit the distilling into any Kind of Spirits whatever, Wheat, *Indian* Corn, Rye, Barley, Oats or Cider."

The preamble recites that it is necessary that great care should be taken that all kinds of grain should be carefully preserved for the support of the army and inhabitants; that "distilling is of very pernicious Consequence, as it occasions a Scarcity of Grain, and introduces among the Soldiers and Inhabitants a Liquor which will tend to the Destruction of the Consumers." A fine was imposed, of twenty shillings, for each bushel of grain, and of three pounds for each barrel of cider so used,—one half to go to the prosecutor.

In June, 1779, Eleazer Trevett was permitted to retail liquors in East Greenwich in a less quantity than a gallon, upon giving security that he would not sell less than a pint, and that he would not suffer the same to be drank in his house.

On same page, before the last paragraph:

In November, 1780, the collectors of excise in Newport and Middletown were authorized to call special courts for the prosecution of dealers who refused to give, or gave a false account, of their liquors.

of soldiers and to prevent the detaining and secreting soldiers) several Tavern keepers, Innholders and sellers of Strong Drink in this Colony, have been guilty of aiding, assisting and attempting to carry out of the Government's Service, many of the Soldiers inlisted into the Colony's Pay," &c.

In October, 1761, the excise law for Newport was continued for another term of five years, and also extended to Middletown for the same time.

October, 1762, the price of licenses was raised from £15, old tenor, to not exceeding £5, lawful money, "considering the Advantages that many Persons receive by taking such licenses."

In October, 1765, it was made an offence to erect or keep up any sign for a public house, without having a license therefor.

February, 1769, all persons, except licensed dealers, were forbidden to sell cakes, liquor, &c., within one mile in Newport and Providence and four miles in other towns of the annual "General Meetings of the People called Quakers," and if a slave was the offender, his owner was to pay the penalty.

In February, 1770, inhabitants of the town of Providence were allowed to sell all kinds of spirituous liquors in quantities not less than one quart, "provided the same be not drank in the House of the Retailer."

In February, 1779, the fine for selling without license was increased to £30, lawful money, and the charge for licenses not exceeding £50.

In March, 1787, "Whereas many idle and dissolute Persons, both Whites and Indians, frequently assemble themselves at or near the Indian Meeting House in Charlestown to drink any strong Liquors, and thereby in-

toxicate themselves, and, in a riotous and abusive manner, disturb the quiet and sober People, who collect themselves to worship the Deity agreeably to the Dictates of their own Consciences, to the great Annoyance and Subversion of the public Peace and Order," it was enacted that no person should sell any liquor "on the Sabbath day" within one mile of said meeting house or bring any "into the fields or roads within one mile of said Meeting House on the days of the said Indians assembling for divine worship with intent to drink the same or retail it out to the idle and vicious Persons so assembled."

At the close of the revolutionary war the burden of the public debt required extraordinary sources of revenue, and at the February session, 1783, special taxes were imposed upon almost every kind of personal property and merchandise imported into the State, and upon carriages, billiard-tables, dogs, &c., kept within it. The general features of the law were something like those with which we were familiar during the late rebellion, and the provisions relating to the tax on liquors quite similar to those in the Newport excise law. It would seem that the law did not meet with popular favor, for at the following May session a committee was appointed to amend it, and at the June session it was repealed and an act laying an impost of *two per centum ad valorem* upon certain articles was adopted in its stead. In March, 1786, another excise law was passed which was suspended in May, and a committee was appointed to revise it in June. In December, an act, probably the committee's report, was adopted. In September, 1789, a further act appears for levying and collecting certain duties and imposts upon many articles, including liquors. In October, 1783, the Newport and Middletown collectors were authorized to collect the excise monthly instead of semi-annually.



Nothing further appears with reference to any of these laws, and it is therefore probable that they were regarded as repealed by the general repealing clause in the Digest of 1798.

In this Digest appears the old law of 1728 requiring licenses for sales less than a gallon, with its several modifications [p. 391], a noteworthy feature of which is the fact that the fees and fines are for the first time designated by dollars instead of the terms of the English currency, *e. g.*, license fee four dollars to twenty; fine, twenty dollars; tavern keeper not to trust over two dollars, &c., though the change had been adopted in June, 1795, for all accounts and in civil suits.

The act of 1721-5 to prevent drunkenness by prohibiting the sale of liquors to posted drunkards also appears, [p. 394], and these comprise all the laws on this subject from that time in force.

In May, 1806, licenses were divided into two classes, tavern-keepers—for the sale of liquor less than a pint, or to be drunk on the premises, and retailers for quantities between a pint and a gallon. No one could receive a license of the former class unless, in the opinion of the Town Council, he could keep a hotel.

In October, 1817, this act was repealed, and the original act re-established, with the addition that keepers of victualling houses, cooks' shops and oyster-houses or cellars might have the same license as tavern keepers.

In the Digest of 1822 (p. 295) there is substantially the same law, with the fine increased to fifty dollars, with the provision that all debts for liquors sold on credit, less than a quart, should be barred, and that no license should

Case 1:04-cv-00418-T Document 12 Filed 02/03/2005 Page 38 of 146



be given to a colored person, nor one allowed to sell as a servant under a license.

The old act relating to posted drunkards is also in this revision, (p. 297,) and it continued in force until the revision of 1857, when it was repealed.

The Town Council were authorized in June, 1822, (p. 19,) to limit in any license the quantity to be sold to any person at any one time to not less than a pint, not to be drunk on the premises.

In January, 1824, the law was changed. Victualling houses, cooks' shops, &c., were left out, and licenses granted only to tavern keepers, the Town Council being required in each case to declare that the public convenience required a tavern in the place asked for, and that the applicant was a suitable person to keep it and had the necessary accommodations. Ferry-houses were exempted from the act. No liquor was to be sold on the first day of the week except to travellers. Persons not tavern-keepers might sell a quart or more without license, except on Sunday. The acts of January and June, 1822, were by this law repealed. It had a short life, however, for at the second May session of the same year this law also was repealed, and those of January and June were revived. In all these, as in similar license laws, bonds were required to keep good order, &c., to which, as well as to other details, it is not necessary specially to refer. In May, 1825, it was provided that no license should be granted to any sheriff or jailor, and in October following that a license might be withdrawn, if one kept a disorderly house. In June, 1826, the penalty for selling without a license, &c., was made recoverable by indictment as well as by suit, one-half to the informer, as before, and one-half to the State, instead



of to the town. This act is remarkable for two things; it is the first that requires any part of the fines to go to the State, and the first that treats the offender strictly as a criminal, to be proceeded against by indictment. In January, 1827, the towns were authorized to make ordinances to punish drunkenness by a penalty not exceeding twenty dollars.

In October, 1829, it was declared not to be necessary in an indictment to set forth the kind or quantity of liquor sold, or the exact time of sale, nor the name of the person to whom sold. In this act, doubtless, was the origin of that form of complaint and warrant, that subsequently took the place of the indictment and prevailed in use until July, 1877, when it was declared by the Supreme Court to be defective in not stating the name of the purchaser, in the case *State* vs. *Doyle*, *X. R. I.*, 575. The provision as to the name is not in the act in Digest of 1844.

In January, 1830, the license fee was fixed at from five to fifty dollars, with a penalty of fifty dollars for a sale of less than ten gallons by any persons not licensed, in his dwelling-house or possessions. In the following June it was provided that persons violating this law might be indicted or sued for the penalty, and that general allegations only should be necessary.

In January, 1834, Town Councils were permitted to prohibit sales by licensed persons on Sundays and other days, under the penalty of a forfeiture of license. (P. 59.)

In June, 1835, "temperance taverns" were permitted to be licensed, without the privilege to sell ardent spirits. (P. 4).

In January, 1836, the act of January, 1830, which made it an offence for a person to sell less than ten gal-

lons in "his or their" dwelling-house or possessions was amended to include also the "dwelling-house or possessions of any other person." (P. 95.)

In October, 1836, (p. 85), an act was passed to prevent the introduction of ardent spirits into jails, and in January, 1837, (p. 6), a similar act with reference to poor-houses, leaving it, however, in the latter case discretionary with the Town Council to prohibit it or not. While these were eminently wise and proper laws, one cannot help thinking how much the use of such spirits must have had to do with the filling of the poor-houses and jails, and how much less harm, after all, would be occasioned by their introduction into such places than into families and homes.

At the same session, (p. 8), a new license act was passed, which provided that Town Councils, &c., "shall grant licenses to suitable persons applying therefor (and having proper accommodations, &c.,) for keeping taverns and for selling rum, &c., in quantities less than a quart, and to be drank in such house only," the price to be from ten to twenty-five dollars; also that they "may grant licenses" to sell from one quart to ten gallons, not to be drank on the premises, for a fee from five to twenty dolars, and in each case two dollars of the license fee was to go to the State. This is the first law to provide that the State Treasury should derive any revenue from the license fees. It was indeed a small beginning. This law seems to have met with considerable opposition, for at the same session its operation was suspended to the following May, then further suspended to the rising of the next Assembly, the former laws being revived in the meantime, and at the October session it was repealed.

January, 1838, presents another revision of the license



law, giving Town Councils power to grant tavern licenses, as before, and other licenses for any specified quantity less than ten gallons, and which might also contain a condition that it should not be drunk on the premises of the seller. This act was amended in June, 1838, by the introduction of the "local option" feature, its first appearance in our laws, allowing the freemen of any town or city, in legal town meeting, to instruct the Council to grant or not to grant licenses, to which instruction the Council was "bound to conform."

An interesting case arose under the law of January, 1838.[1] In August the freemen of Providence instructed the Board of Aldermen not to grant licenses. In September the defendant bought a basket of champagne, imported from France, twelve quarts, and sold it to an innkeeper for use in his inn. After conviction the defendant claimed that the law violated the provision of the constitution of the United States that "no State shall, without the consent of Congress, lay any imposts or duties on imports," &c.; also, that giving Congress the exclusive power of regulating commerce with foreign nations and among the several states; also that it was in violation of a commercial treaty with France.

The court held that a sale by a person other than the importer was not covered by these provisions, and that the act was constitutional as an exercise by the State of its police power, it being the object of such acts "to aid the police of the several towns in the preservation of good order and in the prevention of pauperism."

In October, 1838, the operation of this law was suspended to February 15, 1839, no licenses to be granted in the meantime to continue beyond that date.

1. *State* vs. *Peckham*, III. R. I., 289.

In January, 1839, another license law was passed, not substantially different from the existing laws, but rather a consolidation of them, with slight changes in license fees and other details, and continuing the "local option" clause.

In January, 1841, came still another law, by which licenses might be granted to taverns, ale houses, cook-shops, oyster cellars, &c., for sales of less than a gallon, and to others for sales of one quart to a gallon, not to be used on the premises, for a smaller fee, thereby making the sales free for more than a gallon. In this act the "local option" clause was omitted and all other acts repealed. In January, 1842, victualling and oyster houses, not to sell liquor, were permitted to be licensed in the same way as temperance taverns. In January, 1843, the sale of liquor less than one gallon on the public waters from Pawtucket bridge to Pawtuxet river was prohibited.

In January, 1844, justices of the peace who had issued warrants for the illegal sale of liquor, doubts having arisen as to their authority, were exempted from liability therefor, unless an action for the supposed trespass should be brought within ten days after the passage of this act. At the same session the existing laws were again revised and consolidated without material change, except that licenses were required for sales up to ten gallons instead of one gallon, as before. This act is found in the Digest of 1844, p. 495.

In January, 1845, a penalty was imposed for "disturbing any meeting lawfully held for the purpose of promoting temperance."

In May, 1845, it was again enacted that no licenses should be granted in any town in which the electors, at



the annual town meeting, should decide that they should not be granted for that year.

In January, 1846, the towns were authorized to appoint complainants or prosecutors for violation of the license law, who should receive one-half of the fines, and increased fines were imposed for second and third offences. The validity of this law was settled in the cases of *State* vs. *Fletcher*, 1 R. I., 93; *State* vs. *Wilbor*, 1 R. I. 199.

In January, 1848, the mode of voting under the "local option" clause was specified, and the continuance of licenses limited to the Monday following the annual town meeting in each town. In May, the Council, notwithstanding the vote of a town against license, might license "one or more prudent and discreet persons to sell wines and strong liquor in their respective towns or cities for medicinal or artistical purposes, under such restrictions and regulations" as might be prescribed.

In June, 1848, the penalties for violations of the license law were reduced to twenty dollars, to bring them within the jurisdiction of justices of the peace of the several towns, from whose judgment there should be no appeal, and in January, 1850, the act was further amended by giving jurisdiction of a case to the justice to whom the complaint was first made. As all justices of the peace had authority to hold justice courts, it would seem that this act was rendered necessary either by reason of excessive zeal in making numerous complaints for the same offence, or, perhaps, more probably, by reason of subsequent complaints in the interest of defendants with acquittals, which were resorted to in order to defeat original complaints. In this act was also a provision relating to the complainant's recognizance for surety for costs and the more important one that the person accused, who claimed

Case 1:04-cv-00418-T Document 17 Filed 02/03/2005 Page 41 of 146



exemption by license, must show that fact by way of defence.

In October, 1848, provision was made for appeals; also for reducing to writing the testimony of any witness for the State to be used as evidence in the appellate court in case of the absence of the witness. In this act also appears the peculiar provision requiring the payment by the defendant of three dollars, as counsel fee for the complainant, in addition to the costs. In *Littlefield* vs. *Peckham*, 1 R. I. 500, it was held that the costs and counsel fee so taxed, could not be recovered back by the appellant, and that the act was not in violation of the constitution or bill of rights.

This act, also, for the first time, included "malt" liquors with "ale, wine and strong" liquors.

In May, 1851, the sale of liquor less than ten gallons was prohibited "over all the waters of Narragansett Bay."

May, 1852, is an important epoch in the history of liquor legislation in this State. At that time, Maine took up the experiment of prohibition, and Rhode Island followed her example by passing "an act for the suppression of drinking-houses and tippling-shops," commonly known as the "Maine law." Without enumerating all its details, it prohibited the manufacture and sale of all intoxicating liquors throughout the State, except by town agents, specially appointed to sell "for medicinal and mechanical purposes only," and all liquors kept for sale illegally—exception being made of imported liquors in original packages—were to be forfeited and destroyed. This act went into effect on the third Monday of July, 1852, and another act provided that no new licenses should be granted to extend beyond that time. In the case of *Greene* vs. *Briggs*, 1 Curtis, 311, the validity of this law was contested. A seizure of certain liquors had been made, pursuant to the statute, and decreed, by the Court of Magistrate of Providonce, to be forfeited, when they were replevied from the officers by process from the U. S. Circuit Court, by one claiming to be a citizen of New York. The defendants showed their authority to take and hold the liquors under the law; but Judge Curtis decided it to be inoperative, because the complaint was against no particular person and did not charge the substantive facts necessary to constitute an offence, and declared the law unconstitutional, because the right of trial by jury was infringed, by requiring a bond with surety for the payment of the penalty and costs.



In January, 1853, the law was substantially re-enacted, with such changes as were deemed to be necessary by reason of the foregoing decision, and with the addition of imprisonment to the fine for its violation. It also contained a provision for submitting the question of its repeal to the vote of the people at the following annual election. By the report at the May Session it appears that 9,074 voted "No" and 8,369 voted "Yes," making a majority of 905* in favor of the law.

Numerous questions were raised by those who were prosecuted under this act, and its constitutionality was repeatedly attacked. In *State* vs. *Copeland*, 3 R. I. 33, it was decided that the provisions of the popular vote on the question of repealing a statute, though illegal, did not render the rest of the act unconstitutional, in a case where the vote was not in favor of repeal, and that if the vote had been in favor of repeal, it could have been of no effect, the act would have continued in force and a

*This is as reported and printed in the Acts and Resolves, but it will be readily seen that the majority should have been 705.

conviction under it sustained. In *State* vs. *Snow*, 3 R. I. 64, it was decided that a law which provides that property shall be forfeited for its violation, is not unconstitutional, but that section 9 of this act, relating to the mode of proceeding in case of forfeiture, was not in conformity to the requirements of the constitution and was therefore void.

In *State* vs. *Johnson*, 3 R. I. 94, it was held that the offence of being a common seller was distinct from that of keeping and selling, and in *State* vs. *Head*, 3 R. I. 135, that selling and keeping for sale were distinct offences, and that one might be convicted of each by the same testimony. In *State vs. Colwell*, 3 R. I. 284, is found what has been termed the "*and* and *or*" decision, which disposed of a large number of complaints upon the ground that charging the sale of "ale, wine, rum *or* other strong *or* malt liquors," did not in fact charge which offence, or that either offence had been committed by the defendant.

In January, 1854, the defendant in a complaint, claiming exemption as a town agent, was required to prove the fact in defence; in other words, that the State in making out its case should not be required to prove that a defendant was *not* a town agent.

In June, 1854, a penalty was provided for indecent intoxication, with the further provision for a discharge in case the offender should disclose the place where and person of whom he obtained he intoxicating liquor, and should give evidence thereof upon a complaint against the person charged with the sale. This act was repealed in January, 1857.

In January, 1855, the authority to appoint town agents was confined to one place in each town or city.

In May, 1855, the provision requiring a defendant to prove authority as a town agent was extended to trials of indictments. At the same session certain officers of the city of Newport were exempted from giving surety for costs on commission on complaints, as were like officers of Providence in the original act.



In January, 1856, agents were permitted to sell for "sacramental, chemical and culinary purposes," and their duties and liabilities were more particularly defined; penalties were provided for persons bringing into or conveying within the State liquors intended to be sold contrary to law, and the provisions for proceedings relating to the seizure and forfeiture of liquors illegally kept were modified to conform to the decisions above referred to.

In January, 1857, what is known as the "nuisance act" was passed. This act declared by law what experience had long before ascertained, that all places used as tippling shops, &c., are common nuisances. Fines from $100 to $1,000 or imprisonment from sixty days to one year were imposed as the punishment for the maintenance of such nuisances, and owners of property permitting such a use of their premises were made equally liable. In this law it was provided that actual sales should not be necessary for conviction, but that the character of the place might be proved by its appearance and reputaton.

In *State* vs. *Paul*, 5 R. I. 185, and *State* vs. *Keeran*, 5 R. I. 497, the constitutionality of this act was sustained, and, wlth slight changes, it has remained upon the statute book to the present time.

In 1857, there was another revision of the statutes in which the nuisance act appears as Chapter 73, and a prohibitory act embodying that of January, 1853, with its amendments and some other modifications as Chapter 78.

At the January Session, 1862, officers were authorized to

Case 1:04-cv-00418-T Document 12 Filed 02/02/2005 Page 43 of 146



sell forfeited liquors to any town agent and pay the proceeds to the General Treasurer. With the exception of this act the liquor laws remained undisturbed from January, 1857, to January, 1863, when a radical change was made. The prohibitory law, Chapter 78 of the Revised Sattutes, was then repealed, and a license law adopted in its stead. The payment required by the new law for icense to sell less than three gallons was $50, and for an unrestricted quantity $100, one-quarter of which went to the town and the balance to the State. A bond was required not to sell to minors, to any person in a state of intoxication, to an advertised or posted drunkard, &c., under a penalty of $20 and forfeiture of license, which, however, might be renewed. Evasions, by giving liquors and taking pay for something else and secret sales were provided against, and no action could be maintained for the price of liquors drank on the premises. The nuisance act was also amended to exempt licensed grog shops, and to declare that only those which had no license were nuisances.

At the January Session, 1865, the sale of liquors to minors at school or college, by any person, licensed or not, was forbidden under a penalty of $100, and subsequently at the same session an act was passed giving to Town Councils authority to grant or refuse licenses in their discretion; forbidding any person to eject from his premises an intoxicated person to whom he had sold liquor, and also forbidding any licensed person to sell to any minor, under a fine of $50 and incapacity to hold license for two years.

In January, 1867, the promoters of shows, concerts, &c., at which beer or liquors were sold with their consent, were made subject to a fine not exceeding $500 or imprisonment not exceeding six months, unless such shows shoud be first duly licensed.



At the same session these provisions were extended to masked balls, (ch. 688,) and in the same acts, Sheriffs and Chiefs of Police in Providence and Newport were authorized to enter houses which they had cause to suspect were inhabited by persons of ill-fame, or were used for illegal sale of liquor or for gambling, to order all persons there assembled to depart, and upon their refusal to arrest them.

At the same session, Chapter 444 (the act of Jan. 1863) was repealed and another license law was adopted, giving authority to the Town Councils to grant or refuse licenses in their respective towns, increasing the price to not less than $200 nor more than $500; requiring a bond of $1000 with two satisfactory sureties not to sell on Sundays, nor to females, minors or to persons of intemperate habits. If the licensed place became disorderly, so as to annoy residents in the neighborhood, or if gambling were permitted there, the license might be revoked. Subject to these provisions the parts of Chapter 78 of the Revised Statutes, which had been repealed, were revised and additional penalties were provided. The sheriffs of the counties were appointed a State police to enforce the law and especially to "use their utmost endeavors to repress and prevent crime by the suppression of unlicensed liquor shops, gambling places and houses of ill-fame." Provision was also made for the seizure and forfeiture of liquors illegally kept. At the May session the sale of one gallon or less of domestic grape or currant wine was exempted from the operation of the law. At the January session, 1868, the towns were authorized to appoint special constables to enforce the law; licenses were forbidden in

places connected with a dwelling house; transfers of licenses were permitted, &c.

At the January Session, 1869, the first day of July was fixed as the time for the expiration of all licences. In May the sheriffs were authorized to designate a deputy to enforce the law, and Town Councils to grant licenses up to July 1 at proportionate rates.

In June, 1871, an act was passed relating to the time for granting licenses and for giving bond and making payment. At the January Session, 1872, an act was passed "Of the assay and inspection of liquors." It provided for the appointment of a State Assayer and State Inspector of Liquors, and the sale of all ale, wine and other liquors was forbidden unless the same had been inspected and assayed, under a fine of not less than $100, or imprisonment in the State Workhouse not less than three months; while the sale of liquors inferior in quality to representations and of adulterated liquors incurred heavier penalties. Every package was to be branded or stamped, and poor or adulterated liquors to be forfeited.

The good intent of this act to assure the sale of pure liquors only is readily apparent, but it is equally plain that the law could not possibly be carried into practice. For instance, every bottle of ale or champagne had to be assayed; to do this it had to be opened, of course, and once opened its value was gone. Besides, to subject to chemical analysis the contents of all the barrels, kegs and bottles of beer, wines and liquors sold within this State daily, hundreds if not thousands of packages, doubtless, would have required a regiment of chemists and involved enormous expense. Had this remained a law, the most radical could hardly have desired one which would have proved more strictly prohibitory. At the following



May session the law was modified by abolishing the office of inspector and providing for an analysis by the Assayer when required by the Attorney General, Sheriff, Chief of Police, &c. Penalties for the sale of inferior or adulterated liquors were continued, but the authority to take samples for analysis was not continued.

At the same January session, (Chapter 980,) what is known as the civil damage, or Ohio law, was enacted. This law gave to every wife, child, husband, employer or other person within this State, injured in person, property, means of support or otherwise, by any intoxicated person, or by his intoxication directly or indirectly, a right of action against him or them who caused or contributed to the intoxication either by sale or gift of liquor; and also against the owner of property who knowingly permitted the unlawful sale of liquor upon his premises.

At this session, also, towns were empowered by vote in town meeting to prevent the granting of licenses by Town Councils.

In December, 1872, a new digest called the General Statutes went into effect. In this we find the nuisance act, somewhat extended, as chapter 73, and a license act, substantially embodying the existing laws above referred to, with more or less of modification and amendment in details, as chapter 79. Prominent among the modifications is the charge in the civil damage law. By this chapter, the person who makes an unauthorized sale of liquor is liable for all injuries which one may commit while in a state of intoxication, arising from such sale, thereby limiting very materially the stringent and far-reaching provisions of Chapter 980. In *State* vs. *Amery*, 12 R. I. 64, this chapter was held to be constitutional except as to importers.

The penalty for unlicensed shows is continued in chapter 80, and the act of January, 1872, relating to the assay and the inspection of liquors, which had been repealed at the previous May Session, also appear as Chapter 118.

At the January Session, 1873, the act " Of the assay of liquors " passed at the preceding May Session was readopted, (chapters 263, 264,) evidently to save all question of the validity of that act by reason of the General Statutes going into effect in December, 1872, and chapter 118, of the General Statutes, was again and specially repealed. (Chapter 268.)

At the January Session, 1874, another effort was made for prohibition by the passage of Chapter 385, which repealed all provisions of Chapter 79 of the General Statutes relating to licenses and struck out the words "licensed" and "unlicensed" from that chapter. A simple glance at the condition of that chapter with these words stricken out, marks this act as a curiosity of legislation.

As the date of this passage was April 3, 1874, just at the close of the session, it is probable that there was not time to perfect an efficient act, and hence this was adopted as an expression of opinion or indication of a new policy to be pursued, rather than as a practical law; for at the following May Session we find the liquor laws elaborately amended and put into operative condition as a prohibitory system. The punishment for maintaining a nuisance was made to consist of both fine and imprisonment, within the limits of one hundred and one thousand dollars and thirty days and one year.

The manufacture and sale of liquors was forbidden, except by a registered pharmacist or his assistant for me-



dicinal, artistic and mechanical purposes only; not to be drunk on the premises of the seller; and although not clearly expressed, it was the evident intention of the act to provide that liquors were to be sold in the same manner and under the same conditions as poisons; *e. g.*, if sold upon a physician's prescription it was to be recorded, this act further providing that the prescription should not be refilled without a new order from the physician; if sold otherwise, a record was also to be made in a book open to inspection, giving the name, date, purpose and quantity of the sale, the bottle to be labelled " Poison."

This act, by section II., also added to the list of medicines and poisons in chapter 119, "Alcohol and its preparations," " or such as being intended for internal administration contain opium or more than *two per centum* of alcohol,"

The endeavor so to frame a statute as to prevent its easy evasion often results in including within its provisions much more than was intended by its promoters, and of this the present act furnishes an interesting illustration. For instance, wine for sacramental purposes could only be sold by a pharmacist with the label "Poison;" perfumery, bay-rum, cologne and many other articles came under the same provisions, while grocers who dealt in " Painkiller," Jamaica ginger, flavoring extracts and other compounds containing more than two *per cent.* of alcohol, found themselves unexpectedly deprived of an important portion of their traffic. It is not surprising, therefore, to find at an adjournment of this session in June, (chapter 413), section 11, was repealed and wine for sacramental purposes, flavoring extracts and essences similar to those theretofore in common use were exempted from the operation of the law.

Chapter 392 also extended the civil damage law by making an unauthorized seller of liquors liable for any injuries committed by a person in a state of intoxication arising *in part* from such sale. Chapter 404 was passed to declare valid transfers of license, still in force under the old law in cases where the prior public notice of seven days had no been given.

Chapter 412, entitled "An Act in Relation to the Preservation of the Public Peace," commonly known as the "constabulary law," though containing no specific allusion to the liquor laws, was passed with an especial view to their enforcement. It provided for the appointment, by the Governor, of a state constable and seven deputies with ample powers throughout the State, except in the service of civil process, and though their jurisdiction was not limited, it was understood that their particular duty was to prosecute violations of the prohibitory law, their tenure of office, general authority and freedom from local influence giving them peculiar advantage and efficiency in that class of cases.

In addition to the provisions of Chapter 413, before referred to, the law relating to refilling prescriptions was amended by prohibiting the refilling only when the writer indicated his objection upon the receipt; also all sales of liquor for medicinal purposes were required to be made only upon and in accordance with the prescription of a medical practitioner, and all sales for mechanical and artistical purposes upon a written statement signed by the purchaser, and setting forth the use to which it was to be applied, and a fine from fifty to one hundred dollars was to be imposed for a false statement of such intended use.

The January Session, 1875, brought no amendment of



the prohibitory law, but at the following May Session this football of legislation was camped upon the other side. First came the repeal of the constabulary law in Chapter 505, and in Chapter 508 an elaborate license law filling thirteen pages of the printed statute book. It is unnecessary here to enumerate its various provisions, for in its general features it was quite similar to the license laws that preceded it, and experience has shown that elaboration and severity of details are of very little practical consequence.

One new feature may however be noted, viz.: The provision for the election of three license commissioners in the city of Providence, who, in place of the Board of Aldermen, should have the entire control of licenses in the city; other towns might elect commissioners by vote in town meeting. The local option clause is also made a part of the act, while all provisions relating to search and seizure are omitted. In January, 1876, (Ch. 519,) the penalty for a common nuisance was restored to fine *or* imprisonment.[1] In Chapter 521 the License Commissioners of Providence were required to make report to the General Assembly.

Chapter 624, (January, 1877,) requires every town to account to the State for the full-half part of money received from licenses, without deduction for expenses.

In Chapter 653, (January, 1877,) the penalty for keeping a nuisance was again made to include fine *and* imprisonment, and the unlawful keeping of liquor for sale was made punishable by a fine of twenty dollars and ten days imprisonment.

By Chapter 675, all licenses were to expire on the first day of July. Chapter 676 authorized any town

1. See Petition of Barry, 12 R. I. 51.

except Providence to abolish the office of License Commissioners. By Chapter 697, the time for voting for or against licenses in the city of Providence was appointed at the annual municipal election. Chapter 710, repealing Chapter 675, provides that licenses shall expire on the first day of July, and that licenses may be granted for a less term than one year, expiring at that time, at a proportionate rate.

At the January Session, 1880, (Ch. 797), an act was passed to simplify the proceedings under the license law, both in the forms of complaint and in the evidence at the trial. By this act forms are set forth, and it is provided that negative allegations need not be averred or proved; (*e. g.*,) that the defendant was not a registered pharmacist, &c., that all liquors mentioned in sections 18 and 19 of Chapter 508, shall be considered as intoxicating; that keeping liquors for sale need not be proved by an actual sale, but may be proved *prima facie* by the character of the premises or of the persons frequenting it or by the appurtenances usually found in grog shops; that no sale shall be made on Sunday except by a pharmacist on a physician's prescription; that Town Councils may prohibit sales during specified hours of election or other public days, giving at least twenty-four hours notice; that Mayors, Aldermen, Chiefs of Police, or constables specially authorized, may enter any licensed place to see how it is conducted and preserve order, and may arrest any person violating Chapter 508, and that the drinking of liquor in such place on Sunday shall be *prima facie* evidence of a sale.

So much of this act as declares certain facts *prima facie* evidence of guilt of the charge in the complaint has recently been decided to be unconstitutional by the Supreme Court, in *State* vs. *Beswick*, 13 R. I.



The foregoing sketch contains references to upwards of 130 different acts of the General Assembly, and covers a period of nearly 234 years, during 222 years of which there has been a license law of some sort, and a prohibitory law during two periods covering 12 years. The record suggests a few plain conclusions.

It is apparent, even from this general and imperfect review of these acts, that the license system has not accomplished the result to be sought for in all legislation—the suppression of a public evil. Aside from our common knowledge of the fact that license laws have not been effectual to arrest the progress of intemperance, the numerous changes here referred to, have been so many solemn and official confessions of their inefficiency.

To my mind, therefore, the conclusion seems inevitable that whatever our theories may be, the history of the state shows that the remedy for this public evil is not to be found in a license law, however stringent and minute.

What then shall be done? Shall the sale of liquor be left free and unrestrained by law as other articles of traffic, and the matter be left solely as a moral question of personal conduct to the individual conscience? The advocates of this course are few and to adopt it would be to banish a recognized evil from the acknowledged domain of law, and to treat this mischief in a manner different from any other, simply because a large class of the people "love to have it so."

The only other alternative is to prohibit the sale of liquor in drinking-saloons and simply for drinking purposes, for only in this way can we reach the root of the public evil. A thing cannot be stopped by allowing it to go on.

Forbidding the sale of an article which brings danger

and harm to the community is the most practical and reasonable method of dealing with it, especially when it is clear that the danger and harm are not averted by any other method which comes short of this. To do this may interfere somewhat with the convenience and habits and preferences of many, but what good citizen can allow mere personal choice to weigh against the public welfa- ? If, then, license is inefficient and freedom unwise, w .e forced to the conclusion that prohibition at least deserves a trial commensurate with the importance of the end to be attained. There has been no such trial in this state as yet, for no great moral or social reform can be effected in a few months or in a few years. Then, too, the numerous changes in legislation have doubtless impaired the effectiveness of both systems, for instability of law paralyzes its power; but in the two centuries and more of license there would seem to have been time for this difficulty to correct itself, if it were possible for that system to settle down upon a fixed and right foundation; while under the prohibitory law so many questions were raised which had to be settled, that for a time its execution was in practical abeyance; and then, as we all remember, followed the disturbance and excitment that preceded ar ttended the breaking out of the civil war, which tu..ed the public mind from matters that were deemed to be of less importance. A law which touches a question of social reform should be placed, as far as possible, beyond the changes of political parties. It can accomplish nothing if it is on this year and off next. There seems, therefore, to be good sense in the proposition of some to settle definitely this matter of the sale of liquor by incorporating into the constitution some provision for its restraint, as has been done in the provision prohibiting



lotteries. The policy of the State would not then be fluctuating and uncertain. Permanency of law begets a public opinion in its favor. To some extent, at least, men are apt to think "whatever is, is right." We have a notable example of this in the constitutional amendment abolishing slavery. It is to-day approved North and South, while before its adoption apologists for the institution were found in both sections, and abolitionists were looked upon almost with contempt.

The page of history shows the way we have come, our experiments, our successes and our failures; the condition of things around us shows what we have yet to do, in order to discharge fully the duties that are laid upon us as those who care for their fellow-men. Surely then, if we have profited anything from the past and are alive to the necessities of the present, we ought by this time to be able and ready to agree upon some policy that shall be best adapted to prevent the great evils of intemperance and to mould that policy into some permanent and enduring form. But no law will enforce itself nor will any law be practically efficient beyond the moral sense and interest of the people. It is nevertheless of the first importance that the law should be right, then supplementing law with earnest personal endeavor, we may look forward to the future for the best results that the imperfect systems of human government may venture to expect.

NOTE.—The only acts relating to this subject which were passed after the presentation of the foregoing sketch, down to the revision styled Public Statutes in 1882, were the following:—

Chapter 830, June 1880, included houses of ill-fame among nuisances under Chapter 78 of the General Statutes.

B

# TOWARD LIQUOR CONTROL

*By* RAYMOND B. FOSDICK *and*
ALBERT L. SCOTT

*With a Foreword by*
JOHN D. ROCKEFELLER, JR.

HARPER & BROTHERS PUBLISHERS
*New York and London*
1933

TOWARD LIQUOR CONTROL
*Copyright, 1933, by Harper & Brothers*
*Printed in the United States of America*

FIRST EDITION
K-H

# PREFACE

THIS study, initiated in February, 1933, is based primarily on field investigation conducted by the members of our staff in England, France, Germany, Italy, Russia, Poland, Finland, Sweden, Norway, and Denmark, as well as in all the Canadian provinces. In addition, extensive examination was made of American experience both under prohibition and in the various states prior to prohibition. We have also analyzed current state legislation which in the last few months has anticipated the repeal of the Eighteenth Amendment. In order to obtain the opinion of representative groups as to what measure and plan of liquor control were feasible in the various states, members of the staff have interviewed many people in different parts of the country—judges, lawyers, clergymen, social workers, newspaper editors, representatives of the Foreign Language Information Service, distillers, brewers, members of the Federal Bureau of Industrial Alcohol and the Prohibition Bureau, law enforcement officers, police officials, college presidents, members of the state boards of control already established, and

Case 1:04-cv-00418-T Document 12 Filed 02/03/2005 Page 52 of 146



others. A representative cross-section of American opinion, as geographically widespread as the time permitted, was thus obtained.

It has been our purpose not only to outline broad general principles but to point the way to methods of liquor control supported by the best opinion and experience which we could secure both in this country and abroad.

Many people have helped in this study, and it is impossible to mention by name all those to whom our thanks are due. But we acknowledge with gratitude the generous measure of time and patience, as well as the uniform and unwearied courtesy and helpfulness which all of us engaged in this undertaking encountered both here and abroad.

Particular reference is due those most closely associated with us. Their devoted work and enthusiasm have made this book possible. Indeed, while we assume responsibility for the volume as its authors, it has been the product of group consideration, and to this group we would pay a sincere tribute of thanks. It consisted of the following:

Mr. Leonard V. Harrison, of the Bureau of Social Hygiene, who visited Denmark, Sweden, Norway, Finland, and England, and who, more than any other one person, is responsible for the chapters on the systems of control; Dr. Luther Gulick of Columbia University, Director of the

Institute of Public Administration, whose expert knowledge of governmental practices has been of incalculable assistance; Mr. Everett Colby, who studied the situation in Russia and England, and who brought to our subsequent discussions an intimate knowledge of public life; Mr. Chauncey Belknap, whom we have consulted on legal questions; Mr. A. LeRoy Chipman, who spent several months studying the existing control plans in every Canadian province; Dr. Frank A. Ross of Columbia University, who studied particularly the history of liquor control; Mr. Frank B. Amos, who interviewed many prominent Americans, especially in the Middle West and South; Miss Elizabeth Laine, who worked on problems connected with existing legislation; Mr. Joseph F. Shadgen, who contributed generously from his store of knowledge of the actual business of manufacturing alcoholic beverages; Dr. Theodore Abel of Columbia University, who carried on a study in Poland, Germany, and Austria; Dr. Vittorio Racca of the Institute of Human Relations at Yale University, who surveyed the liquor control system of Italy; Mrs. Margaret Grant Schneider, who interviewed representatives of many groups, assisted in research work, and carried a heavy load of office detail; and Mr. Alexander L. Radomski, who served as a research worker in source material.

Case 1:04-cv-00418-T Document 12 Filed 02/03/2005 Page 54 of 146



This study is the result of their labors, and whatever is creditable in the report is due to them.

RAYMOND B. FOSDICK
ALBERT L. SCOTT

49 West 49 STREET
NEW YORK CITY,
October 2, 1933

from the conflict of interest between liquor dealers and reformers. Seldom was any attempt made to discriminate between the handling of beer and of hard liquor. License administration was frequently in the hands of those who had a personal interest in making control ineffectual.

### *Suggested Methods of License*

Our investigations have convinced us that these weaknesses cannot easily be eradicated from the operation of the license system in America, and, for reasons which we shall later discuss, we recommend the frank abandonment of further legislative tinkering with licenses and the acceptance of an altogether different method of control. At the same time, some states will doubtless be tempted to follow beaten paths and adhere to the old rules. Therefore, our task in preparing this report would be incompletely performed if we failed to present an outline of what we consider the soundest possible licensing system, if such a system must be adopted.

*First:* The outstanding prerequisite of a licensing system is the creation of a single state licensing board, with state-wide authority and responsibility, appointed by the governor and working through a well-paid, full-time managing director. The administrative personnel of the board should be appointed on a merit basis, free from politics and with a per-

manent tenure. The board should have an appropriation commensurate with its responsibilities.

It is possible that the state board should be supplemented by local agencies in metropolitan centers and by advisory boards in other areas. In general, however, experience has proved that a licensing board with state-wide powers is more efficient, more responsive to broad public opinion and more free from political influence than autonomous county or municipal bodies can possibly be. The state board should control both beverage and industrial alcohol and should be responsible for the granting and revoking of all licenses. It should also be given the widest possible discretion in regard to the issuance of regulations. Indeed, flexibility of administration within broad limits of policy determined by the legislature is a cardinal principle.

*Second:* The intelligence, character and integrity of the members of this board are considerations of the first importance. Unless these qualities are conspicuously present, the licensing system will be defeated before it starts. The members should be given long terms of office and should be eligible for reappointment. Their security of tenure will help to make them independent of political pressure. Salaries should be substantial, to attract the best brains obtainable. Under no circumstances should appointments to the board be made on the basis of partisan

political considerations. Nor should resort be had to a bipartisan board in the mistaken belief that this device eliminates politics. In practice, it turns public departments over to the keeping of *both* parties.

*Third:* The "tied house," and every device calculated to place the retail establishment under obligation to a particular distiller or brewer, should be prevented by all available means. "Tied houses," that is, establishments under contract to sell exclusively the product of one manufacturer, were, in many cases, responsible for the bad name of the saloon. The "tied house" system had all the vices of absentee ownership. The manufacturer knew nothing and cared nothing about the community. All he wanted was increased sales. He saw none of the abuses, and as a non-resident he was beyond local social influence. The "tied house" system also involved a multiplicity of outlets, because each manufacturer had to have a sales agency in a given locality. In this respect the system was not unlike that now used in the sale of gasoline, and with the same result: a large excess of sales outlets. Whether or not this is of concern to the public in the case of gasoline, in relation to the liquor problem it is a matter of crucial importance because of its effect in stimulating competition in the retail sale of alcoholic beverages. "Tied houses" should,

therefore, be prohibited, and every opportunity for the evasion of this system should, if possible, be foreseen and blocked.[2]

There are many devices used by brewers and distillers to achieve this same end, such as the furnishing of bars, electric signs, refrigerating equipment, the extension of credit, the payment of rebates, the furnishing of warranty bonds when required to guarantee the fulfillment of license conditions and of bail bonds when the dealer is haled into court. A license law should endeavor to prohibit all such relations between the manufacturer and the retailer, difficult though this may be.

*Fourth:* Suitable restrictions should be established by the license law or by administrative regulation with respect to the number and character of *places* where liquor may be sold. This is regarded as of the highest significance in England, where great effort is being made to reduce the number of licenses from year to year and to improve the appearance and character of licensed places. The number of li-

[2] Almost every beer and general liquor law that has recently been enacted includes this provision, e.g., Rhode Island (Laws 1933, Chapter 2013, Section 48). In some states, as in Illinois (Laws 1933, Page 518, Section 9) and New York (Laws 1933, Chapter 180, Section 86), the manufacturer and the retail licensee are jointly held responsible for any violations of this provision. In Indiana (Laws 1933, Chapter 80, Section 21) and in Iowa (Laws 1933, Chapter 37, Section 26) the gift of equipment such as bars, refrigerators, furniture, electric signs, etc., by manufacturers is expressly prohibited.

censes may be limited on a population basis as is done in Massachusetts and Rhode Island under the new law.[3]

Closely related to the limitation of the number of licenses is the restriction of the location and character of places where liquor may be sold. In the past, saloons were prohibited in some states within a specified distance of schools and churches. While location must be subject to control, we believe the restriction should be an administrative measure rather than a legislative enactment. This will enable the state licensing authority to grant or refuse licenses on a rational basis after consulting neighborhood and community desires, and after considering the requirements of local zoning laws. While the license law should also prohibit screens, upstairs rooms and back rooms, and the presence of gambling and slot machines, and should establish general regulations with regard to lavatories, et cetera, the licensing authority should be given wide power to expand and enforce such legal provisions through appropriate rules and regulations.[4]

[3] Massachusetts (beer law) Laws 1933, Chapter 120, Section 6; Rhode Island, Laws of 1933, Chapter 2013, Section 16.

[4] The use of screens is prohibited in the new laws of the following states: Connecticut (taverns only) (Laws 1933, Chapter 140, Section 25), Missouri (beer law) (Laws 1933, Page 256, Section 13139Z8), Nebraska (beer law) (Laws 1933, Page 85, Section 10), New Jersey (beer law) (Laws 1933, Chapter 85, Section 3) and Rhode Island (Laws 1933, Chapter 2013, Section 27).

*Fifth:* Licenses should be classified to recognize the inherent differences between beer, wine and spirits as problems of control.[5] One of the most satisfactory license classifications in this country before prohibition was in Massachusetts where seven kinds of licenses were provided.[6]

Somewhat on the lines of this precedent a classification like the following might be desirable:

A. For Off-Premises Consumption—

Class I Beer to 3.2 per cent.[7]

II Natural wines up to 10 or 12 per cent.

[5] See page 29.

[6] Massachusetts Revised Laws, 1902—Ch. 100, Sec. 18.

*First Class*—To sell liquor of any kind to be drunk on the premises.

*Second Class*—To sell malt liquors, cider and light wines containing not more than fifteen per cent of alcohol, to be drunk on the premises.

*Third Class*—To sell malt liquors and cider, to be drunk on the premises.

*Fourth Class*—To sell liquors of any kind, not to be drunk on the premises.

*Fifth Class*—To sell malt liquors, cider and light wines containing not more than fifteen per cent of alcohol not to be drunk on the premises.

*Sixth Class*—Licenses to retail druggists and apothecaries to sell liquors of any kind for medicinal, mechanical or chemical purposes only, and to such persons only as may certify in writing for what use they want them.

*Seventh Class*—Licenses to dealers in paints or in chemicals to sell alcohol for mechanical, manufacturing or chemical purposes only.

[7] Though this chapter does not deal with light beer and wine, they are included in this classification in order to make it all-inclusive.

III Spirits and all other alcoholic beverages.

IV Medicinal beverages and tonics, containing spirits.

V Undenatured, industrial alcohol.

B. For On-Premises Consumption—

VI Beer to 3.2 per cent.

VII Natural wines up to 10 or 12 per cent.

VIII Spirits and all other alcoholic beverages.

C. For Manufacture and Processing—[8]

Divided as under A

D. For Commercial Transportation—[8]

Divided as under A, but distinguishing between shipments within the state and across state lines.

In many, if not most of the states, not all of these licenses will be either necessary or desirable, particularly classes VII and VIII. In any case the conditions attaching to each of these classes should, for reasons stated in Chapter II, follow different principles. For example, in our judgment beer to 3.2 per cent (Classes I and VI) should be subject to little restriction. The heavier beers and wines should be purchasable by the package for home consumption (Class

[8] The state regulations should be prepared in coöperation with the federal government and supplemented by federal regulations.

II), but for on-premises consumption by the glass, only with meals (Class VII). We think it undesirable to combine Classes VI and VIII. Most of the restrictions with regard to back rooms, screens, etc., apply only to Classes VII and VIII.

It is perhaps unnecessary to point out that any state admitting VIII is running the gravest kind of risk. It is through the open door of these two classes that the saloon will endeavor to find its way back into our social life. The sale of higher alcoholic beverages for on-premises consumption threatens the return of evils which in the past have defied control, and only the affirmative pressure of public opinion in a given state or community could possibly justify the admission of this type of license.

*Sixth:* The hours of sale of liquor, particularly for on-premises consumption (Classes VI, VII and VIII), should be carefully regulated. The English plan of stopping such sale and closing places of sale for two hours during the afternoon appeals to us as desirable. A closed period in the afternoon is of no inconvenience to normal consumption, but is extremely useful in preventing "soaking" and the excessive use of alcohol. The hours for Sundays, holidays, etc., will require still further restriction. It must be remembered, however, that a too stringent limitation of hours will play into the hands of the bootleggers. This is to be avoided, particularly in the

immediate future, while the organized bootlegging system is being stamped out.

*Seventh:* Licenses issued for the retail sale of liquor should run not only to the person who sells, but to the *premises* where the liquor is sold. Revocation of a premises license is a far more effective weapon of control than is the revocation of an individual license.

*Eighth:* The license law should prohibit, as far as possible, all sales practices which encourage consumption. This would include treating on the house, sales on credit or IOU's, bargain days, and reduced prices previous to elections.

Rules are also necessary forbidding sale to minors, habitual alcoholics, paupers, mental defectives and to anyone who is drunk.[9]

*Ninth:* Advertising should, where possible, be rigidly restricted or forbidden. Six states have already passed such laws.[10]

[9] These provisions are generally included in legislative proposals and in some instances, as in Connecticut (Laws 1933, Chapter 140, Sections 56 and 57) and Rhode Island (Laws 1933, Chapter 2013, Section 70), an order of interdiction is prescribed for persons receiving town aid and for those whose relatives have filed complaint. In Connecticut, not only is the sale of alcoholic beverages prohibited to minors (Section 59), but a penalty is also provided for inducing minors to procure liquor (Section 60).

[10] Delaware (Laws 1933, House Bill 312, Section 9), Iowa (beer law) (Laws 1933, Chapter 37, Section 34), and Ohio (beer law) (Laws 1933, Senate Bill 346, Section 4) provide that all advertising (all outdoor advertising in Iowa) shall be under the supervision of the liquor commissions, while Oklahoma (beer

The problem cannot be solved entirely by legislation, since subtle and inferential advertising may meet the letter but not the spirit of the law. The radio and nationally circulated publications are also beyond complete state control. None the less, each state should outline its liquor advertising code. These codes should be as nearly uniform as possible so that advertisers may readily conform. With this in mind, we suggest as a basis for discussion some such program as the following:

1. Newspaper and magazine advertising to contain nothing beyond the name, the address, the date of incorporation of a manufacturer or dealer, a coat of arms or trade-mark, and a description in the simplest terms of the article or articles dealt in, such as "Kentucky Rye Whiskey," or "Cointreau," or "Italian Vermouth."
2. All additional advertising matter, including slogans, to be prohibited except on approval of the state licensing board.
3. All outdoor advertising, except on the premises where sold or manufactured, to be prohibited. All outdoor electric or projecting signs

law) (Laws 1933, Chapter 153, Section 2) and Wyoming (beer law) (Laws 1933, Chapter 92, Section 6) provide that there shall be no advertising by any person dealing in alcoholic beverages.

to be further regulated by local fire, zoning and sign legislation.

Content of advertising to be under the same restrictions as newspaper and magazine advertising.

4. All advertising matter attached to vehicles owned by manufacturers, distributors and dealers to be subject to the same restrictions as publication advertising.
5. All advertising through the use of calendars, pencils, golf balls, thermometers, free samples, cut-rate sales, etc., to be prohibited.
6. Radio advertising to be subject to the general rules outlined for publications.

The penalties to be provided by law should be moderate, particularly during the first few years while definite standards are being determined. No restrictions should be imposed upon the advertising of 3.2 per cent beer. The restrictions as a whole should apply not alone to the advertisers, but also to the advertising media, in order to reach the problem of indirect liquor advertising by ginger-ale companies, refrigerator companies and others who sell accessories.

We believe that such a code will be sufficiently elastic to meet the legitimate demand of the trade and at the same time to permit of enforcement.

Undoubtedly, the most serious objections to these restrictions will come not from the liquor dealers themselves, but from the advertising agencies, the billboard and electric sign companies and even from some newspapers and magazines. These groups should realize, however, that unless reasonable restrictions are willingly accepted, there will undoubtedly be in the near future a complete prohibition of all kinds of liquor advertising, with extensive federal legislation as well as state codes.

*Tenth:* In addition to the foregoing possibilities, an effort may be made under the licensing system to control prices and profits. In Rhode Island, where legislation of this type has already been passed, the price control provision has been extended to the wholesale rather than to the retail trade.[11] Experience in this field is limited, but experiment may be fruitful. For example, the licensing authority could be authorized to establish minimum and maximum prices for the sale of liquor, to require uniform systems of accounts to be kept by liquor dealers, and to capture as an excise all profits in excess of a specified rate or a percentage of all profits.[12]

## Local Option

Under the license system as it operated before prohibition, the voters in individual cities and coun-

[11] Rhode Island Laws of 1933, Chapter 2013, Section 49.
[12] See Chapter VII.

State of Rhode Island and Providence Plantations

C

# REPORT

of the

Commission Appointed Under

## Resolution Creating a Special Bi-Partisan Commission

to Study Pending Legislation in Congress Affecting the Manufacture, Possession, Transportation and Sale of Alcoholic Beverages and the Amendment and Repeal of the 18th Amendment to the Constitution of the United States and to Submit a Program Thereon to the General Assembly

as made to the

## GENERAL ASSEMBLY

April 6, 1933

PROVIDENCE:
THE OXFORD PRESS
1933

Gaylord Bros.
Makers
Syracuse, N. Y.
PAT. JAN. 21, 1908

Chapter 858, January session, 1881, provided for voting at each annual election in the town of Pawtucket on the question of granting licenses.

Chapter 889, same session, is a codification of existing laws preparatory to the revision of the Statutes. It contained a new provision that no license should be granted for the sale of liquor within four hundred feet of any public school. Another remarkable feature of this act was the introduction of the provision that "Every person who shall keep a place in which it is reputed that intoxicating liquors are kept for sale without having a license therefor," except as a pharmacist, shall be fined or imprisoned. This was held to be unconstitutional in *State* vs. *Kartz*, 13 R. I.

cepting the clauses relative to voting in Pawtucket, it is exactly the same as Chapter 87 of the Public Statutes.

This completes the sketch of legislation down to that revision, which is so accessible that further mention of its provisions need not here be made.

State of Rhode Island and Providence Plantations

# REPORT

of the

Commission Appointed Under

## Resolution Creating a Special Bi-Partisan Commission

to Study Pending Legislation in Congress Affecting the Manufacture, Possession, Transportation and Sale of Alcoholic Beverages and the Amendment and Repeal of the 18th Amendment to the Constitution of the United States and to Submit a Program Thereon to the General Assembly.

RI
342.0...
C734
April 6, 1932

# REPORT

Of the Commission appointed under "Resolution Creating a Special Bi-Partisan Commission to Study Pending Legislation in Congress Affecting the Manufacture, Possession, Transportation and Sale of Alcoholic Beverages and the Amendment and Repeal of the 18th Amendment to the Constitution of the United States and to Submit a Program Thereon to the General Assembly."

*To the Honorable the General Assembly of the State of Rhode Island and Providence Plantations:*

The resolution authorizing the appointment of the Commission prescribes for it the following duties:—

"Said Commission shall make a thorough study of all existing and proposed State and Federal Legislation relating to the manufacture, possession, transportation and sale of alcoholic beverages, together with the various proposals to repeal or amend the 18th amendment and the methods of submitting the same to the legislatures or conventions. Said Commission shall submit a report to the present session of the General Assembly on or before the last day for the introduction of new business therein with (1) such amendments to the state law as are made necessary by any legislation passed by the present Congress, (2) any legislation made necessary by any proposed repeal or amendment to the 18th amendment proposed by the present Congress and (3) any other legislation designed to regulate the manufacture, possession, transportation and sale of alcoholic beverages as said commission may deem desirable."

The Commission reported to your Honorable Body on March 14, 1933, such report covering so much of its duties as related to the proposed repeal of the Eigh-

teenth Amendment to the Constitution of the United States and in connection with said report submitted drafts of legislation providing for the holding of a convention and the doing of such other acts as shall be necessary in connection with such proposed repeal.

It now reports with reference to the remaining duties imposed upon it by said resolution.

The Congress which was in existence at the time of the passage of the resolution authorizing the creation of this commission passed out of existence without enacting any legislation modifying the Volstead Act or other laws theretofore passed for the enforcement of the provisions of the 18th amendment. The 73rd Congress, however, has passed a law approved March 22, 1933, modifying the provisions of the Volstead Act so that after the expiration of fifteen days after the date of enactment it will be lawful to sell alcoholic beverages containing not more than 3.2 of alcohol by weight and this commission deems it desirable that certain legislation should be passed in this state so as to make the law of Rhode Island conform to the law of the United States and to make it possible legally to sell in Rhode Island beverages of the alcoholic content made permissible by the Act of Congress. Your commission also deems it desirable, and in this it is acting in accordance with a suggestion of the Governor, that legislation be now enacted which will be in force if and when the Eighteenth Amendment to the Constitution of the United States shall be repealed. A proposal for such repeal is now pending before conventions in the several states and should such repeal be accomplished, your commission believes it desirable that there be upon the statute books legislation which will make lawful the selling in Rhode Island of alcoholic beverages containing a larger percentage of alcohol than that permitted by the act of Congress referred to.



In this connection your commission has studied drafts of laws proposed in various states and has also studied legislation enacted in this state from time to time dealing with the manufacture, keeping for sale, and sale of intoxicating liquors.

The Legislature of Rhode Island has dealt with this subject on various occasions. From 1728 onward many acts are to be found in the Legislative Record evidencing an intent to control in some manner the traffic in intoxicating liquors. These acts disclose that in Rhode Island several different methods have been tried, for example:

In the Digest of 1822, page 295, is to be found "An act enabling the Town Councils in this state to grant licenses for retailing strong liquors and for other purposes." In the same digest is to be found "An act to prevent drunkenness" (page 297). The act first referred to attacks the problem from the licensing standpoint. The act secondly referred to attempts to prevent drunkards from securing intoxicating liquors. It authorized the publication by town councils of the names of known common drunkards and prohibited licensees from selling intoxicating liquors to them.

In the Digest of 1844 these two acts are found to be still in force.

The first act of the May session 1852 was "An Act for the suppression of drinking houses and tippling shops",—a prohibition act. The second section of that act authorized town councils and the mayor and aldermen in cities to appoint agents to sell liquors for medicinal and mechanical purposes. The second act passed at the same session provided that all licenses for retail-

ing liquor then in force should continue in force until the third Monday of July 1852 and no longer.

Thus, about 81 years ago Rhode Island made the "noble experiment". That all was not well with the experiment, however, is demonstrated by the "Act for the more effective suppression of drinking houses and tippling shops" passed at the January session 1853 (p. 232). This act too was amended at the January session of 1854 (p. 265).

In the Revised Statutes of Rhode Island 1857 we find Chapter 78 entitled, "Of the suppression of Intemperance", a title which remained in the Statute Books in Rhode Island until 1923.

Evidently the Civil War brought a reaction in favor of liquor just as the World War brought a reaction against liquor.

In January 1863 Chapter 444 of the Public Laws was passed authorizing any resident to sell intoxicating liquors upon making a deposit of money with the town or city clerk and furnishing a bond. By 1867 the pendulum had swung back to the licensing theory and Chapter 670 at the January Session of that year repeals the laws last above mentioned and gives to town councils and Boards of Aldermen a right to grant licenses. This act is a revision of Chapter 78 of the Revised Statutes (1857). There was a further revision by Chapter 757 of the January session of 1868 and in 1872, Chapter 973 of the January session was passed providing for the assay and inspection of liquors. This Statute has remained upon the books practically unchanged ever since.

The General Statutes of 1872, Chapter 79, dealt with the suppression of intemperance and at the May Session of 1875 (Chapter 508) was passed "An Act to regulate and restrain the sale of intoxicating liquors".



This was a general revision of the pre-existing law and permitted the issue of licenses for the sale of such liquors. This law was again revised in 1881 (Chapter 889). At the January session of that year this revision was carried in the Public Statutes of 1882 as Chapter 87. This was followed by the approval on April 7, 1886 of Article 5 of the Amendments of the Constitution of Rhode Island establishing constitutional prohibition in Rhode Island. Its history may be found in the case of *State* v. *Hattie Clark,* 15 R. I. 383 (1886).

The Constitutional prohibition was followed by the Prohibitive Act of May 27, 1886, Chapter 596, entitled, "An Act for the suppression of intemperance". Again showing that events have a way of recurring, it is notable that this Act created a State Police (See Sections 39-47).

At the May session of 1889 Article 8 of the Amendments to the Constitution of Rhode Island was submitted, (Chapter 808). A special election was held on the third Thursday of June in that year to act upon the proposal of amendment. The election resulted in the approval of Article 8 which annulled Article 5. This was immediately followed by a special session of the legislature on August 1, 1889 at which Chapter 816 entitled, "An Act to regulate and restrain the sale of strong malt and spirituous liquors" was passed. This act was carried into the General Laws 1896 as Chapter 102 entitled, "Of the suppression of intemperance". The history of certain provisions of this Act may be found in *Rhuland* v. *Waterman, Town Clerk,* 29 R. I. 365 (1908). This law as amended was carried into General Laws 1909 as Chapter 123 under the same title. As amended it remained in force until the going into operation of

the 18th amendment to the Constitution of the United States.

The Secretary of State of the United States on January 29, 1919, announced that the 18th amendment had been adopted. By its own terms it became effective one year after its adoption. This was followed by the enactment of Chapter 1740 of the Public Laws of 1919 entitled, "An act to regulate the sale of non-intoxicating beverages and in amendment of Section 1 of Chapter 123 of the General Laws". This act was repealed by the Sherwood Act, so-called, Chapter 2231, January session 1922, and that in turn by the nuisance act of 1932, Chapter 1859.

After reviewing the history of this legislation in Rhode Island and the vast amount of litigation that has grown out of it, your Commission reports that it will be almost impossible to draft a law for the promotion of temperance and the rigorous control of the sale of alcoholic beverages without adopting a large body of the pre-existing law. That law is the crystallization of two hundred years of continuous struggle with this problem. This struggle has been intensified since the adoption of the 18th amendment to the Constitution of the United States and your Commission has attempted to embody in the draft of an act which it herewith reports the benefits which it believes the experience under the 18th amendment has conferred upon us. It has also attempted to harmonize the provisions of the proposed law with the laws of the United States and with the laws of our sister states.

The plan of the act is to permit the immediate issue of licenses for non-intoxicating beverages. They are defined to be alcoholic beverages of a minimum content of .5 of one percent and a maximum of 3.2 percentum



by weight. The manufacture and sale of such beverages would be permitted until the repeal of the eighteenth amendment and thereafter the manufacture and sale of all alcoholic beverages would be permissible. The fee for every license under which the manufacturer or dealer would be entitled by reason of the repeal of the eighteenth amendment to manufacture and deal in intoxicating beverages are doubled when such repeal takes effect. If upon such repeal a dealer is prohibited from dealing in intoxicating beverages his license fee would not be affected by such repeal. This latter remark applies to Class C. retailers' licenses under which it is permissible to establish a bar; but the act provides that neither before nor after the repeal of the eighteenth amendment shall intoxicating beverages be sold at a bar. Further, the act provides that alcoholic beverages composed in whole or in part of alcohol produced by distillation shall not be consumed on the premises where sold. This of course, would be particularly applicable when the repeal of the eighteenth amendment is effected, as it cannot be lawfully done until such repeal.

The draft provides for the creation of a bi-partisan five-man commission having exclusive power to issue manufacturers' and wholesalers' licenses. It is also given the general power of supervision and review of the acts of all local boards in the matters of the issue, suspension, and revocation of retail licenses and the supervision of all places where alcoholic beverages may be sold. The act also empowers the commission to fix the wholesale prices of alcoholic beverages. The purpose of this provision is to restrict the profits of dealers engaged in a large way in the manufacture or sale of these beverages and thus to remove the evils resulting from high pressure salesmanship in order inordinately

to increase profits. This feature also is designed to place in the hands of the commission a powerful weapon for use in the suppression of illicit traffic in alcoholic beverages.

The members of the commission created by the act would be appointed by the governor with the advice and consent of the senate and the governor is required to select his nominees from lists submitted to him by the chairman of each of the political parties. The senate would have the power to reject any nominee the governor presents to it but has no power of its own to elect.

As proposed by the act the licensing bodies are: police commissions where they exist in towns and cities; in towns where there are no police commissions, the town councils; in cities where there are no police commissions, the mayors and boards of aldermen; in cities where there are neither boards of aldermen nor police commissions, the mayors and councils. In Providence the board of public safety as long as the same shall be the general licensing authority therein. In this connection the members of the commission are not unanimous.

The fees paid for licenses are required to be turned over by the licensing body to the treasurer of the town or city where the licensing place is located.

A tax of one dollar per barrel of thirty-one gallons is proposed to be levied upon alcoholic beverages manufactured in this state payable by the manufacturer. The plan for the imposition and collection of the tax is to require the manufacturer to make an annual return to the state board of tax commissioners whereupon that body will assess the tax and certify the lists thereof, to the general treasurer for collection. This is the method under which the corporate excess tax is now assessed



and collected. It is expected that the revenue from the tax so assessed will be considerable and it is this thought that suggests that towns and cities be entitled to all the license fees.

In the matter of permitting beverages from outside the state to be brought within the state, the act suggests that such imports be permitted only by placing the order addressed to the seller in the hands of the commission for transmission to the seller. This gives the commission full information as to beverages coming into the state. It is required to inspect such beverages upon their arrival and to notify the party ordering the same where they may be had after such inspection. A charge is authorized for this service which may be raised or lowered in the discretion of the commission in order to place local manufacturers on an equality with foreign shippers.

The police features of the act are in substance the same as those which existed in our general laws before the adoption of the eighteenth amendment.

In considering the imposition of a tax, the commission has had its mind principally upon the products of breweries. The products of distilleries or wineries were not particularly studied with a view to determining how great a tax such products can bear, and the commission has left the act with a provision for taxing all beverages at the same rate. Should the distillation of liquors or manufacture of wine become an item of importance in the state at some future time, the general assembly can at that time make additional and adequate provisions for dealing with these products, if it so desires.

Should profits be earned in excess of those which may be retained by the corporation, the state receives them,

thus giving the public the benefit of such profits rather than private individuals.

The commission has tried in every way to correct the old evils of the liquor traffic. As evidence of its effort in this connection, the commission points out three features of the proposed law.

First: The law is drawn so as to prohibit any connection, directly or indirectly, between manufacturer and wholesaler and the retail trade; second: The law prohibits the sale of anything but non-intoxicating beverages over a bar, and, in addition, prohibits the consumption of hard liquors on any premises where sold; and third: The law limits the profit of the wholesale dealer in the sale and distribution of alcoholic beverages.

In many details both of form and substance the commission was not unanimous in its conclusions. The rule of majority vote was followed on all matters concerning which there were differences of opinion.

The adoption of the proposed act will require the amendment of clause B, chapter 1258 of the Public Laws of 1932, draft for that purpose accompanies the report.

The submission of this report, together with the draft of the act accompanying the same, completes the work of the commission.

PATRICK P. CURRAN,
*Chairman,*

ANNE S. K. BROWN,
J. HOWARD McGRATH,
EDMUND W. FLYNN,
CHARLES P. SISSON,
FRANK MAURAN, JR.,
*Secretary.*



To prevent misconstruction and misunderstanding, the following members qualify their signatures to this report by reservation of the right to disapprove such proposals as conflict with the uniform application of the principle of local option and home rule to cities and towns, and real appointive power to the governor.

EDMUND W. FLYNN.

Whereas I appreciate the conscientious and laborious efforts of the Commission in its endeavors to present a comprehensive liquor Act, which includes the sale of non-intoxicating beer and wines, which is immediately demanded, and intoxicating liquors the sale of which depends upon the future event of the repeal of the Eighteenth Amendment to the Constitution of the United States, I fear that too much discussion and dispute concerning the act as applied to the sale of intoxicating liquors will prevent immediate passage of this comprehensive act, and indefinitely delay the sale of non-intoxicating beer and wines. One consideration only is before the Country at this time, to wit, the sale of non-intoxicating beer and wine. My conviction is that the General Assembly should pass immediately an Act permitting the sale of these beverages, and at this Session of the General Assembly after further and more exhaustive study enact laws applicable to the sale of intoxicating liquors which will become effective when the Eighteenth Amendment is repealed. There are other objections to the proposed Commission Act which I deem it unnecessary to advance until after the consideration of my fundamental objection herein stated.

For these reasons I cannot fully subscribe to the report of the Commission.

HARRY T. BODWELL.

# SUMMARY OF RHODE ISLAND RETAIL LIQUOR LICENSES

| CITY/TOWN | CENSUS 2000 | A | BH | BL | BM | BT | BV | C | D | DL | E | ED | J | T | *TOTAL RETAIL LICENSEES |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | CLASS OF LICENSE | | | | | | | | | | | | | |
| Barrington | 16,819 | 0 | 0 | 1 | 0 | 0 | 1 | 0 | 4 | 0 | 0 | 0 | 0 | 0 | 6 |
| Bristol | 22,469 | 4 | 1 | 8 | 0 | 2 | 22 | 0 | 9 | 1 | 0 | 0 | 0 | 0 | 47 |
| Burriville | 15,796 | 3 | 0 | 2 | 0 | 0 | 16 | 1 | 4 | 0 | 0 | 0 | 0 | 0 | 26 |
| Central Falls | 18,928 | 4 | 0 | 3 | 0 | 0 | 24 | 0 | 4 | 0 | 0 | 0 | 0 | 0 | 35 |
| Charlestown | 7,859 | 2 | 0 | 2 | 0 | 1 | 8 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 14 |
| Coventry | 33,668 | 5 | 0 | 8 | 0 | 0 | 17 | 0 | 6 | 0 | 1 | 0 | 0 | 0 | 37 |
| Cranston | 79,269 | 19 | 0 | 19 | 0 | 1 | 63 | 0 | 13 | 0 | 3 | 0 | 1 | 0 | 119 |
| Cumberland | 31,840 | 5 | 0 | 3 | 0 | 0 | 22 | 1 | 11 | 1 | 0 | 0 | 0 | 0 | 43 |
| East Greenwich | 12,948 | 2 | 0 | 3 | 0 | 1 | 21 | 0 | 4 | 0 | 0 | 0 | 0 | 0 | 31 |
| East Providence | 48,688 | 9 | 0 | 18 | 0 | 0 | 46 | 1 | 16 | 0 | 0 | 0 | 0 | 0 | 90 |
| Exeter | 6,045 | 2 | 0 | 3 | 0 | 0 | 7 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 12 |
| Foster | 4,274 | 2 | 0 | 0 | 0 | 0 | 4 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 7 |
| Glocester | 9,948 | 2 | 0 | 1 | 0 | 1 | 10 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 14 |
| Hopkinton | 7,836 | 2 | 0 | 1 | 0 | 0 | 6 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 10 |
| Jamestown | 5,622 | 1 | 0 | 0 | 0 | 1 | 8 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 11 |
| Johnston | 28,195 | 3 | 0 | 5 | 0 | 0 | 30 | 1 | 2 | 0 | 0 | 0 | 0 | 0 | 41 |
| Lincoln | 20,898 | 4 | 0 | 5 | 0 | 0 | 17 | 0 | 4 | 0 | 0 | 0 | 0 | 0 | 30 |
| Little Compton | 3,593 | 2 | 0 | 0 | 0 | 0 | 4 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 8 |
| Middletown | 17,334 | 4 | 0 | 9 | 1 | 4 | 22 | 1 | 7 | 0 | 0 | 0 | 1 | 0 | 49 |
| Narragansett | 16,361 | 3 | 0 | 6 | 0 | 3 | 21 | 0 | 6 | 0 | 0 | 0 | 1 | 0 | 40 |
| New Shoreham | 1,010 | 2 | 0 | 1 | 1 | 0 | 23 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 28 |
| Newport | 26,475 | 14 | 1 | 11 | 0 | 10 | 55 | 1 | 17 | 0 | 1 | 0 | 1 | 0 | 111 |
| North Kingstown | 26,326 | 4 | 0 | 11 | 0 | 0 | 21 | 0 | 2 | 1 | 0 | 0 | 0 | 0 | 39 |
| North Providence | 32,411 | 5 | 0 | 9 | 1 | 1 | 31 | 0 | 14 | 1 | 0 | 0 | 0 | 0 | 62 |
| North Smithfield | 10,618 | 2 | 0 | 2 | 0 | 0 | 7 | 0 | 4 | 0 | 0 | 0 | 0 | 0 | 15 |
| Pawtucket | 72,958 | 30 | 0 | 1 | 0 | 1 | 59 | 2 | 25 | 0 | 2 | 0 | 0 | 0 | 120 |
| Portsmouth | 17,149 | 4 | 1 | 1 | 0 | 1 | 14 | 0 | 4 | 0 | 0 | 0 | 0 | 0 | 25 |
| Providence | 173,618 | 61 | 0 | 10 | 0 | 7 | 169 | 23 | 41 | 0 | 22 | 36 | 1 | 3 | 374 |
| Richmond | 7,222 | 2 | 0 | 3 | 0 | 0 | 6 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 11 |
| Scituate | 10,324 | 2 | 0 | 1 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 5 |
| Smithfield | 20,613 | 4 | 0 | 8 | 0 | 0 | 24 | 1 | 3 | 0 | 0 | 0 | 0 | 0 | 40 |
| South Kingston | 27,921 | 4 | 0 | 5 | 0 | 3 | 20 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 34 |
| Tiverton | 15,260 | 3 | 0 | 4 | 0 | 1 | 11 | 0 | 3 | 0 | 0 | 0 | 0 | 0 | 22 |
| Warren | 11,360 | 3 | 0 | 4 | 0 | 1 | 18 | 2 | 6 | 0 | 0 | 0 | 0 | 0 | 34 |
| Warwick | 85,808 | 14 | 3 | 20 | 1 | 6 | 83 | 0 | 17 | 2 | 0 | 0 | 0 | 0 | 147 |
| West Greenwich | 5,085 | 1 | 0 | 1 | 0 | 1 | 6 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 10 |
| West Warwick | 29,581 | 6 | 0 | 9 | 0 | 2 | 27 | 0 | 14 | 0 | 0 | 0 | 0 | 0 | 58 |
| Westerly | 22,966 | 4 | 0 | 13 | 0 | 5 | 25 | 0 | 9 | 0 | 0 | 0 | 0 | 2 | 58 |
| Woonsocket | 43,224 | 10 | 0 | 15 | 0 | 0 | 41 | 1 | 14 | 0 | 0 | 0 | 0 | 1 | 82 |
| *TOTALS | 1,048,319 | 253 | 6 | 226 | 4 | 53 | 1,011 | 35 | 272 | 6 | 29 | 36 | 5 | 7 | 1,944 |

RETAIL LICENSES

- A Package Store (off premise)
- *AT Airport (1-Warwick)
- BH Hotel
- BL Victular Limited
- BM Victular/Brew Pub (BV)
- BT Tavern
- BV Victular
- C Bar
- D Club
- DL Club Limited
- E Druggist
- ED Economic Development (BV)
- J Convention Hall
- T Legitimate Theatre

OTHER LICENSES

- Brewery
- Farmer Winery
- Marine/Railroad/Airline
- Wholesale - Limited
- Wholesale - Full Privilege
- Winery

STAT_ _F RHODE ISLAND AND PROVIDENCE PLANTATIONS
DEPARTMENT OF BUSINESS REGULATION
DIVISION OF COMMERCIAL LICENSING AND REGULATION
233 RICHMOND STREET
PROVIDENCE, RI 02903

B

E

Telephone: (401) 222-2416
Fax: (401) 222-6654
TDD: (401) 222-2999

## LIQUOR COMPLAINT FORM

**INSTRUCTIONS:** Please complete this form and return to the above address if you have reason to believe that a Liquor Licensee regulated by the Department of Business Regulation has violated the law or failed to meet his/her responsibilities and obligation to the public. Please print or type. This form will NOT be accepted unless signed by complainant.

---

COMPLAINANT'S Name:

*John Haronian*

---

Residence:

---

Mailing Address (If different from Residence):

*1405 Douglas Avenue, North Providence, RI 02904*

---

Daytime Telephone number: Nighttime Telephone Number:

*353-4400*

---

Name and address of LIQUOR ESTABLISHMENT the complaint is being made:

*Busa Wine & Spirits, Inc., 1325 Post Road, Warwick; and*

*Busa Fine Wine & Spirits, Inc., 1214 Atwood Avenue, Johnston*

---

Name of LICENSEE the complaint is being made:

*Busa Wine & Spirits, Inc. and Busa Fine Wine & Spirits, Inc.*

---

Date and Time and Place of alleged Violation:

*Both stores currently operate as a chain in violation of RI Gen. Laws §3-5-11*

---

Other Federal, State Municipal, Local Agencies, or Legal Counsel you have contacted, including results of contacts:

*A separate complaint with the Franchising Section of the Division of Securities Regulation.*

---

On the reverse side of this form, or on an attached piece of paper, explain as fully as possible the exact nature of your complaint against the licensee or regulated activity. Be sure to include specific information such as dates and purchase services, name, address, telephone of offending licensee, account numbers, etc. Also, attach any documentation which you feel will help support your allegations including sales slips, warranty contracts, purchase and sales agreement, canceled checks, travel vouchers, insurance policies, etc.

*The two Busa stores share a common name and hold themselves out to the public as being the same business entity. Under the interpretation of RI Gen. Laws §3-5-11 suggested by the two Busa stores in their complaint against Douglas Wine & Spirit, their use of the same name would be evidence of an illegal chain store.*

*These two stores . also engaging in joint advertising. These joint ads do not indicate that the stores are separately owner or operated. The ads indicate the same price for both stores.*

*In addition to the two Rhode Island stores discussed above, Daniel P. Busa, Jr., President of Busa Fine Wine & Spirits, Inc. in Johnston, is also the owner of Busa Bros Liquors, Inc. of Lexington, Massachusetts and State Road Liquor Mart, Inc, of Burlington, Massachusetts. Under §3-5-11, a prohibited chain store operation can be based on common ownership and management of an in-state store and an out-of-state store. This joint ownership by Daniel Busa of three liquor stores is proof of a chain store operation.*

*These stores are engaged in other activities that suggest the existence of an illegal chain store.*

*If the Busa stores do not constitute an illegal chain store, they are operating as an unregistered franchise. A separate complaint with the Franchising Section of the Division of Securities Regulation.*

---

The undersigned swears to or affirms the truth and accuracy of all statements, answers, representations and allegations contained herein, including all statements hereto attached.

X____________________________________ Date: ______________________

Signed

ST. , OF RHODE ISLAND AND PROVIDENCE PLANTATIONS
DEPARTMENT OF BUSINESS REGULATION
DIVISION OF SECURITIES
233 RICHMOND STREET - SUITE 232
PROVIDENCE, RI 02903-4232

DEPARTMENT COMPLAINT FORM

Office Use Only
Case No.
Date Filed

**INSTRUCTIONS:** Please complete this form and return to above address if you have reason to believe that a licensee regulated by the department has violated the law or failed to meet his responsibilities and obligations to the public.

Complainant's Name: Last *Haronian* First *John* Middle

Residence Street City/Town State Zip

Mailing Address (if different from residence)

*1405 Douglas Avenue, North Providence, RI 02904*

Home Telephone

Business Telephone & Extension *353-4400*

Name, Address, Phone of person who always knows where to contact me

*Robert J. Roughsedge, Lawson & Weitzen, LLP, 88 Black Falcon Ave, Suite 345, Boston, MA 02210, (617) 439-4990*

Licensee or regulated activity about whom or which I am making complaint

*Busa Wine & Spirits, Inc. and Busa Fine Wine & Spirits, Inc.*

Name Address(Business or Residence) Phone

*Busa Wine & Spirits, Inc. 1325 Post Road, Warwick; and*

*Busa Fine Wine & Spirits, Inc., 1214 Atwood Avenue, Johnston*

Type of Licensee or Regulated Activity

___Securities ___Charitable Organizations

___Broker Dealer ___Fund Raiser

_X_ Franchisor

Date, Time and Place of alleged violation

*Ongoing*

Other Federal, State, Municipal, local agencies or legal counsel I have contacted with regard to this complaint, including results of contacts.

*Division of Commercial Licensing and Regulation, Liquor/Enforcement and Compliance Section. A joint investigation, as permitted under RI Gen. Laws §19-28-1.31 may assist your investigation of this matter.*

Explain as fully as possible on the reverse side the exact nature of your complaint against the licensee or regulated activity. Be sure to include specific information such as date and purchase price of contested goods/services, name, address, telephone of offending licensee, account numbers, etc. Also, attach any documentation which you feel will help support your allegations including sales slips, warranty contracts, purchase and sale agreements, cancelled checks, travel vouchers, insurance policies, etc. (SEE REVERSE)

The undersigned swears to or affirms the truth and accuracy of all statements, answers, representations and allegations contained herein, including all statements hereto attached.

SIGNED ________________ DATE _____________ **A COPY OF THIS COMPLAINT WILL BE FORWARDED TO THE LICENSEE ABOUT WHICH YOU HAVE COMPLAINED. (SEE BACK)**

**NATURE OF COMPLAINT: If more space is needed attach additional sheets.**

*The Busa stores operate as a franchise without having registered as such as required by RI Gen. Laws §19-28-1.5. These liquor stores market themselves under a common name and mark.*

If the complaint involves losses on your investments please provide copies of your schedule D of IRS form 1040 in order to identify the trades responsible for your losses.

It is important that you understand the Division's role in this matter. The Division enforces the State's securities laws which were enacted to protect investors by prohibiting unlicensed and/or fraudulent securities activity. The Division does not, however, represent individuals and their financial interests in the way that a private attorney would. The Rhode Island Uniform Securities Act provides for relief for individuals by civil suit. Accordingly, if you believe that you have been harmed and want to pursue the matter further, you should promptly consult a private attorney regarding the alternatives potentially open to you under state and federal law.

You may also wish to seek arbitration through the National Association of Securities Dealers, Inc. c/o Arbitration Committee, 33 Whitehall Street, New York, NY 10004, (212) 858-4400. Thank you for bringing this matter to our attention.

11/00

STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS
*Office of the Secretary of State*
*Matthew A. Brown, Secretary of State*

Corporations Database

# Rhode Island Corporation Search:

| | |
|---|---|
| Corporation Status: | Active |
| Look In: | Corporation Name |
| Search Terms: | |
| Search Type: | Show Records with ALL of the above terms. Click Here for help with Boolean Searches |

Submit Reset

ANNUAL REPORT AUTO-FILL

Please Select the Year you are filing for: 2003 Submit Reset

(Note: You Need Adobe Reader Version 5 or above to create an auto-filled annual report, Click Here for the free download)

## ID# 68960

## BUSA WINES & SPIRITS, INC.

**Purpose:** TO HOLD AND MAINTAIN LIQUOR LICENSE AND TO PURCHASE, SELL & DISTRIBUTE AT RETAIL BEER, WINE, LIQUOR & ALCOHOLIC BEVERAGES.

**General Information**

**Status:** AC
**Charter:** DBC
**Chapter:** TITLE: 7-1.1-51
**State:** RHODE ISLAND
**Duration:** PERPETUAL
**File Date:** 7 /7 /1992
**Effective Date:**N/A
**Last Report Date:** 02/10/2003

**Annual Report Image:**
2001 Annual
2002 Annual
2003 Annual
**Help On Viewing Annual Reports**

**Sic Code:** 3251--Liquor stores

**Authorized Shares:** 600 NO PAR VALUE

**Business Address**

BUSA WINES & SPIRITS, INC.
1325 POST RD
WARWICK, RI 02888, USA
(401)785-2500

**Name and Address of the Registered/Resident Agent**

JOHN C. REVENS, JR.
946 CENTERVILLE ROAD
WARWICK, RI 02886 USA
Agent is active...Registered office is maintained

---

**Primary Officer/Director/Partner/Manager Information**

**Title:** PRESIDENT
THOMAS X BUSA
3210OLD BILLERICA ROAD
BEDFORD, MA01730-, USA

**Mailing Information**

N/A

---

Corporations Division
Office of the Secretary of State Matthew A. Brown
100 North Main St.
First Floor
Providence, RI 02903
corporations@sec.state.ri.us
www.sec.state.ri.us

Business Hours:
M-F 8:30 am to 4:30 pm
Tel. (401) 222-3040
Fax. (401) 222-1309
Director: Sandra Williams

STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS
*Office of the Secretary of State*
*Matthew A. Brown, Secretary of State*

Corporations Database

# Rhode Island Corporation Search:

Corporation Status: Active
Look In: Corporation Name
Search Terms:
Search Type: Show Records with ALL of the above terms. Click Here for help with Boolean Searches

Submit Reset

ANNUAL REPORT AUTO-FILL

Please Select the Year you are filing for: 2003 Submit Reset

(Note: You Need Adobe Reader Version 5 or above to create an auto-filled annual report, Click Here for the free download)

## ID# 114920

## BUSA FINE WINES & SPIRITS, INC.

**Purpose:** TO HOLD AND OPERATE UNDER A RETAIL LIQUOR LICENSE, TO OPERATE AND MANAGE A RETAIL LIQUOR STORE

**General Information**

**Status:** AC
**Charter:** DBC
**Chapter:** TITLE: 7-1.1-51
**State:** RHODE ISLAND
**Duration:** PERPETUAL
**File Date:** 10 /18 /2000
**Effective Date:** 10/18/2000
**Last Report Date:** 02/10/2003

**Annual Report Image:**
2001 Annual
2002 Annual
2003 Annual
Help On Viewing Annual Reports

**Sic Code:** 3251--Liquor stores

**Authorized Shares:** 600 NO PAR VALUE

**Business Address**

BUSA FINE WINES & SPIRITS, INC.
1214 ATWOOD AVENUE
JOHNSTON, RI 02919-, USA
(401)272-9445

**Name and Address of the Registered/Resident Agent**

JOHN C. REVENS, JR.
946 CENTERVILLE ROAD
WARWICK, RI 02886- USA
Agent is active...Registered office is maintained

---

**Primary Officer/Director/Partner/Manager Information**

**Title:** PRESIDENT
DANIEL P BUSA JR.
6 FARM ROAD
LEXINGTON, MA02420-, USA

**Mailing Information**

N/A

---

Corporations Division
Office of the Secretary of State Matthew A. Brown
100 North Main St.
First Floor
Providence, RI 02903
corporations@sec.state.ri.us
www.sec.state.ri.us

Business Hours:
M-F 8:30 am to 4:30 pm
Tel. (401) 222-3040
Fax. (401) 222-1309
Director: Sandra Williams



large selection of wines, micro & domestic beers, kegs and more!
SAVE!
BUSA
STOCK UP for the holidays!
SUTTER HOME White Zinfandel 1.5 lt. $5.99
RANCHO ZABACO Heritage Zinfandel 750 ml. $9.99
WOOD BRIDGE - Cabernet - Chardonnay - Merlot 1.5 lt. $10.99
BANFI Chianti Classico Riserva 750 ml. $11.99
BELLA SERA Pinot Grigio 1.5 lt. $7.99
FRANCISCAN OAKVILLE Chardonnay 750 ml. $11.99
Low Prices!
MILLER LITE 30 Pack $16.99
SAM ADAMS All 2/12 pk cases $19.99
NEWPORT STORM All 6 Packs $5.99
Low Prices!
BUDWEISER & BUD LIGHT 20 Pack Bottles $12.49
STELLA ARTOIS 12 Pack Bottles $9.99
$10.99 BACARDI Coconut • Raspberry Vanilla 750 ml.
$14.99 FRANGELICO 750 ml.
Great Selection
$9.99 SKYY VODKA 750 ml.
$31.99 JACK DANIELS 1.75 ml.
1412 ATWOOD AVE • JOHNSTON 272-9445 1325 POST RD • WARWICK 785-2500 • Fax 785-2503
Sale Ends 12-22-03

D

## The Commonwealth of Massachusetts
## William Francis Galvin

Secretary of the Commonwealth
One Ashburton Place, Boston, Massachusetts 02108-1512
Telephone: (617) 727-9640

### *BUSA BROS LIQUORS, INC.* Summary Screen

Help with this form

**The exact name of the Domestic Profit Corporation:** BUSA BROS LIQUORS, INC.

**Entity Type:** Domestic Profit Corporation

**Identification Number (FEIN, Trust ID, etc.):** 042295403

**Date of Organization in Massachusetts:** 02/17/1961

**Current Fiscal Month / Day:** 09 / 30 **Previous Fiscal Month / Day:** 00 / 00

**The location of its principal office in Massachusetts:**
No. and Street: 55 BEDFORD ST.
City or Town: LEXINGTON State: MA Zip: 02173 Country: USA

**If the business entity is organized wholly to do business outside Massachusetts, the location of that office:**
No. and Street:
City or Town: State: Zip: Country:

**The name and address of the Resident Agent:**
Name:
No. and Street:
City or Town: State: Zip: Country:

**The officers and all of the directors of the corporation:**

| Title | Individual Name<br>First, Middle, Last, Suffix | Address (no PO Box)<br>Address, City or Town, State, Zip Code | Expiration of Term |
|---|---|---|---|
| PRESIDENT | DANIEL P. BUSA JR. | 6 FARM RD., LEXINGTON, MA USA<br>6 FARM RD., LEXINGTON, MA USA | |
| TREASURER | DANIEL P. BUSA JR. | 6 FARM RD., LEXINGTON, MA USA<br>6 FARM RD., LEXINGTON, MA USA | |
| CLERK | DANIEL P. BUSA JR. | 6 FARM RD., LEXINGTON, MA USA | |

| | | | |
|---|---|---|---|
| | | 6 FARM RD.,<br>LEXINGTON, MA USA | |

**business entity stock is publicly traded:** __

**The total number of shares and par value, if any, of each class of stock which the business entity is authorized to issue:**

| Class of Stock | Par Value Per Share<br>Enter **0** if no Par | Total Authorized by Articles of Organization or Amendments<br>*Num of Shares* *Total Par Value* | Total Issued and Outstanding<br>*Num of Shares* |
|---|---|---|---|
| No Stock Information available online. Prior to August 27, 2001, records can be obtained on microfilm. | | | |

__ Consent __ Manufacturer __ Confidential Data __ Does Not Require Annual Report

__ Partnership __ Resident Agent __ For Profit __ Merger Allowed

**Note: There is additional information located in the cardfile that is not available on the system.**

**Select a type of filing from below to view this business entity filings:**

ALL FILINGS
Annual Report
Application For Revival
Articles of Amendment
Articles of Consolidation - Foreign and Domestic

View Filings New Search

Comments

© 2001 - 2003 Commonwealth of Massachusetts
All Rights Reserved

Help

**The Commonwealth of Massachusetts**
**William Francis Galvin**
**Secretary of the Commonwealth**
One Ashburton Place, Boston, Massachusetts 02108-1512
Telephone: (617) 727-9640

**FEE: $ 125.00**

NOTE: PLEASE TYPE OR PRINT CLEARLY!

# MASSACHUSETTS CORPORATION ANNUAL REPORT

020141530

Federal Identification No. 04-2295403

1. The exact name of the corporation is: Busa Bros. Liquors, Inc.

2. Location of its principal office in Massachusetts: 55 Bedford Street
(number and street)
Lexington (city or town) MA (state) 02173 (zip)

NOTE: If corporation is organized wholly to do business outside Massachusetts, state location of that office also:

(number & street) (city or town) (state) (zip)

3. Name and address of the Resident Agent, if any:
(name)

(number & street) (city or town) (zip)

4. Date of the end of the last fiscal year was: September (month) 30 (day) 2002 (year)

5. Check here if the corporation stock is publicly traded: ☐.

6. The capital stock of each class as of the end of its last fiscal year was:

| CLASS OF STOCK | PAR VALUE PER SHARE STATE IF NO PAR | TOTAL AUTHORIZED BY ARTICLES OF ORGANIZATION OR AMENDMENTS | | TOTAL ISSUED AND OUTSTANDING |
|---|---|---|---|---|
| | | Number of Shares | Total Par Value | Number of Shares |
| COMMON: | NO PAR | 500 | | 100 |
| PREFERRED: | | | | |

7. State the names and addresses of the officers specified below and of all the directors of the corporation, and the date on which the term of office of each expires:

| OFFICERS | NAME | ADDRESS Number, Street, City or Town, State, Zip Code | EXPIRATION OF TERM |
|---|---|---|---|
| PRESIDENT | Daniel P. Busa, Jr. | 6 Farm Rd Lexington, MA | * |
| TREASURER | Daniel P. Busa, Jr. | 6 Farm Rd Lexington, MA | * |
| CLERK | Daniel P. Busa, Jr. | 6 Farm Rd Lexington, MA | * |
| DIRECTORS | Daniel P. Busa, Jr. | 6 Farm Rd Lexington, MA | 12/31/2002 |

* UNTIL SUCCESSOR IS ELECTED AND DULY QUALIFIED

I, the undersigned Daniel P. Busa Jr., being the President of the above-named corporation, in compliance with the General Laws, Chapter 156B, hereby certify that the above information is true and correct as of the dates shown. IN WITNESS WHEREOF AND UNDER PENALTIES OF PERJURY, I hereto sign my name on this Tenth day of December, 2002.

Signature: Daniel P Busa Title: President

Contact Person: SAME Contact Person Telephone #: 781-861-1806

157481
08-21-02

156bmcar 4/5/00

# The Commonwealth of Massachusetts
## William Francis Galvin

Secretary of the Commonwealth
One Ashburton Place, Boston, Massachusetts 02108-1512
Telephone: (617) 727-9640

## *STATE ROAD LIQUOR MART, INC.* Summary Screen

Help with this form

**The exact name of the Domestic Profit Corporation:** STATE ROAD LIQUOR MART, INC.

**Entity Type:** Domestic Profit Corporation

**Identification Number (FEIN, Trust ID, etc.):** 042428312

**Date of Organization in Massachusetts:** 05/04/1967

**Current Fiscal Month / Day:** 09 / 30 **Previous Fiscal Month / Day:** 00 / 00

**The location of its principal office in Massachusetts:**
No. and Street: 182 CAMBRIDGE ST.
City or Town: BURLINGTON State: MA Zip: 01803 Country: USA

**If the business entity is organized wholly to do business outside Massachusetts, the location of that office:**
No. and Street:
City or Town: State: Zip: Country:

**The name and address of the Resident Agent:**
Name:
No. and Street:
City or Town: State: Zip: Country:

**The officers and all of the directors of the corporation:**

| Title | Individual Name<br>First, Middle, Last, Suffix | Address (no PO Box)<br>Address, City or Town, State, Zip Code | Expiration of Term |
|---|---|---|---|
| PRESIDENT | DANIEL P. BUSA JR. | 6 FARM RD.,<br>LEXINGTON, MA USA<br>6 FARM RD.,<br>LEXINGTON, MA USA | |
| TREASURER | DANIEL P. BUSA JR. | 6 FARM RD.,<br>LEXINGTON, MA USA<br>6 FARM RD.,<br>LEXINGTON, MA USA | |
| CLERK | DANIEL P. BUSA JR. | 6 FARM RD.,<br>LEXINGTON, MA USA | |

| | | | |
|---|---|---|---|
| | | 6 FARM RD., LEXINGTON, MA USA | |

**business entity stock is publicly traded:** __

**The total number of shares and par value, if any, of each class of stock which the business entity is authorized to issue:**

| Class of Stock | Par Value Per Share Enter **0** if no Par | Total Authorized by Articles of Organization or Amendments *Num of Shares* *Total Par Value* | Total Issued and Outstanding *Num of Shares* |
|---|---|---|---|
| No Stock Information available online. Prior to August 27, 2001, records can be obtained on microfilm. | | | |

__ Consent __ Manufacturer __ Confidential Data __ Does Not Require Annual Report

__ Partnership __ Resident Agent __ For Profit __ Merger Allowed

**Note: There is additional information located in the cardfile that is not available on the system.**

**Select a type of filing from below to view this business entity filings:**

ALL FILINGS
Annual Report
Application For Revival
Articles of Amendment
Articles of Consolidation - Foreign and Domestic

View Filings    New Search

Comments

© 2001 - 2003 Commonwealth of Massachusetts
All Rights Reserved

Help

The Commonwealth of Massachusetts
William Francis Galvin
Secretary of the Commonwealth
One Ashburton Place, Boston, Massachusetts 02108-1512
Telephone: (617) 727-9640

**FEE: $ 125.00**

NOTE: PLEASE TYPE OR PRINT CLEARLY!

020141529

# MASSACHUSETTS CORPORATION ANNUAL REPORT

Federal Identification No. 04-2428312

1. The exact name of the corporation is: State Road Liquor Mart, Inc.

2. Location of its principal office in Massachusetts: 182 Cambridge Street (number and street)

Burlington (city or town) MA (state) 01803 (zip)

NOTE: If corporation is organized wholly to do business outside Massachusetts, state location of that office also:

(number & street) (city or town) (state) (zip)

3. Name and address of the Resident Agent, if any: (name)

(number & street) (city or town) (zip)

4. Date of the end of the last fiscal year was: September (month) 30 (day) 2002 (year)

5. Check here if the corporation stock is publicly traded: ☐.

6. The capital stock of each class as of the end of its last fiscal year was:

| CLASS OF STOCK | PAR VALUE PER SHARE STATE IF NO PAR | TOTAL AUTHORIZED BY ARTICLES OF ORGANIZATION OR AMENDMENTS | | TOTAL ISSUED AND OUTSTANDING |
|---|---|---|---|---|
| | | Number of Shares | Total Par Value | Number of Shares |
| COMMON: | NO PAR | 5000 | | 1000 |
| PREFERRED: | | | | |

7. State the names and addresses of the officers specified below and of all the directors of the corporation, and the date on which the term of office of each expires:

| OFFICERS | NAME | ADDRESS Number, Street, City or Town, State, Zip Code | EXPIRATION OF TERM |
|---|---|---|---|
| PRESIDENT | Daniel P. Busa, Jr. | 6 Farm Rd. Lexington, MA | * |
| TREASURER | Daniel P. Busa, Jr. | 6 Farm Rd. Lexington, MA | * |
| CLERK | Daniel P. Busa, Jr. | 6 Farm Rd. Lexington, MA | * |
| DIRECTORS | Daniel P. Busa, Jr. | 6 Farm Road Lexington, MA | 12/31/2002 |

* UNTIL SUCCESSOR IS ELECTED AND DULY QUALIFIED

I, the undersigned DANIEL P BUSA JR, being the PRESIDENT of the above-named corporation, in compliance with the General Laws, Chapter 156B, hereby certify that the above information is true and correct as of the dates shown. IN WITNESS WHEREOF AND UNDER PENALTIES OF PERJURY, I hereto sign my name on this [signature] day of December, 20 02.

Signature: [signature] Title: President

Contact Person: SAME Contact Person Telephone #: 781 861 1806

157481
06-21-02

158bmoar 4/5/00

(A)

LAW OFFICES OF
REVENS, REVENS & ST. PIERRE
A PROFESSIONAL CORPORATION
946 CENTERVILLE ROAD
WARWICK, RHODE ISLAND 02886-4373

JOHN C. REVENS, JR.
DAVID E. REVENS
MICHAEL A. ST. PIERRE*

KEVIN M. HAYES
JAMES E. KELLEHER
NICOLE J. SHANNON
JENNIFER A. ST. LAURENT*

TELEPHONE
(401) 822-2900
TELECOPIER
(401) 826-3245

*MEMBER OF MASSACHUSETTS BAR

RECEIVED
RHODE ISLAND

JAN 30 2004

SECURITIES DIVISION
BUSINESS REGULATION

January 28, 2004

Department of Business Regulation
SECURITIES DIVISION
Attn: Steven G. Kagan
233 Richmond Street
Providence, RI 02903-4232

RE: Busa Wine & Spirits, Inc.

Dear Mr. Kagan:

This letter is sent in response to your letter dated, January 5, 2004, which inquires as to my client's status under RIGL 19-28.1 et seq. The complaint lodged by Mr. John Haronian is lacking in specificity and is frivolous on its face. The complaint discusses in no detail the date, time or place of any alleged violation; only to state that it is "ongoing". The "Nature of Complaint" is similarly lacking in specificity in that it makes a bald assertion while providing neither documentation nor any "specific information "as requested

It is clear from the "Department Complaint Form" that in fact Busa Wine & Spirits, Inc. and Busa Fine Wine & Spirits, Inc. are two separate and distinct companies that do not market themselves under a common name or mark. Busa Wine & Spirits, Inc. is located at 1325 Post Road in Warwick; Thomas X. Busa is the President and sole shareholder of this company. Busa Fine Wine & Spirits is located at 1214 Atwood Avenue in Johnston; Daniel P. Busa is the President and sole shareholder of this company. Again, two separate and distinct companies.

Please contact me with any questions or concerns.

Very truly yours,

Jennifer St. Laurent Sowa, Esquire

JAS
J40122ltrBusaWine

LAW OFFICES OF
REVENS, REVENS & ST. PIERRE
A PROFESSIONAL CORPORATION
946 CENTERVILLE ROAD
WARWICK, RHODE ISLAND 02886-4373

JOHN C. REVENS, JR.
DAVID E. REVENS
MICHAEL A. ST. PIERRE*

KEVIN M. HAYES
JAMES E. KELLEHER
NICOLE J. SHANNON
JENNIFER A. ST. LAURENT*

TELEPHONE
(401) 822-2900
TELECOPIER
(401) 826-3245

*MEMBER OF MASSACHUSETTS BAR

January 28, 2004

Department of Business Regulation
SECURITIES DIVISION
Attn: Steven G. Kagan
233 Richmond Street
Providence, RI 02903-4232

RECEIVED
RHODE ISLAND
JAN 30 2004
SECURITIES DIVISION
BUSINESS REGULATION

RE: Busa Fine Wine & Spirits, Inc.

Dear Mr. Kagan:

This letter is sent in response to your letter dated, January 5, 2004, which inquires as to my client's status under RIGL 19-28.1 et seq. The complaint lodged by Mr. John Haronian is lacking in specificity and is frivolous on its face. The complaint discusses in no detail the date, time or place of any alleged violation; only to state that it is "ongoing". The "Nature of Complaint" is similarly lacking in specificity in that it makes a bald assertion while providing neither documentation nor any "specific information "as requested

It is clear from the "Department Complaint Form" that in fact Busa Wine & Spirits, Inc. and Busa Fine Wine & Spirits, Inc. are two separate and distinct companies that do not market themselves under a common name or mark. Busa Wine & Spirits, Inc. is located at 1325 Post Road in Warwick; Thomas X. Busa is the President and sole shareholder of this company. Busa Fine Wine & Spirits is located at 1214 Atwood Avenue in Johnston; Daniel P. Busa is the President and sole shareholder of this company. Again, two separate and distinct companies.

Please contact me with any questions or concerns.

Very truly yours,

Jennifer St. Laurent Sowa, Esquire

JAS
J40122ltrBusaFineWine

**LAWSON & WEITZEN, LLP**

ATTORNEYS AT LAW

88 BLACK FALCON AVENUE, SUITE 345
BOSTON, MASSACHUSETTS 02210-2414

EVAN T. LAWSON
RICHARD B. WEITZEN *
PAMELA B. BANKERT
FRANK L. BRIDGES
IRA H. ZALEZNIK
JOHN J. WELTMAN ***
VALERIE L. PAWSON
GEORGE F. HAILER +
GEORGE E. CHRISTODOULO, PC
KENNETH B. GOULD
JOSEPH FRIEDMAN
JOHN A. TENNARO
WILLIAM F. COYNE, JR.
DAVID A. RICH *
DENNIS J. MANESIS ++
NATALIE A. KANELLIS †
PATRICIA L. FARNSWORTH
K. SCOTT GRIGGS
MICHAEL J. McDEVITT
MARTIN S. EBEL ††
STEVEN M. BUCKLEY
J. MARK DICKISON **
CLARE B. BURHOE
ROBERT J. ROUGHSEDGE +++
CAROLINE A. O'CONNELL *
JILL M. MORRISSEY
MARISSA A. GOLDBERG
MICHAEL WILLIAMS
NICOLE L. JOHNSON
KATHRYN E. PIECZARKA

BOSTON
TELEPHONE (617) 439-4990
TELECOPIER (617) 439-3987
EMAIL: POST@LAWSON-WEITZEN.COM
WWW.LAWSON-WEITZEN.COM

CAPE COD
LAWSON, WEITZEN & BANKERT, LLP
SIX GRANITE STATE COURT
BREWSTER, MASSACHUSETTS 02631
TELEPHONE (508) 255-3600

June 28, 2004

Steven G. Kagan
Department of Business Regulation
Securities Division
233 Richmond Street, Suite 232
Providence, RI 02903-4232

Jeffrey J. Greer, Assoc. Director
Department of Business Regulation
Commercial Licensing Division
Liquor/Enforcement and Compliance
233 Richmond Street, Suite 230
Providence, RI 02903-4230

Re: Busa Wine & Spirits, Inc.
Busa Fine Wine & Spirits, Inc.

Dear Messrs. Kagan and Greer,

This letter is in reply to the answers of Busa Wine & Spirits, Inc. and Busa Fine Wine & Spirits, Inc. (Exhibit A) to the complaints filed against them by Mr. John Haronian regarding their violations of R.I. Gen. Laws § 19-28.1 et seq., and R.I. Gen. Laws § 3-5-11. Complaints were filed with both the Franchising Section of the Division of Securities Regulation, and the Division of Commercial Licensing and Regulation, Liquor/Enforcement and Compliance Section. (Exhibit B).

As stated in the complaint, Busa Wine & Spirits, Inc., of 1325 Post Road, Warwick, RI, and Busa Fine Wine & Spirits, Inc., of 1214 Atwood Avenue, Johnston, RI, operate as a franchise, without having registered as such as required by R.I. Gen. Laws § 19-28.1-5. Pursuant to R.I. Gen. Laws § 19-28.1-3, a franchise includes an oral or written agreement, either express or implied, which grants the right to distribute goods under a marketing plan, and allows the business to be substantially associated with a trademark, trade name, or advertising. Indicia of a marketing plan include promotional or advertising material, or cooperative advertising.

Both establishments are substantially associated with a common name and mark. The

* ALSO ADMITTED IN NY
** ALSO ADMITTED IN NH
*** ALSO ADMITTED IN CA
+ ALSO ADMITTED IN DC
++ ALSO ADMITTED IN NJ & PA
+++ ALSO ADMITTED IN RI, CT, NH & ME
† ALSO ADMITTED IN NH & NY
†† ALSO ADMITTED IN MI

word "Fine" is the only minor difference between the names "Busa Wine & Spirits, Inc." and "Busa Fine Wine & Spirits, Inc." Furthermore, the two establishments participate in a marketing plan, which includes cooperative promotional and advertising material. For example, an advertisement taken out by the two establishments under the common name "Busa" indicates that they distribute products under a cooperative marketing plan, that the same products are sold at either location, and that both stores are associated with the common name "Busa." (See Exhibit C).

Alternatively, the two Busa establishments operate as a chain store in violation of R.I. Gen. Laws § 3-5-11 by sharing a common name, and by holding themselves out to the public as being the same business entity. Although the current statute provides that the determination of what constitutes a chain store is a question of fact to be determined by the DBR, the current proposal to amend the statute before the General Assembly enumerates factors to determine whether a chain store organization exists. In defining chain store, the proposed amendment includes factors such as the same management or operation of more than one liquor-licensed business, coordinated advertising or implementation of marketing strategies, common billing, and common pricing of products.

As indicated by the advertisement (See Exhibit C), in addition to sharing a common name, the stores engage in coordinated advertising and marketing strategies, and common pricing of products. Daniel P. Busa, Jr., President of Busa Fine Wine & Spirits, Inc., is also the owner of Busa Bros. Liquors, Inc. of Lexington, Massachusetts, and State Road Liquor Mart, Inc., of Burlington, Massachusetts (Exhibit D). Pursuant to § 3-5-11, a prohibited chain store operation includes common ownership is not limited to stores located in the state, and, therefore, the common ownership by Daniel Busa of the three liquor stores constitutes a chain store operation.

By operating either as an unregistered franchise, or alternatively by engaging in business as a chain store organization, Busa Wine & Spirits, Inc. and Busa Fine Wine & Spirits, Inc. are engaged in ongoing violations of R.I. Gen. Law § 19-28.1 et. seq, and R.I. Gen. Law § 3-5-11.

Complainant further requests permission to take discovery on the matters addressed by his complaint. Please call me if you have any questions at (617) 439-4990.

Very truly yours,

Robert J. Roughsedge

Enclosures
cc: Client

A

F

STA… OF RHODE ISLAND AND PROVIDENC… PLANTATIONS
DEPARTMENT OF BUSINESS REGULATION
DIVISION OF COMMERCIAL LICENSING AND REGULATION
233 RICHMOND STREET
PROVIDENCE, RI 02903

Telephone: (401) 222-2416
Fax: (401) 222-6654
TDD: (401) 222-2999

## LIQUOR COMPLAINT FORM

**INSTRUCTIONS:** Please complete this form and return to the above address if you have reason to believe that a Liquor Licensee regulated by the Department of Business Regulation has violated the law or failed to meet his/her responsibilities and obligation to the public. Please print or type. This form will NOT be accepted unless signed by complainant.

COMPLAINANT'S Name:

*John Haronian*

Residence:

Mailing Address (If different from Residence):

*1405 Douglas Avenue, North Providence, RI 02904*

Daytime Telephone number: Nighttime Telephone Number:

*353-4400*

Name and address of LIQUOR ESTABLISHMENT the complaint is being made:

*A Texeira & Co., Inc. d/b/a/ Top's Liquors, 605 Newport Ave., Pawtucket; and*

*The Cumberland Wine Shop, Inc., 27 Dexter St., Cumberland*

Name of LICENSEE the complaint is being made:

*A Texeira & Co., Inc. d/b/a/ Top's Liquors and The Cumberland Wine Shop, Inc.*

Date and Time and Place of alleged Violation:

*A Texeira & Co., Inc. d/b/a/ Top's Liquors and The Cumberland Wine Shop, Inc. currently operate as a chain in violation of RI Gen. Laws §3-5-11.*

Other Federal, State Municipal, Local Agencies, or Legal Counsel you have contacted, including results of contacts:

*None*

On the reverse side of this form, or on an attached piece of paper, explain as fully as possible the exact nature of your complaint against the licensee or regulated activity. Be sure to include specific information such as dates and purchase services, name, address, telephone of offending licensee, account numbers, etc. Also, attach any documentation which you feel will help support your allegations including sales slips, warranty contracts, purchase and sales agreement, canceled checks, travel vouchers, insurance policies, etc.

*Honorato Custodio is an officer of these two stores. This joint management of two liquor stores violates RI Gen. Law. §3-5-11 by creating a chain store.*

*These stores are engaged in other activities that suggest the existence of an illegal chain store.*

The undersigned swears to or affirms the truth and accuracy of all statements, answers, representations and allegations contained herein, including all statements hereto attached.

X________________________________________ Date: ____________________________

Signed

STATE OF RHODE ISLAND
AND PROVIDENCE PLANTATIONS
Office of the Secretary of State

Edward S. Inman, III, Secretary o
Corporations D
100 North Main Street, Providence, RI 02903
401-222

# PROFIT CORPORATION ANNUAL REPORT FOR THE YEAR 2003

**Filing Period: January 1–March 1 •• Filing Fee: $50.00**

(FORM MUST BE TYPED OR PRINTED IN BLACK)

1. Corporate ID No.: 9450
2. Name of Corporation: A. TEIXEIRA & COMPANY, INC.
3. Street Address Principal Business Office: 605 Newport Ave. City: Pawtucket State: RI Zip: 02861
4. Business Phone No.: 401-722-5334
5. State of Incorporation: RHODE ISLAND
6. SIC Code:
7. Brief Description of the Character of Business Conducted in Rhode Island: Retail sale of alcoholic beverages

## 8. NAMES AND ADDRESSES OF THE OFFICERS ("X" BOX FOR ATTACHMENT) FILL IN SPACES BEFORE USING ATTACHMENTS

| | Name | Street Address | City | State | Zip |
|---|---|---|---|---|---|
| President | Joachim Duarte | 150 High St. | Cumberland | RI | 02864 |
| Vice President | Manuel Moitoso | 1085 Lonsdale Ave. | Central Falls | RI | 02863 |
| Secretary | Sandra Matrone Mack | 1500 Fleet Center | Providence | RI | 02903 |
| Treasurer | Honorato Custodio | 605 Newport Ave. | Pawtucket | RI | |

## 9. NAMES AND ADDRESSES OF THE DIRECTORS ("X" BOX FOR ATTACHMENT) FILL IN SPACES BEFORE USING ATTACHMENTS

| Director Name | Street Address | City | State | Zip |
|---|---|---|---|---|
| None | | | | |
| | | | | |
| | | | | |
| | | | | |

## 10. SHARES AUTHORIZED ("X" BOX FOR ATTACHMENT)

AUTHORIZED SHARES

| Number of Shares | Class/Series | Par Value |
|---|---|---|
| 1,000 NO PAR VALUE | | |

## 11. SHARES ISSUED ("X" BOX FOR ATTACHMENT)

ISSUED SHARES

| Number of Shares | Class/Series | Par Value |
|---|---|---|
| 632.00 | Common Stock | none |

This report must be **signed in ink** by either the President, Vice President, Secretary, Assistant Secretary, Treasurer, Receiver or Tru

*9450*

File Date: 1/28/03

Check No.: 148956

By: [signature]

Under penalty of perjury, I declare and affirm that I have examined this report, including any accompanying schedules and statements, that all statements contained herein are true and correct.

[signature] 1/24/03
Signature of Officer Date

Sandra Matrone Mack
Print or Type Name of Officer

Secretary

STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS
Office of the Secretary of State

Edward S. Inman, III, Secretary of State
Corporations Division
100 North Main Street, Providence, RI 02903-
401-222-

STOP

# PROFIT CORPORATION ANNUAL REPORT FOR THE YEAR 2003

*Filing Period: January 1–March 1 • Filing Fee: $50.00*

(FORM MUST BE TYPED OR PRINTED IN BLACK)

1. Corporate ID No.: 119043
2. Name of Corporation: THE CUMBERLAND WINE SHOP, INC.
3. Street Address Principal Business Office: 27 Dexter Street — City: Cumberland — State: RI — Zip: 02864
4. Business Phone No.: 529-3253
5. State of Incorporation: RHODE ISLAND
6. SIC Code: 3251
7. Brief Description of the Character of Business Conducted in Rhode Island: RETAIL SALE OF ALCOHOLIC BEVERAGES

**8. NAMES AND ADDRESSES OF THE OFFICERS** ("X" BOX FOR ATTACHMENT) FILL IN SPACES BEFORE USING ATTACHMENTS

| | |
|---|---|
| President Name: Honorato M. Custodio | Vice President Name: None |
| Street Address: 605 Mendon Avenue | Street Address: |
| City: Pawtucket State: RI Zip: 02861 | City: State: Zip: |
| Secretary Name: None | Treasurer Name: None |
| Street Address: | Street Address: |
| City: State: Zip: | City: State: Zip: |

**9. NAMES AND ADDRESSES OF THE DIRECTORS** ("X" BOX FOR ATTACHMENT) FILL IN SPACES BEFORE USING ATTACHMENTS

| | |
|---|---|
| Director Name: None | Director Name: None |
| Street Address: | Street Address: |
| City: State: Zip: | City: State: Zip: |
| Director Name: None | Director Name: None |
| Street Address: | Street Address: |
| City: State: Zip: | City: State: Zip: |

**10. SHARES AUTHORIZED** ("X" BOX FOR ATTACHMENT)

AUTHORIZED SHARES

| Number of Shares | Class/Series | Par Value |
|---|---|---|
| 1,000 NO PAR VALUE | | |

**11. SHARES ISSUED** ("X" BOX FOR ATTACHMENT)

ISSUED SHARES

| Number of Shares | Class/Series | Par Value |
|---|---|---|
| 750 | Common | NPV |

This report must be **signed in ink** by either the President, Vice President, Secretary, Assistant Secretary, Treasurer, Receiver or Tr

* 1 1 9 0 4 3 *

File Date: 3·14·03

Check No.: 1213

By: 1UP

Under penalty of perjury, I declare and affirm that I have examine this report, including any accompanying schedules and statement that all statements contained herein are true and correct.

[signature] — Signature of Officer — Date: 3/13/03

Honorato M. Custodio
Print or Type Name of Officer

President

(B)

State of Rhode Island

A-105

CUMBERLAND
City or Town

# Board of Licensing Commissioners
## Application for License By Corporation

RETAILER CLASS:

A X BH___ BM___ BT___ BV___ BVL___ C___ E___ ED___ J___ T___ (2:00 a.m.)

A. TEIXEIRA & CO. INC. — 401-333-4131
Name of Applicant (Corp. Name) — Telephone #

POP'S LIQUORS
D/B/A

2080 DIAMOND HILL RD CUMBERLAND RI 02864
Address of Premise

RI — 1981
State - Incorporated — Date of Incorporation

Name, Address and Telephone Number of Officers:

JOAQUIM DUARTE [redacted]
President

MANUEL MOITOSO [redacted]
Vice President

Secretary

HONORATO M CUSTODIO [redacted]
Treasurer

Name and Address of All Directors or Board Members:

NO BOARD OF DIRECTORS

Classes of Stock:

(a) Amount of Each Authorized 1000 Common

(b) Amount of Each Issued: 532

Names and Addresses of All Registered Owners of Each Class and amount owned: (attach if necessary)

JOAQUIM DUARTE [redacted] (266)
MANUEL MOITOS [redacted] (133)
HONORATO CUSTODIO [redacted] (133)

If any of the above hypothecated or pledged provide details:

If application is in behalf of undisclosed principal or party in interest, give details:

Does Applicant Own Premises ? Yes___ No X Is Property Mortgaged ? Yes ___ No ___
Is Property Leased ? Yes X No ___

Give Name and Address Mortgagee or Lessee and Amount of Extent
CHAPEL FOUR CORNERS LLC 2080 DIAMOND HILL RD
CUMBERLAND RI 02864 $105,000.00 PER YEAR

Have any Officers, Board Members or Stockholders ever been arrested or convicted of a crime ?
Yes ___ No X If Yes Explain.

Is any other business to be carried on in Licensed Premises ? Yes ___ No X If yes Explain.

Is any Officer, Board Member or Stockholder engaged in any manner as a Law Enforcement Officer ?
If yes Please explain.
NO

Is applicant or any of its officers, Board Members or Stockholders interested directly or indirectly, as principle or associate, or in any manner whatsoever, in any retail license issued under Chapter 3-7 of the General Laws of Rhode Island, 1956, as amended ? If Yes, explain.
JOAQUIM DUARTE, MANUEL MAITOSO, HONORATO CUSTODIO
OWN A 75% INTEREST IN THE CUMBERLAND WINE SHOP INC

Is applicant the owner or operator of any other business ? If yes, explain.
NO

State amount of capital invested in the business.
$300,000

Does applicant have draft system ?
NO

I hereby certify that the above statements are true to the best of my knowledge and belief.

[signature]
APPLICANT

10-27-03
DATE

[signature]
Witness of Licensing Board or Notary Public

10-27-03
Date of Witness or Notary Expiration

Instructions for Corporation Applicants

1. Every question on Application Form must be answered. Any false statement made by the Applicant will be sufficient grounds for denial of the application or the revocation of the license in case one has been granted.

State of Rhode Island

A-105

Cumberland
City or Town

# Board of Licensing Commissioners
## Application for License By Corporation

RETAILER CLASS:

A X BH___ BM___ BT___ BV___ BVL___ C___ E___ ED___ J___ T___ ( 2:00 a.m. )

A. Teixeira & Co. Inc. — 401-333-4131
Name of Applicant (Corp. Name) — Telephone #

Pop's Liquors
D/B/A

2080 Diamond Hill Rd Cumberland RI 02864
Address of Premise

RI — 1981
State - Incorporated — Date of Incorporation

Name, Address and Telephone Number of Officers:

Joaquim Duarte [redacted]
President

Manuel Moitoso [redacted]
Vice President

Secretary

Honorato M Custodio [redacted]
Treasurer

Name and Address of All Directors or Board Members:

No Board of Directors

Classes of Stock:

(a) Amount of Each Authorized 1000 Common

(b) Amount of Each Issued: 532

Names and Addresses of All Registered Owners of Each Class and amount owned: (attach if necessary)

Joaquim Duarte [redacted] (266)
Manuel Mattos [redacted] (133)
Honorato Custodio [redacted] (133)

If any of the above hypothecated or pledged provide details:

If application is in behalf of undisclosed principal or party in interest, give details:

Does Applicant Own Premises ? Yes ___ No X Is Property Mortgaged ? Yes ___ No ___
Is Property Leased ? Yes X No ___

Give Name and Address Mortgagee or Lessee and Amount of Extent
CHAPEL FOUR CORNERS LLC 2080 DIAMOND HILL RD
CUMBERLAND RI 02864 $105,000.00 PER YEAR

Have any Officers, Board Members or Stockholders ever been arrested or convicted of a crime ?
Yes ___ No X If Yes Explain.

Is any other business to be carried on in Licensed Premises ? Yes ___ No X If yes Explain.

Is any Officer, Board Member or Stockholder engaged in any manner as a Law Enforcement Officer ?
If yes Please explain.
NO

Is applicant or any of its officers, Board Members or Stockholders interested directly or indirectly, as principle or associate, or in any manner whatsoever, in any retail license issued under Chapter 3-7 of the General Laws of Rhode Island, 1956, as amended ? If Yes, explain.
JOAQUIM DUARTE, MANUEL MOITOSO, HONORATO CUSTODIO
OWN A 75% INTEREST IN THE CUMBERLAND WINE SHOP INC

Is applicant the owner or operator of any other business ? If yes, explain.
NO

State amount of capital invested in the business.
$300,000

Does applicant have draft system ?
NO

I hereby certify that the above statements are true to the best of my knowledge and belief.

[signature]
APPLICANT

10-27-03
DATE

[signature]
Witness of Licensing Board or Notary Public

10-27-03
Date of Witness or Notary Expiration

Instructions for Corporation Applicants

1. Every question on Application Form must be answered. Any false statement made by the Applicant will be sufficient grounds for denial of the application or the revocation of the license in case one has been granted.

(C)

State of Rhode Island

A101

CUMBERLAND, RI
City or Town

# Board of Licensing Commissioners
## Application for License By Corporation

RETAILER CLASS:
(A)__ BH__ BM__ BT__ BV__ BVL__ C__ E__ ED__ J__ T__ ( 2:00 a.m. )

Name of Applicant (Corp. Name) ACT INC. Telephone # 658-0506

D/B/A MENDON LIQUORS

Address of Premise 2370 MENDON RD. CUMBERLAND, RI 02864

State - Incorporated RHODE ISLAND Date of Incorporation

Name, Address and Telephone Number of Officers:
CESAR L. TEIXEIRA, 5 MAPLE ST. CUMBERLAND, RI 02864 / 728-4766
President
BASIL SILVA, 37 SONNY DR. CUMBERLAND, RI 02864 / 658-0518
Vice President
ARMENIO TEIXEIRA, 48 JENKS AVE. CENTRAL FALLS, RI 02864 723-3517
Secretary

Treasurer CESAR TEIXEIRA

Name and Address of All Directors or Board Members:

SAME AS ABOVE

Classes of Stock:
(a) Amount of Each Authorized 8,000 shares COMMON STOCK, NO PAR

(b) Amount of Each Issued: 3,000 shares ISSUED

Names and Addresses of All Registered Owners of Each Class and amount owned: (attach if necessary)

SAME AS ABOVE

If any of the above hypothecated or pledged provide details:
N/A

If application is in behalf of undisclosed principal or party in interest, give details:

Does Applicant Own Premises ? Yes__ No ✓ Is Property Mortgaged ? Yes __ No __
Is Property Leased ? Yes__ No __

Give Name and Address Mortgagee or Lessee and Amount of Extent
Lessor: JOAQUIM DUARTE
HIGH ST.
CUMBERLAND, RI 02864

Have any Officers, Board Members or Stockholders ever been arrested or convicted of a crime ?
Yes __ No ✓ If Yes Explain.

Is any other business to be carried on in Licensed Premises ? Yes __ No ✓ If yes Explain.

Is any Officer, Board Member or Stockholder engaged in any manner as a Law Enforcement Officer ?
If yes Please explain.
N/A

Is applicant or any of its officers, Board Members or Stockholders interested directly or indirectly, as principle or associate, or in any manner whatsoever, in any retail license issued under Chapter 3-7 of the General Laws of Rhode Island, 1956, as amended ? If Yes, explain.
NA

Is applicant the owner or operator of any other business ? If yes, explain.
NA

State amount of capital invested in the business.
175,000

Does applicant have draft system ?
NO

I hereby certify that the above statements are true to the best of my knowledge and belief.

[signature] 10/20/02
APPLICANT DATE

[signature] 10/25/02
Witness of Licensing Board or Notary Public Date of Witness or Notary Expiration

Jeannette E. Simpson 10-25-02

Instructions for Corporation Applicants

1. Every question on Application Form must be answered. Any false statement made by the Applicant will be sufficient grounds for denial of the application or the revocation of the license in case one has been granted.

**LAWSON & WEITZEN, LLP**
ATTORNEYS AT LAW

88 BLACK FALCON AVENUE, SUITE 345
BOSTON, MASSACHUSETTS 02210-2414

EVAN T. LAWSON
RICHARD B. WEITZEN *
PAMELA B. BANKERT
FRANK L. BRIDGES
IRA H. ZALEZNIK
JOHN J. WELTMAN ***
VALERIE L. PAWSON
GEORGE F. HAILER +
GEORGE E. CHRISTODOULO, PC
KENNETH B. GOULD
JOSEPH FRIEDMAN
JOHN A. TENNARO
WILLIAM F. COYNE, JR.
DAVID A. RICH *
DENNIS J. MANESIS ++
NATALIE A. KANELLIS †
PATRICIA L. FARNSWORTH
K. SCOTT GRIGGS
MICHAEL J. McDEVITT
MARTIN S. EBEL ††
STEVEN M. BUCKLEY
J. MARK DICKISON **
CLARE B. BURHOE
ROBERT J. ROUGHSEDGE +++
CAROLINE A. O'CONNELL *
JILL M. MORRISSEY
MARISSA A. GOLDBERG
MICHAEL WILLIAMS
NICOLE L. JOHNSON
KATHRYN E. PIECZARKA

BOSTON
TELEPHONE (617) 439-4990
TELECOPIER (617) 439-3987
EMAIL: POST@LAWSON-WEITZEN.COM
WWW.LAWSON-WEITZEN.COM

CAPE COD
LAWSON, WEITZEN & BANKERT, LLP
SIX GRANITE STATE COURT
BREWSTER, MASSACHUSETTS 02631
TELEPHONE (508) 255-3600

June 28, 2004

Jeffrey J. Greer, Assoc. Director
Department of Business Regulation
Commercial Licensing Division
Liquor/Enforcement and Compliance
233 Richmond Street, Suite 230
Providence, RI 02903-4230

Re: The Cumberland Wine Shop, Inc. d/b/a Cumberland Wine & Spirits
A. Teixeira & Co. Inc. d/b/a Pop's Liquors
ACT, Inc. d/b/a Mendon Liquors

Dear Mr. Greer,

This letter is in regards to the complaint filed by Mr. John Haronian against A. Teixeira & Co. Inc., and The Cumberland Wine Shop, Inc. concerning their violations of R.I. Gen. Laws § 3-5-11. The complaint was filed with the Division of Commercial Licensing and Regulation, Liquor/Enforcement and Compliance Section. To this date, the respondents have not filed any answer. (Exhibit A). Since filing the complaint, it has been discovered that ACT, Inc. d/b/a Mendon Liquors is also violating the above statute in conjunction with the two establishments.

As stated in the complaint, The Cumberland Wine Shop, Inc. d/b/a Cumberland Wine & Spirits, of 27 Dexter Street in Cumberland and A. Teixeira & Co. Inc. d/b/a Pop's Liquors, of 2080 Diamond Hill Road also in Cumberland, operate as an illegal chain store organization prohibited by R.I. Gen. Laws § 3-5-11. New information reveals that along with ACT, Inc. d/b/a Mendon Liquors of 2370 Mendon Road, Cumberland, is part of that same chain store operation. Although the current statute provides that the determination of what constitutes a chain store is a question of fact to be determined by the DBR, common ownership has been recognized as indicating an illegal chain store.

* ALSO ADMITTED IN NY
** ALSO ADMITTED IN NH
*** ALSO ADMITTED IN CA
+ ALSO ADMITTED IN DC
++ ALSO ADMITTED IN NJ & PA
+++ ALSO ADMITTED IN RI, CT, NH & ME
† ALSO ADMITTED IN NH & NY
†† ALSO ADMITTED IN MI

**LAWSON & WEITZEN, LLP**



The current proposal to amend the statute before the General Assembly enumerates factors to determine whether a chain store organization exists. In defining chain store, the proposed amendment includes any group that includes "the same management or operation of more than one liquor-licensed business," and "the same individual or corporate owners."

All three establishments are violating the statute by having common management and ownership. First, Honorato M. Custodio is an officer of two of the establishments as the Treasurer of A. Teixeira & Co., Inc. and the president of the Cumberland Wine Shop, Inc. (Exhibit B). Second, Joaquim Duarte, Manuel Moitoso, and Honorato M. Custodio are the same owners of Cumberland Wine & Spirits and Pop's Liquors. The owners admit their joint ownership on their liquor applications. (Exhibit B). Third, ACT, Inc. d/b/a Mendon Liquors, leases its premises from Joaquim Duarte, an owner of A. Teixeira & Co., Inc. d/b/a Pop's Liquors and the Cumberland Wine Shop, Inc. Given that Duarte derives rent income from this lease arrangement, he has a direct financial interest in Mendon Liquors. The liquor license application fails to disclose this interest, by leaving out the terms of the lease, even though this information is required to be included on the application. (Exhibit C).

By operating as a chain store organization, with common ownership, management and direct financial interests among the owners, the three establishments are engaged in ongoing violations of R.I. Gen. Law § 3-5-11.

Complainant further requests permission to take discovery on the matters addressed by his complaint. Please call me if you have any questions at (617) 439-4990.

Very truly yours,

Robert J. Roughsedge

Enclosures

cc: Client

(B)

(G)

STATE C RHODE ISLAND AND PROVIDENCE NTATIONS
DEPARTMENT OF BUSINESS REGULATION
DIVISION OF COMMERCIAL LICENSING AND REGULATION
233 RICHMOND STREET
PROVIDENCE, RI 02903

Telephone: (401) 222-2416
Fax: (401) 222-6654
TDD: (401) 222-2999

# LIQUOR COMPLAINT FORM

**INSTRUCTIONS:** Please complete this form and return to the above address if you have reason to believe that a Liquor Licensee regulated by the Department of Business Regulation has violated the law or failed to meet his/her responsibilities and obligation to the public. Please print or type. This form will NOT be accepted unless signed by complainant.

---

COMPLAINANT'S Name:

*John Haronian*

---

Residence:

---

Mailing Address (If different from Residence):

*1405 Douglas Avenue, North Providence, RI 02904*

---

Daytime Telephone number: Nighttime Telephone Number:

*353-4400*

---

Name and address of LIQUOR ESTABLISHMENT the complaint is being made:

*Kitson's Liquor d/b/a Christy's Liquors, 673 Putnam Pike, P.O. Box 888, Chepachet; and*

*Christy's Liquor Inc., 1188 Mainstreet, P.O. Box 800, Chepachet; and*

*Crestwood Wine & Spirits d/b/a Christy's Liquors, 151 Sandy Bottom Road, Coventry; and*

*Clift's Liquors Inc. d/b/a Christy's Liquors, 191 Willet Avenue, Riverside; and*

*Heritage Liquors Inc. d/b/a Christy's Liquor Superstore, 529 Reservoir, Cranston.*

---

Name of LICENSEE the complaint is being made:

*Kitson's Liquor d/b/a Christy's Liquors, Christy's Liquor Inc., Crestwood Wine & Spirits d/b/a Christy's Liquors, Clift's Liquors Inc. d/b/a Christy's Liquors, and Heritage Liquors Inc. d/b/a Christy's Liquor Superstore.*

---

Date and Time and Place of alleged Violation:

*On going.*

---

Other Federal, State Municipal, Local Agencies, or Legal Counsel you have contacted, including results of contacts:

*A separate complaint with the Franchising Section of the Division of Securities Regulation.*

---

On the reverse side of this form, or on an attached piece of paper, explain as fully as possible the exact nature of your complaint against the licensee or regulated activity. Be sure to include specific information such as dates and purchase services, name, address, telephone of offending licensee, account numbers, etc. Also, attach any documentation which

you feel will help support your allegations including sales slips, warranty contracts, purchase and sales agreement, canceled checks, travel vouchers, insurance policies, etc.

*Under the interpretation of RI Gen. Laws §3-5-11 suggested by the five Christy's Liquors stores in their complaint against Douglas Wine & Spirit, their use of the same name would be evidence of an illegal chain store.*

*Kitson's Liquor d/b/a Christy's Liquors, Christy's Liquor Inc. describe themselves as having "Two Locations To Better Serve Our Customers" in the attached web page.*

*These stores are engaged in other activities that suggest the existence of an illegal chain store.*

*If the five Christy's Liquors do not constitute an illegal chain store, they are operating as an unregistered franchise. A separate complaint with the Franchising Section of the Division of Securities Regulation.*

---

The undersigned swears to or affirms the truth and accuracy of all statements, answers, representations and allegations contained herein, including all statements hereto attached.

X____________________________________ Date: ______________________

Signed

Chepachet.com is now accepting Visa, MasterCard, Discover and American Express for Business Listings ... CLICK HERE!

# Christy's Liquors

**"Two Locations To Better Serve Our Custon**

ON MAIN STREET

| | |
|---|---|
| Owner/Contact: | Robert Kitson |
| Street Address: | 1184 Main Street, Chepachet, RI |
| Phone: | Store 568-2222; Office 568-8100 |
| Hours: | Open Monday thru Saturday 9:00am to 9:00pm |

ON PUTNAM PIKE

| | |
|---|---|
| Owner/Contact: | Kevin Kitson |
| Street Address: | 677 Putnam Pike, Chepachet, RI<br>2 miles east of Chepachet |
| Phone: | Store 568-1111; Office 568-8100 |
| Hours: | Open Monday thru Saturday 9:00am to 9:00pm |
| Profile: | Both Christy's Liquors locations offer a wide array imported and domestic beer, wine, and liquor. Als available are lottery tickets, a variety of snack iter cigarettes at discount prices. |
| Member of: | Glocester Business Association |

©1999-2002 MouseWorks. All rights

**LIKE THIS SITE?** Please tell a friend! **SUGGESTIONS?** Please tell us! info@chepachet.cc

© 1999-2003 Chepachet.com & MouseWorks Web Site Design. All rights reserved.
142 George Allen Road • Chepachet, RI 02814 • 401.568.4016
This site is best viewed at 800 x 600 screen resolution.

STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS
*Office of the Secretary of State*
***Matthew A. Brown, Secretary of State***

Home | Administration | Archives & Public Records | Corporations | Elections | Business Development | Civics & Public

Corporations Database

# Rhode Island Corporation Search:

Corporation Status: Active
Look In: Corporation Name
Search Terms:
Search Type: Show Records with ALL of the above terms. Click Here for help with Boolean Searches
Submit | Reset

---

ANNUAL REPORT AUTO-FILL

Please Select the Year you are filing for: 2003 Submit | Reset

(Note: You Need Adobe Reader Version 5 or above to create an auto-filled annual report, Click Here for the free download)

---

## ID# 740

## Christy's Liquors, Inc.

**Purpose:** TO ENGAGE IN THE BUSINESS, OPERATION AND MANAGEMENT OF A RETAIL LIQUOR STORE.

**General Information**

**Status:** AC
**Charter:** DBC
**Chapter:** TITLE: 7-1.1-51
**State:** RHODE ISLAND
**Duration:** PERPETUAL
**File Date:** 8 /14 /1986
**Effective Date:**N/A
**Last Report Date:** 01/27/2003

**Annual Report Image:**
2001 Annual
2002 Annual
2003 Annual
**Help On Viewing Annual Reports**

**Sic Code:** 3251--Liquor stores

**Authorized Shares:** 600 COMM NO PAR VALUE

**Business Address**

Christy's Liquors, Inc.
1188 MAIN STREET, P.O. BOX 800
CHEPACHET, RI 02814, USA
(401)568-8100

**Name and Address of the Registered/Resident Agent**

KEVIN J. KITSON
P.O. BOX 800
CHEPACHET, RI02814 USA
Agent is active...Registered office is maintained

---

**Primary Officer/Director/Partner/Manager Information**

**Title:** PRESIDENT
KEVIN J KITSON
673 PUTNAM PIKE
CHEPACHET, RI02814, USA

**Mailing Information**

N/A

---

**Event Information**

Activity

---

Corporations Division
Office of the Secretary of State Matthew A. Brown
100 North Main St.
First Floor
Providence, RI 02903
corporations@sec.state.ri.us
www.sec.state.ri.us

Business Hours:
M-F 8:30 am to 4:30 pm
Tel. (401) 222-3040
Fax. (401) 222-1309
Director: Sandra Williams

STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS
*Office of the Secretary of State*
***Matthew A. Brown, Secretary of State***

Home | Administration | Archives | Corporations | Elections | Business Development | Civics & Public Information

Corporations Database

# Rhode Island Corporation Search:

Corporation Status: Active

Look In: Corporation Name

Search Terms:

Search Type: Show Records with ALL of the above terms. Click Here for help with Boolean Searches

Submit Reset

---

ANNUAL REPORT AUTO-FILL

Please Select the Year you are filing for: 2003 Submit Reset

(Note: You Need Adobe Reader Version 5 or above to create an auto-filled annual report, Click Here for the free download)

---

## ID# 15939

## KITSON'S LIQUORS, INC.

**Purpose:** TO ENGAGE IN THE BUSINESS, OPERATION AND MANAGEMENT OF A RETAIL LIQUOR STORE.

**General Information**

**Status:** AC
**Charter:** DBC
**Chapter:** TITLE: 7-1.1
**State:** RHODE ISLAND
**Duration:** PERPETUAL
**File Date:** 5 /17 /1982
**Effective Date:**05/24/1982
**Last Report Date:** 01/23/2003

**Annual Report Image:**
2001 Annual
2002 Annual
2003 Annual
**Help On Viewing Annual Reports**

**Sic Code:** 3251--Liquor stores

**Authorized Shares:** 500 NO PAR VALUE

---

**Business Address**

KITSON'S LIQUORS, INC.
673 PUTNAM PIKE, P.O. BOX 888
CHEPACHET, RI 02814, USA
(401)568-8100

**Name and Address of the Registered/Resident Agent**

KEVIN J. KITSON
P.O. BOX 888
CHEPACHET, RI02814 USA
Agent is active...Registered office is maintained

---

**Primary Officer/Director/Partner/Manager Information**

**Title:** PRESIDENT
DEBORAH E KITSON
46 BLACKINTON DRIVE
CHEPACHET, RI02814, USA

**Mailing Information**

N/A

---

## Event Information

Activity

---

Corporations Division
Office of the Secretary of State Matthew A. Brown
100 North Main St.
First Floor
Providence, RI 02903
corporations@sec.state.ri.us
www.sec.state.ri.us

Business Hours:
M-F 8:30 am to 4:30 pm
Tel. (401) 222-3040
Fax. (401) 222-1309
Director: Sandra Williams

STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS
*Office of the Secretary of State*
***Matthew A. Brown, Secretary of State***

Home | Administration | Archives & | Corporations | Elections | Business | Civics & Public

Corporations Database

# Rhode Island Corporation Search:

Corporation Status: Active

Look In: Corporation Name

Search Terms:

Search Type: Show Records with ALL of the above terms. Click Here for help with Boolean Searches

Submit Reset

---

ANNUAL REPORT AUTO-FILL

Please Select the Year you are filing for: 2003 Submit Reset

(Note: You Need Adobe Reader Version 5 or above to create an auto-filled annual report, Click Here for the free download)

---

## ID# 91352

## CRESTWOOD WINE & SPIRITS, INC.

**Purpose:** RETAIL SALE OF LIQUOR AND RELATED PRODUCTS.

**General Information**

**Status:** AC
**Charter:** DBC
**Chapter:** TITLE: 7-1.1-51
**State:** RHODE ISLAND
**Duration:** PERPETUAL
**File Date:** 9 /12 /1996
**Effective Date:**09/17/1996
**Last Report Date:** 05/29/2003

**Annual Report Image:**
2001 Annual
2002 Annual
2003 Image Not Available
**Help On Viewing Annual Reports**

**Sic Code:** 3251--Liquor stores

**Authorized Shares:** 600 NO PAR VALUE

---

**Name and Address of the Registered/Resident Agent**

**Business Address**

CRESTWOOD WINE &
SPIRITS, INC.
151 SANDY BOTTOM ROAD
COVENTRY, RI 02816-, USA
(401)828-1029

DAVID H. FERRARA
21 GARDEN CITY DRIVE
CRANSTON, RI02920 USA
Agent is active...Registered office is maintained

---

**Primary Officer/Director/Partner/Manager Information**

**Title:** PRESIDENT
JOHN W CABRAL
551 READ SCHOOLHOUSE ROAD
COVENTRY, RI02816, USA

**Mailing Information**

N/A

---

**Event Information**

Activity

---

Corporations Division
Office of the Secretary of State Matthew A. Brown
100 North Main St.
First Floor
Providence, RI 02903
corporations@sec.state.ri.us
www.sec.state.ri.us

Business Hours:
M-F 8:30 am to 4:30 pm
Tel. (401) 222-3040
Fax. (401) 222-1309
Director: Sandra Williams

STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS
*Office of the Secretary of State*
*Matthew A. Brown, Secretary of State*



Corporations Database

# Rhode Island Corporation Search:

Corporation Status: Active

Look In: Corporation Name

Search Terms:

Search Type: Show Records with ALL of the above terms. Click Here for help with Boolean Searches

Submit | Reset

---

ANNUAL REPORT AUTO-FILL

Please Select the Year you are filing for: 2003 Submit | Reset

(Note: You Need Adobe Reader Version 5 or above to create an auto-filled annual report, Click Here for the free download)

---

## ID# 8534

## CLIFT'S LIQUORS, INC.

**Purpose:** OPERATING A LIQUOR STORE

**General Information**

**Status:** AC
**Charter:** DBC
**Chapter:** TITLE: 7-1.1-51
**State:** RHODE ISLAND
**Duration:** PERPETUAL
**File Date:** 9 /15 /1987
**Effective Date:**N/A
**Last Report Date:** 05/01/2003

**Annual Report Image:**
2001 Annual
2002 Annual
2003 Annual
Help On Viewing Annual Reports

**Sic Code:** 3251--Liquor stores

**Authorized Shares:** 500 NO PAR VALUE

---

**Name and Address of the Registered/Resident Agent**

**Business Address**

CLIFT'S LIQUORS, INC.
191 WILLETT AVENUE
EAST PROVIDENCE, RI
02915, USA
(401)433-4223

DAVID H. FERRARA
P.O. BOX 20130
CRANSTON, RI02920 USA
Agent is active...Registered office is maintained

**Primary Officer/Director/Partner/Manager Information**

**Title:** PRESIDENT
HOWARD J CLIFT JR
191 WILLETT AVENUE
EAST PROVIDENCE, RI02915, USA

**Mailing Information**

N/A

**Event Information**

Activity

Fictitious Names
Activity

Corporations Division
Office of the Secretary of State Matthew A. Brown
100 North Main St.
First Floor
Providence, RI 02903
corporations@sec.state.ri.us
www.sec.state.ri.us

Business Hours:
M-F 8:30 am to 4:30 pm
Tel. (401) 222-3040
Fax. (401) 222-1309
Director: Sandra Williams

STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS
*Office of the Secretary of State*
*Matthew A. Brown, Secretary of State*

Home | Administration | Archives & Public Records | Corporations | Elections | Legislative Info | Civics & Public Info

Corporations Database

# Rhode Island Corporation Search:

Corporation Status: Active
Look In: Corporation Name
Search Terms:
Search Type: Show Records with ALL of the above terms. Click Here for help with Boolean Searches

Submit | Reset

---

ANNUAL REPORT AUTO-FILL

Please Select the Year you are filing for: 2003 Submit Reset

(Note: You Need Adobe Reader Version 5 or above to create an auto-filled annual report, Click Here for the free download)

---

## ID# 39687

## Heritage Liquors Inc.

**Purpose:** OPERATING A LIQUOR STORE

**General Information**

**Status:** AC
**Charter:** DBC
**Chapter:** TITLE: 7-1.1-51
**State:** RHODE ISLAND
**Duration:** PERPETUAL
**File Date:** 8 /8 /1986
**Effective Date:**N/A
**Last Report Date:** 05/01/2003

**Annual Report Image:**
2001 Annual
2002 Annual
2003 Annual
**Help On Viewing Annual Reports**

**Sic Code:** 3251--Liquor stores

**Authorized Shares:** 200 COMM NO PAR VALUE

---

**Name and Address of the Registered/Resident Agent**

**Business Address**

Heritage Liquors Inc.
529 RESERVOIR AVENUE
CRANSTON, RI 02910, USA
(401)467-4700

DAVID H. FERRARA
P.O. BOX 20130
CRANSTON, RI02920 USA
Agent is active...Registered office is maintained

**Primary Officer/Director/Partner/Manager Information**

**Title:** PRESIDENT
DEBORAH J MARLEY
579 RESERVOIR AVENUE
CRANSTON, RI02910, USA

**Mailing Information**

N/A

**Event Information**

Activity

Fictitious Names
Activity

Corporations Division
Office of the Secretary of State Matthew A. Brown
100 North Main St.
First Floor
Providence, RI 02903
corporations@sec.state.ri.us
www.sec.state.ri.us

Business Hours:
M-F 8:30 am to 4:30 pm
Tel. (401) 222-3040
Fax. (401) 222-1309
Director: Sandra Williams

(C)

Filing Fee: $10.00

# FICTITIOUS BUSINESS NAME STATEMENT
# OF

HERITAGE LIQUORS INC.
(Correct Name of Corporation)

To the Secretary of State
of the State of Rhode Island

Pursuant to the provisions of Section 7-1.1-7.1 of the General Laws, 1956, as amended, the undersigned corporation hereby submits the following statement for authority to transact business in the State of Rhode Island under a fictitious name:

FIRST: Fictitious Business name to be used Christy's Liquors

SECOND: Name of applicant corporation Heritage Liquors Inc.

THIRD: Incorporated under the laws of Rhode Island

FOURTH: Date of incorporation August 8, 1986

FIFTH: Business in which engaged liquor store

SIXTH: Address of registered office within Rhode Island
529 Reservoir Avenue, Cranston, RI 02910

SEVENTH: Applicant is otherwise qualified to do business in the State of Rhode Island.

Dated August 12, 1992

(This statement shall expire five (5) years from date of filing)

HERITAGE LIQUORS INC.
(Applicant)

By Deborah J. Marley

Its President

FORM 32 2M 7-78

Christy's Liquors, Inc.
1184 Main Street
Chepachet, Rhode Island 02814

July 30, 1992

Ms. Deborah J. Marley, President
Heritage Liquors, Inc.
579 Resevoir Avenue
Cranston, Rhode Island 02910

Dear Ms. Marley:

This is to confirm that on August 29, 1986 an agreement was signed between Lantern Liquors, Inc. and Heritage Liquors, Inc. authorizing the use of the name "CHRISTY'S LIQUORS" by HERITAGE LIQUORS, INC. within the city of Cranston, Rhode Island.

Heritage Liquors, Inc. shall not use the name or conduct business under the name of Christy's Liquors, Inc.

Lantern Liquors, Inc./Christy's Liquors, Inc. makes no representations, covenants, or warranties as to their property right in the names "CHRISTY'S LIQUORS," "CHRISTY," or "CHRISTY'S."

Christy's Liquors, Inc. (Lantern Liquors, Inc.).

By: Robert H. Kitson, PRESIDENT
Robert H. Kitson, President

Kevin J. Kitson 7/30/92
Notary Public Exp 8-15-93

Filing Fee: $10.00

# FICTITIOUS BUSINESS NAME STATEMENT
# OF

CLIFT's LIQUORS, INC.
(Correct Name of Corporation)

To the Secretary of State
of the State of Rhode Island

Pursuant to the provisions of Section 7-1.1-7.1 of the General Laws, 1956, as amended, the undersigned corporation hereby submits the following statement for authority to transact business in the State of Rhode Island under a fictitious name:

FIRST: Fictitious Business name to be used ........ Christy's Liquors

SECOND: Name of applicant corporation ........ Clift's Liquors, Inc.

THIRD: Incorporated under the laws of ........ Rhode Island

FOURTH: Date of incorporation ........ September 15, 1987

FIFTH: Business in which engaged ........ liquor store

SIXTH: Address of registered office within Rhode Island ........
191 Willett Avenue, East Providence, RI 02915

SEVENTH: Applicant is otherwise qualified to do business in the State of Rhode Island.

Dated ..Augsut..12.., 1992

(This statement shall expire five (5) years from date of filing)

CLIFT'S LIQUORS, INC.
(Applicant)

By K. [signature]

Its Pres.

FORM 32 2M 7-78

AUTHORIZATION TO USE NAME

For and in consideration of the mutual agreements and consideration hereinafter recited and in consideration of the sum of One ($1.00) Dollar by us received, the receipt of which is hereby acknowledged, Lantern Liquors, Inc. and Robert H. Kitson do hereby authorize and empower Clift's Liquors, Inc. to use and conduct business under the name Christy's Liquors, as hereinafter described:

Clift's Liquors, Inc. shall not use the name or conduct business under the name of Christy's Liquors, Inc.

The use of the name Christy's Liquors shall be exclusively granted to Clift's Liquors, Inc., in addition to permission previously granted, for exclusive use within the City of East Providence, Rhode Island. Clift's Liquors, Inc. shall not use or authorize the use of the name Christy's Liquors in any town or city in the State of Rhode Island other than the Cities of Cranston, Providence and East Providence, Rhode Island. Christy's Liquors, Inc. agress that it will not nor will it authorize any other person or corporation to use the name Christy's Liquors in the City of East Providence. Clift's Liquors, Inc. mutually agrees that it will not use the name Christy's in city or town in the State of Rhode Island other than the City of Cranston, the City of Providence and the City of East Providence without first obtaining permission in writing from Christy's Liquors, Inc. and said permission shall not unreasonably be denied. Clift's Liquors, Inc. mutually agrees that the use of the name

Christy's Liquors in the City of East Providence, without written permission or the possible use in other cities or towns in the State of Rhode Island, with written permission, shall not be transferable. Christy's Liquors, Inc. makes no representations, covenants or warranties as to its property right in the name Christy's Liquors or in the name Christy or Christy's.

IN WITNESS WHEREOF, Christy's Liquors, Inc. has caused this Authorization to be executed by its duly authorized officer this 21st day of October, 1987.

Christy's Liquors, Inc.

BY: Robert H. Citrone, PRES.
President.

D

STATE OF RHODE ISLAND GLOCESTER
Granted: 11/20/03

Board of Licensing Commissioners

Notice of License Granted

RETAILER CLASS:
A X BH BM BT BV BVL C D DL E ED J T 2:OOAM ___

License #: 1

Name Of Applicant: Christy's Liquors, Inc.

D/B/A: Christy's Liquors

Address: 1184 Putnam Pike, Chepachet, RI 02814

Does Applicant have draft system? No

Is this a Transfer: Yes ______ No X

If License is a transfer, complete form below.

Former Licensee:

Former D/B/A:

Former Premises:

(FORWARD COPY TO LIQUOR CONTROL ADMINISTRATION)

STATE OF RHODE ISLAND GLOCESTER
City or Town

# Board of Licensing Commissioners

## Application For License By Corporation

RETAILER CLASS:
A X BH___ BM___ BT___ BV___ BVL___ C___ E___ ED___ J___ T___ (2:00a.m.___)

Name of Applicant (Corp. Name) Tel. #
Christy's Liquors Inc. Store 568-1111/Office 568-8100/ Fax 567-8888

D/B/A
Christy's Liquors

Address of Premise 1184 Main Street, PO Box 800, Chepachet, RI 02814

State - Incorporated Rhode Island | Date of Incorporation August 12, 1986

Name, Address and Telephone Number of all Officers:

President Kevin J. Kitson, [redacted]

Vice President

Secretary Same as above

Treasurer Same as above

Name and Addresses of All Directors or Board Members:
Kevin J. Kitson same as above

Classes of Stock: Common- No Par Value

(a) Amount of Each Authorized: 600 Shares

(b) Amount of Each Issued: 100 Shares

Names and Addresses of All Registered Owners of Each Class and amount owned: (attach list if necessary)
Kevin J. Kitson- 100 Shares

If any of the above stock is hypothecated or pledged provide details:

N/A

If application is in behalf of undisclosed principal or party in interest, give details:

N/A

Does Applicant Own Premises? Yes___ No X | Is Property Mortgaged? Yes X No___ | Is Property Leased? Yes X No___

Give Name and Address of Mortgagee or Lessee and Amount of Extent Robert H & Deborah E Kitson
46 Blackinton Drive
Mtg. Holder: Sovereign Bank-Providence Chepachet, RI 02814

Have any Officers, Board Mem[illegible] or Stockholders ever been arrested or convicted of a crime?
Yes ___ No _x_ I[illegible]s Explain.

Is any other business to be carried on in Licensed Premises? Yes _X_ No ___ If Yes Explain

Retail Sale of misc. food items, popcorn, candy, tobacco, groceries

Is any Officer, Board Member or Stockholder engaged in any manner as a Law Enforcement Officer? If Yes Explain

Foster/Glocester Juvenile Hearing Board--Chairperson

Is Applicant or any of its officers, Board Members or Stockholders interested directly or indirectly, as principle or associ[illegible] or in anymanner whatsoever, in any retail license issued under Chapter 3-7 of the General Laws of Rhode Island, 1956, as amen[illegible]
If yes, explain. Yes, Kevin J. Kitson is employed by Kitson's Liquors Inc. 677 Putnam Pike, Chepachet, RI as operations manager.

Is Applicant the owner or operator of any other business ? If yes, explain.

No

State amount of capital invested in the business?

Does applicant have draft system?

No

I hereby certify that the above statements are true to the best of my knowledge and belief.

Christy's Liquors Inc. By: [signature]

Applicant Kevin J. Kitson, President Date 9/26/03

[signature: Barbara J. Poole] 6-21-05

Witness of Licensing Board or Notary Public — Date of Witness or Notary Expiration

Instructions for Corporation Applicants

1. Every question on Application Form must be answered. Any false statement made by the Applicant wil[illegible] sufficient grounds for the denial of the application or the revocation of the license in case one has granted.

2. Corporations having 25 or more stockholders need not file a list of the names and addresses of stockhol[illegible] (Question # 8)

3. Attention is called to the requirements of the 1963 amendment of Section 3-5-10 of the General Laws.
   (a) All newly elected officers or directors must be reported to the Board of License Commissioners wi[illegible] 30 days.
   (b) Any acquisition by any person of more than ten per cent (10%) of any class of corporate stock be reported within 30 days.
   (c) Any transfer of fifty per cent (50%) or more of any class of corporate stock can be made onl[illegible] written application to the licensing board subject to the procedures for a transfer of a licer[illegible]

4. Submit with this application a copy of proposed menu. (Class BV; BVL)

5. Submit with this application a copy of Pharmacist's Dept. of Health License. (Class E)

(COPY SHALL BE FORWARDED TO LIQUOR CONTROL ADMINISTRATION BY CITY CLERK)

STATE OF RHODE ISLAND
Granted: 11/20/03

GLOCESTER

Board of Licensing Commissioners

Notice of License Granted

RETAILER CLASS:
A X BH BM BT BV BVL C D DL E ED J T 2:OO AM ____

License #: 2

Name Of Applicant: Kitson's Liquors, Inc.

D/B/A: Christy's Liquors

Address: 677 Putnam Pike

Chepachet, RI 02814

Does Applicant have draft system? No

Is this a Transfer: Yes ________ No X

If License is a transfer, complete form below.

Former Licensee: ________

Former D/B/A: ________

Former Premises: ________

STATE OF RHODE ISLA

Glocester
City or Town

# Board of Licensing Commissioners

## Application For License By Corporation

RETAILER CLASS:
A X BH___ BM___ BT___ BV___ BVL___ C___ E___ ED___ J___ T___ (2:00a.m.____)

Name of Applicant(Corp. Name) Fax 568-9100 Tel. #
Kitson's Liquors, Inc. Store tele.: 568-2222 Office 568-8100

D/B/A
Christy's Liquors

Address of Premise
677 Putnam Pike Chepachet, RI 02814

State - Incorporated Rhode Island | Date of Incorporation May 24, 1982

Name, Address and Telephone Number of all Officers:

Tele: [redacted]
President Deborah E. Kitson [redacted]

Tele: [redacted]
Vice President Lisa M. Kitson [redacted]

Secretary Lisa M. Kitson same as above

Treasurer Deborah E. Kitson same as above

Name and Addresses of All Directors or Board Members:
Deborah E. Kitson same as above
Lisa M. Kitson same as above

Classes of Stock: Common - No Par Value
(a) Amount of Each Authorized: 500 Shares

(b) Amount of Each Issued: 200 Shares

Names and Addresses of All Registered Owners of Each Class and amount owned: (attach list if necessary)
Deborah E. Kitson - 100 Shares
Lisa M. Kitson - 100 Shares

If any of the above stock is hypothecated or pledged provide details:
n/a

If application is in behalf of undisclosed principal or party in interest, give details:
n/a

Does Applicant Own Premises? Yes___ No X | Is Property Mortgaged? Yes___ No X | Is Property Leased? Yes X No___

Give Name and Address of Mortgagee or Lessee and Amount of Extent Property owned by:
Robert H. Kitson and Deborah E. Kitson [redacted]

[redacted]

Have any Officers, Board Members tockholders ever been arrested or convicted a crime?
Yes ___ No X___ If Yes explain.

Is any other business to be carried on in Licensed Premises? Yes X___ No ___ If Yes Explain
Retail sale of misc. food items, popcorn, candy, tobacco, groceries.

Is any Officer, Board Member or Stockholder engaged in any manner as a Law Enforcement Officer? If Yes Explain
No

Is Applicant or any of its officers, Board Members or Stockholders interested directly or indirectly, as principle or associate or in anymanner whatsoever, in any retail license issued under Chapter 3-7 of the General Laws of Rhode Island, 1956, as amended If yes, explain. Yes...Deborah E. Kitson is employed by Christy's Liquors, Inc. 1184 Main Street, Chepachet, RI as a store clerk. Lisa M. Kitson is employed by Christy's Liquors, Inc. as office manager and store clerk.

Is Applicant the owner or operator of any other business ? If yes, explain.
No

State amount of capital invested in the business?

Does applicant have draft system?
No

I hereby certify that the above statements are true to the best of my knowledge and belief.

KITSON'S LIQUORS, INC. By: Deborah E Kitson Pres/Treas
Deborah E. Kitson Pres/Treas.
Applicant
Date 9/29/03

Witness of Licensing Board or Notary Public
10/15/2005
Date of Witness or Notary Expiration

**Instructions for Corporation Applicants**

1. Every question on Application Form must be answered. Any false statement made by the Applicant will be sufficient grounds for the denial of the application or the revocation of the license in case one has been granted.

2. Corporations having 25 or more stockholders need not file a list of the names and addresses of stockholders - (Question # 8)

3. Attention is called to the requirements of the 1963 amendment of Section 3-5-10 of the General Laws.
   (a) All newly elected officers or directors must be reported to the Board of License Commissioners within 30 days.
   (b) Any acquisition by any person of more than ten per cent (10%) of any class of corporate stock must be reported within 30 days.
   (c) Any transfer of fifty per cent (50%) or more of any class of corporate stock can be made only by written application to the licensing board subject to the procedures for a transfer of a license.

4. Submit with this application a copy of proposed menu. (Class BV; BVL)

5. Submit with this application a copy of Pharmacist's Dept. of Health License. (Class E)

(COPY SHALL BE FORWARDED TO LIQUOR CONTROL ADMINISTRATION BY CITY CLERK)

STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS
Office of the Secretary of State
Matthew A. Brown, Secretary of State

Corporations Di...
100 North Main
Providence, RI 02903-
401.222

# LIMITED LIABILITY COMPANY ANNUAL REPORT FOR THE YEAR 2003

*Filing Period: September 1 - November 1* • *Filing Fee: $50.00*

*(FORM MUST BE TYPED OR PRINTED IN BLACK)*

| 1. ID No. | 2. Exact name of the limited liability company |
|---|---|
| 118230 | Christy, LLC |

| 3. State of Formation | 4. Brief description of the character of the business which is actually conducted in Rhode Island |
|---|---|
| RHODE ISLAND | TO ENGAGE IN THE BUSINESS OF ACQUIRING, CONSTRUCTING, OWNING AND MANAGING REAL PROPERTY |

| 5. Principal office address | City | State | Zip |
|---|---|---|---|
| 529 Reservoir Avenue | Cranston | RI | 02910 |

**6. MAILING ADDRESS OF LIMITED LIABILITY COMPANY AND NAME OR TITLE OF CONTACT PERSON:**

| Contact Name | Contact Title | | |
|---|---|---|---|
| Deborah J. Marley-Clift | member | | |
| **Street Address** | **City** | **State** | **Zip** |
| 529 Reservoir Avenue | Cranston | RI | 02910 |

**7. NAME AND ADDRESS OF EACH MANAGER OF THE LIMITED LIABILITY COMPANY, IF APPLICABLE**

FILL IN SPACES BEFORE USING ATTACHMENTS ("X" BOX FOR ATTACHMENT) ☐

ANY MODIFICATIONS TO MANAGERS REQUIRES FILING OF AMENDMENT, R.I.G.L. 7-16-12 (a) (2) / 7-16-52

| Manager Name | | | Manager Name | | |
|---|---|---|---|---|---|
| Street Address | | | Street Address | | |
| City | State | Zip | City | State | Zip |
| Manager Name | | | Manager Name | | |
| Street Address | | | Street Address | | |
| City | State | Zip | City | State | Zip |

**8. RESIDENT AGENT IN RHODE ISLAND - DO NOT ALTER - Changes require filing of Form 642 - R.I.G.L. 7-16-11**

| Agent Name | | Address |
|---|---|---|
| JOHN J. VALLONE, ESQ. | | |
| **Address** | **City** | **Zip** |
| 1193 TIOGUE AVENUE | COVENTRY | 02816- |

*This report must be signed in ink by an authorized person pursuant to R.I.G.L. 7-16-66.*

* 1 1 8 2 3 0 *

File Date 9-22-03

Check No. 3127

By: [initials]

FOR SECRETARY OF STATE USE ONLY

Under penalty of perjury, I declare and affirm that I have examined th... including any accompanying schedules and statements, and that all st... contained herein are true and correct.

Deborah J. Marley-Clift member 9/...

Signature of Authorized Person Date

Deborah J. Marley-Clift, Member

Print or Type Name of Authorized Person

Form 632 Rev.

(F)

STATE OF RHODE ISLAND

East Providence
City or Town

# *Board of Licensing Commissioners*

## Notice of License Granted

RETAILER CLASS:
A X BH___BM___BT___BV___BVL___C___D___DL___E___ED___J___T___2:00a.m.___

2003-16
License #

Clift's Liquors, Inc.
Name of Applicant

Christy's Liquors
D/B/A

191 Willett Avenue
Address

East Providence, RI 02915

Does Applicant have draft system? ________________

Is this a Transfer: Yes______ No X

If License is a transfer, complete form below.

Former Licensee:

Former D/B/A:

Former Premises:

(FORWARD COPY TO LIQUOR CONTROL ADMINISTRATION)

STATE OF RHODE ISLAND

OF EAST PROVIDENCE
City or Town

# Board of Licensing Commissioners

## Application For License By Corporation

EAST PROVIDENCE, VALERIE PERRY CITY CLERK
02 OCT 29 PM 2:40
PAID

RETAILER CLASS:
A___BH___BM___BT___BV____BVL___C___E___ED___J___T___ (2:00a.m.____)

Name of Applicant(Corp. Name) Clift's Liquors Inc. Tel 401-433-4220

D/B/A Christy's Liquor's

Address of Premise 191 Willett Ave East Providence

State - Incorporated RI | Date of Incorporation 9 | 15 | 87

Name, Address and Telephone Number of all Officers:

President Howard J. Clift, Jr.

Vice President Howard J. Clift, Jr.

Secretary Howard J. Clift, Jr.

Treasurer Howard J. Clift, Jr.

Name and Addresses of All Directors or Board Members: [redacted]
Howard J. Clift, Jr.

Classes of Stock: No Par Value Common Stock

a) Amount of Each Authorized: 500

b) Amount of Each Issued: 100

Names and Addresses of All Registered Owners of Each Class and amount owned: (attach list if necessary)

If any of the above stock is hypothecated or pledged provide details:
N/A

If application is in behalf of undisclosed principal or party in interest, give details:
N/A

Does Applicant Own Premises? Yes___ No ✓ | Is Property Mortgaged? Yes___ No___ | Is Property Leased? Yes ✓ No___

Give Name and Address of Mortgagee or Lessee and Amount of Extent

Christy LLC
529 Reservoir Ave.
Cranston, RI 02910

Have any Officers, Board Members or Stockholders ever been arrested or convicted of a crime?
Yes ____ No ✓ If Yes Explain.

Is any other business to be carried on in Licensed Premises? Yes ___ No ✓ If Yes Explain

Is any Officer, Board Member or Stockholder engaged in any manner as a Law Enforcement Officer? If Yes Explain

Is Applicant or any of its officers, Board Members or Stockholders interested directly or indirectly, as principle or associate, or in any manner whatsoever, in any retail license issued under Chapter 3-7 of the General Laws of Rhode Island, 1956, as amended? If yes, explain.

Is Applicant the owner or operator of any other business ? If yes, explain.

State amount of capital invested in the business?

Does applicant have draft system?

I hereby certify that the above statements are true to the best of my knowledge and belief.

Howard Cloft Jr. 10/15/02

Applicant Date

Witness of Licensing Board or Notary Public

Date of Witness or Notary Expiration

**Instructions for Corporation Applicants**

1. Every question on Application Form must be answered. Any false statement made by the Applicant will be sufficient grounds for the denial of the application or the revocation of the license in case one has been granted.

2. Corporations having 25 or more stockholders need not file a list of the names and addresses of stockholders - (Question # 8)

3. Attention is called to the requirements of the 1963 amendment of Section 3-5-10 of the General Laws.
   (a) All newly elected officers or directors must be reported to the Board of License Commissioners within 30 days.
   (b) Any acquisition by any person of more than ten per cent (10%) of any class of corporate stock must be reported within 30 days.
   (c) Any transfer of fifty per cent (50%) or more of any class of corporate stock can be made only by written application to the licensing board subject to the procedures for a transfer of a license.

4. Submit with this application a copy of proposed menu. (Class BV; BVL)

5. Submit with this application a copy of Pharmacist's Dept. of Health License. (Class E)

(COPY SHALL BE FORWARDED TO LIQUOR CONTROL ADMINISTRATION BY CITY CLERK)

STATE OF RHODE ISLAND

COVENTRY
(City or Town)

G

# Board of Licensing Commissioners

## NOTICE OF LICENSE GRANTED

Date OCTOBER 27, 2003

The Licensing Board of the City/Town of COVENTRY

on OCTOBER 27, 2003 granted a Class A Beverage

license No. 03-A-02 to CRESTWOOD WINE & SPIRITS INC., dba CHRISTY'S LIQUORS

for the premises located 725 TIOGUE AVENUE

Operated under the trade name of: same

and the above named licensee has filed / will file a surety / real estate bond in the amount of N/A

($ .00)

Payable to City/Town Treasurer of N/A

Signed *Roberta H. Johnson, CMC*

Title Clerk of Licensing Board

Note: If license is a transfer, complete form below.

Former licensee

Former premises

City/Town Clerk
Instructions: Forward white copy to Liquor Control Administration, keep Pink copy for your file.

# State of Rhode Island and Providence Plantations

## TOWN OF COVENTRY

## RETAILER'S BEVERAGE LICENSE

Know all Men by These Presents: Class A No. 03-A-02

That CRESTWOOD WINE & SPIRITS INC., dba CHRISTY'S LIQUORS

has been granted this, a retailer's beverage license Class A, under 3-7 of the General Laws of Rhode Island, 1956, as amended, authorizing the holder hereof to keep for sale and to sell at

725 TIOGUE AVENUE Rhode Island,

beverages at retail in accordance with the provisions of said Chapter 3-7 of the General Laws of Rhode Island, 1956, as amended.

This license expires on December 1, 2004. It is subject to such conditions, rules and regulations as the Liquor Control Administrator, (created by the Administrative Act of 1939), has established or shall in the future establish, and to the terms and provisions of Title 3 of the General Laws of Rhode Island, 1956, as amended. It is likewise subject to such conditions, rules, and regulations now or hereafter established by the Town Council of the Town of Coventry, the body by law authorized to issue this license.

IN WITNESS WHEREOF, said Town Council of the Town of Coventry, acting as a licensing board, has caused this license to be issued and signed by the Clerk of the licensing board.

Roberta H. Johnson, CMC

OCTOBER 27, 2003

Date

Clerk of Licensing Board

*** PLEASE COMPLETE INFORMATION, ...

BEFORE SEPTEMBER 5, 2003 INCOMPLETE APPLICATIONS WILL BE RETURNED.

*** PLEASE INCLUDE ADVERTISING FEE OF $50.00 ***

STATE OF RHODE ISLAND    pd. 8/25/03    COVENTRY - City or Town

## Board of Licensing Commissioners

## Application For License By Corporation

RETAILER CLASS:
A X BH___ BM___ BT___ BV___ BVL___ C___ E___ ED___ J___ T___ (2:00a.m.___)

Name of Applicant(Corp. Name) Crestwood Wine + Spirits Inc. Tel. # 401-826-6300

D/B/A Christy's Liquors

Address of Premise 725 Tiogue Ave, Coventry, RI 02816

State - Incorporated RI    Date of Incorporation 9/17/96

Name, Address and Telephone Number of all Officers: [redacted]

President John W. Cabral [redacted]

Vice President " "

Secretary " "

Treasurer " "

Name and Addresses of All Directors or Board Members:

John W. Cabral "

Classes of Stock: Common 1244 Stock

(a) Amount of Each Authorized: 600 Shares (without Par value)

(b) Amount of Each Issued: 200 Shares (without Par value)

Names and Addresses of All Registered Owners of Each Class and amount owned: (attach list if necessary)

John W. Cabral

[redacted]

If any of the above stock is hypothecated or pledged provide details:

none

If application is in behalf of undisclosed principal or party in interest, give details:

Does Applicant Own Premises? Yes___ No ✓ | Is Property Mortgaged? Yes___ No___ | Is Property Leased? Yes ✓ No___

Give Name and Address of Mortgagee or Lessee and Amount of Extent

Marley Clift LLC
529 Reservoir Ave
Cranston, RI 02910

Have any Officers, Board Members or Stockholders ever been arrested or convicted of a crime?
Yes ___ No ✓ If Yes Explain.

Is any other business to be carried on in Licensed Premises? Yes ___ No ✓ If Yes Explain

Is any Officer, Board Member or Stockholder engaged in any manner as a Law Enforcement Officer? If Yes Explain

No

Is Applicant or any of its officers, Board Members or Stockholders interested directly or indirectly, as principle or associate, or in anymanner whatsoever, in any retail license issued under Chapter 3-7 of the General Laws of Rhode Island, 1956, as amended? If yes, explain.

No

Is Applicant the owner or operator of any other business ? If yes, explain.

No

State amount of capital invested in the business?

165,000.00

Does applicant have draft system?

No

I hereby certify that the above statements are true to the best of my knowledge and belief.

[signature], Pres — 15 Aug 03

Applicant — Date

Josephine K Bowley #28942 — Jan 17, 2006

Witness of Licensing Board or Notary Public — Date of Witness or Notary Expiration

**Instructions for Corporation Applicants**

1. Every question on Application Form must be answered. Any false statement made by the Applicant will be sufficient grounds for the denial of the application or the revocation of the license in case one has been granted.

2. Corporations having 25 or more stockholders need not file a list of the names and addresses of stockholders - (Question # 8)

3. Attention is called to the requirements of the 1963 amendment of Section 3-5-10 of the General Laws.
   (a) All newly elected officers or directors must be reported to the Board of License Commissioners within 30 days.
   (b) Any acquisition by any person of more than ten per cent (10%) of any class of corporate stock must be reported within 30 days.
   (c) Any transfer of fifty per cent (50%) or more of any class of corporate stock can be made only by written application to the licensing board subject to the procedures for a transfer of a license.

4. Submit with this application a copy of proposed menu. (Class BV; BVL)

5. Submit with this application a copy of Pharmacist's Dept. of Health License. (Class E)

(COPY SHALL BE FORWARDED TO LIQUOR CONTROL ADMINISTRATION BY CITY CLERK)

A

February 14, 2004

TO: Department of Business Regulation
Division of Commercial Licensing and Regulation
Jeffrey J. Greer, Associate Director

FROM: Kitson's Liquors, Inc.
dba Christy's Liquors

SUBJECT: John Haronian Complaint

This is in response to your letter of February 4, 2004 in regard to a complaint by John Haronian against the five Class A liquor stores, doing business as Christy's Liquors.

Item #1 It is stated in this complaint that the five Christy's Liquors stores filed a complaint against Douglas Wine & Spirit. Kitson's Liquors, Inc., dba Christy's Liquors, did not file a complaint against Douglas Wine & Spirit.

Item #2 We are members of the Glocester Business Association and each store is listed in the GBA brochure as individual members and we pay our annual dues as such. The web site listing the two stores and the profile description, as well as the heading, "Two Locations To Better Service Our Customers", was not authorized by us, and we did not know that we were listed as such on this web site. The information used in this listing apparently came from the GBA brochure and was posted for the GBA by Mouseworks Site Design Co. We were unaware of this posting. Also, the hours are listed in error as we are open from 9:00am to 10:00pm. The Owner/Contact for the store located at 1184 Main Street is listed as Robert Kitson. Robert Kitson has not owned that store since September 20, 2001. If we were aware of this posting, we would have corrected this listing.

Item #3 We cannot answer Item #3, which states, "These stores are engaged in other activities that suggest the existence of an illegal chain store", as we do not know what Mr. Haronian is referring to by this statement.

Item #4 This refers to the fact that Mr. Haronian has also filed a separate complaint with the Franchising Section of the Division of Securities Regulation regarding Kitson's Liquors, Inc. being operated as an unregistered franchise. Enclosed is a copy of our answers to the Securities Division, dated January 15, 2004, in response to their letter to us dated January 5, 2004.

When my husband, Robert H. Kitson, and I purchased Christy's Liquors on Reservoir Avenue in Cranston in 1971, there were, I believe, nine Haxton Liquor stores and three Murphy Liquor stores as well as a few others in the State of Rhode Island with the same name. These stores advertised under the

same name in print, radio and on television. There was "The Haxton Man" and Murphy, "The Liquor King", etc.

When our family purchased the liquor store located at 677 Putnam Pike in the Town of Glocester in 1982, my husband called the liquor control administration and was told that we could use the same name at that location as a dba, as long as the Glocester store was under a separate corporation and ownership. This store was purchased for my son, Kevin J. Kitson and my daughter, Kerri E. Kitson, and was incorporated under the name Kitson's Liquors, Inc., dba Christy's Liquors. At that time the Cranston store was incorporated under the name Lantern Liquors, Inc., dba Christy's Liquors.

In 1986, my husband and I sold the Christy's Liquors store on Reservoir Avenue, which had been at that location and under the name Christy's Liquors since 1933, and purchased the second liquor store in Glocester at 1184 Main Street in the village of Chepachet. We incorporated this store as Christy's Liquors, Inc., dba Christy's Liquors. Again, we filed an Application For License By Corporation with the Town of Glocester and with the State of Rhode Island and the Class A liquor license was transferred to Christy's Liquors, Inc. dba Christy's Liquors, with no problem.

We do not feel that we fall under the description of an illegal chain store operation as unlike Mr. Haronian's claim that the stores that he owns and controls are "Independently Owned," when not even one Class A liquor license is in his name. Our family owned stores are "Independently Owned and Operated."

Enclosed is a copy of the 2003 Glocester Business Association brochure as well as a copy of our response to the questions from the Securities Division.

Deborah E. Kitson, Pres.
Deborah E. Kitson, President

Lisa M. Kitson, Vice Pres.
Lisa M. Kitson, Vice-President

**LAWSON & WEITZEN, LLP**

ATTORNEYS AT LAW

88 BLACK FALCON AVENUE, SUITE 345
BOSTON, MASSACHUSETTS 02210-2414

EVAN T. LAWSON
RICHARD B. WEITZEN *
PAMELA B. BANKERT
FRANK L. BRIDGES
IRA H. ZALEZNIK
JOHN J. WELTMAN ***
VALERIE L. PAWSON
GEORGE F. HAILER +
GEORGE E. CHRISTODOULO, PC
KENNETH B. GOULD
JOSEPH FRIEDMAN
JOHN A. TENNARO
WILLIAM F. COYNE, JR.
DAVID A. RICH*
DENNIS J. MANESIS ++
NATALIE A. KANELLIS †
PATRICIA L. FARNSWORTH
K. SCOTT GRIGGS
MICHAEL J. McDEVITT
MARTIN S. EBEL††
STEVEN M. BUCKLEY
J. MARK DICKISON **
CLARE B. BURHOE
ROBERT J. ROUGHSEDGE +++
CAROLINE A. O'CONNELL*
JILL M. MORRISSEY
MARISSA A. GOLDBERG
MICHAEL WILLIAMS
NICOLE L. JOHNSON
KATHRYN E. PIECZARKA

BOSTON
TELEPHONE (617) 439-4990
TELECOPIER (617) 439-3987
EMAIL: POST@LAWSON-WEITZEN.COM
WWW.LAWSON-WEITZEN.COM

CAPE COD
LAWSON, WEITZEN & BANKERT, LLP
SIX GRANITE STATE COURT
BREWSTER, MASSACHUSETTS 02631
TELEPHONE (508) 255-3600

June 28, 2004

Steven G. Kagan
Department of Business Regulation
Securities Division
233 Richmond Street, Suite 232
Providence, RI 02903-4232

Jeffrey J. Greer, Assoc. Director
Department of Business Regulation
Commercial Licensing Division
Liquor/Enforcement and Compliance
233 Richmond Street, Suite 230
Providence, RI 02903-4230

Re: Christy's Liquors, Inc. d/b/a Christy's Liquors
Kitson's Liquors, Inc. d/b/a Christy's Liquors
Heritage Liquors, Inc. d/b/a Christy's Liquors
Clift's Liquors, Inc. d/b/a Christy's Liquors
Crestwood Wine & Spirits, Inc. d/b/a Christy's Liquors

Dear Messrs. Kagan and Greer,

This letter is in reply to the answers of Christy's Liquors, Inc., Kitson's Liquors, Inc., Heritage Liquors, Inc., Clift's Liquors, Inc., and Crestwood Wine & Spirits, Inc. (Exhibit A) to the complaints filed against them by Mr. John Haronian regarding their violations of R.I. Gen. Laws § 19-28.1 et seq., and R.I. Gen. Laws § 3-5-11. Complaints were filed with both the Franchising Section of the Division of Securities Regulation, and the Division of Commercial Licensing and Regulation, Liquor/Enforcement and Compliance Section. (Exhibit B).

As stated in the complaint, the above five establishments operate as a franchise, without having registered as such as required by R.I. Gen. Laws § 19-28.1-5. Pursuant to R.I. Gen. Laws § 19-28.1-3, a franchise includes an oral or written agreement, either express or implied, which grants the right to distribute goods under a marketing plan, and allows the business to be substantially associated with a trademark, trade name, or advertising. Indicia of a marketing plan

* ALSO ADMITTED IN NY
** ALSO ADMITTED IN NH
*** ALSO ADMITTED IN CA
+ ALSO ADMITTED IN DC
++ ALSO ADMITTED IN NJ & PA
+++ ALSO ADMITTED IN RI, CT, NH & ME
† ALSO ADMITTED IN NH & NY
†† ALSO ADMITTED IN MI

include promotional or advertising material, or cooperative advertising.

All five establishments are substantially associated with the common name and mark "Christy's." Despite denying the existence of a name use agreement (see Exhibit A), Christy's Liquors, Inc., Heritage Liquors, Inc., and Clift's Liquors, Inc. have filed such agreements with the Secretary of State, but have failed to register the common name. (Exhibit C). Furthermore, the establishments participate in a marketing plan, which includes cooperative promotional and advertising material. For example, Christy's answer admits to joint advertising with Kitson's. Christy's website also claims that they have "two locations to better serve our customers," an indication that the stores distribute products under a cooperative marketing plan, that the same products are sold at either location, and that both stores are associated with the common name "Christy's." (See Exhibit B).

Alternatively, the five Christy's establishments operate as a chain store in violation of R.I. Gen. Laws § 3-5-11 by sharing a common name, and by holding themselves out to the public as being the same business entity. Although the current statute provides that the determination of what constitutes a chain store is a question of fact to be determined by the DBR, the current proposal to amend the statute before the General Assembly enumerates factors to determine whether a chain store organization exists. In defining chain store, the proposed amendment includes factors such as the same management or operation of more than one liquor-licensed business, coordinated advertising or implementation of marketing strategies, common billing, and common pricing of products.

As indicated by the name use agreements and the website, in addition to sharing a common name, the stores engage in coordinated advertising and marketing strategies, and common pricing of products. Kevin J. Kitson, president of Christy's, and his wife Deborah E. Kitson, president of Kitson's, admit to working as clerks at both stores. (see Exhibit D). Kevin and Deborah also jointly own the premises of both store locations. Presumably as husband and wife, both presidents have a direct financial interest in both stores.

Deborah Marley-Clift, the president and owner of Heritage is also the owner of Christy LLC. (Exhibit E). Clift's leases its premises from Christy LLC. (Exhibit F). Crestwood also leases its premises from property owned by Marley-Clift LLC. (Exhibit G). Given this arrangement, Marley-Clift has a direct financial interest in all three of the stores.

**LAWSON & WEITZEN, LLP**



By either operating as an unregistered franchise, or alternatively by engaging in business as a chain store organization, all five establishments are engaged in ongoing violations of R.I. Gen. Law § 19-28.1 et. seq, and R.I. Gen. Law § 3-5-11.

Complainant further requests permission to take discovery on the matters addressed by his complaint. Please call me if you have any questions at (617) 439-4990.

Very truly yours,

Robert J. Roughsedge

Enclosures

cc: Client

4

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

WINE & SPIRITS RETAILERS, INC., *et al.*
*Plaintiffs,*

*v.*

STATE OF RHODE ISLAND, *et al.*,
*Defendants.*

Civil Action No. 04-418-T

**AFFIDAVIT OF ROBERT J. ROUGHSEDGE**

I, Robert J. Roughsedge, do hereby swear, affirm, and state as follows:

1. I am over twenty-one years of age and I have personal knowledge of the matters discussed herein.

2. I am an attorney admitted to practice in the State of Rhode Island.

3. I filed a number of complaints with the Rhode Island Department of Business Regulation's Division of Commercial Licensing and Regulation on behalf of my client, John Haronian.

4. Three of these complaints are attached as **Exhibits E**, **F** and **G** to the *Memorandum in Support of Plaintiffs' Motion for a Preliminary Injunction.* Along with the complaints are the responses from the DBR and the answer, if any, from the storeowners.

5. The final document included in **Exhibits E**, **F** and **G** are the responses filed by me on June 28, 2004. I am unaware of any further action on these complaints since that date. To my knowledge, there has been no action taken by the DBR's Division of Commercial Licensing in response to these complaints.

6. Complaints were also filed with the DBR's Securities Division, which concluded that the use of common names did not make these entities franchises under Rhode Island law.

Signed under the pains and penalties of perjury this 24th day of January 2005.

Robert J. Roughsedge