**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

WINE & SPIRITS RETAILERS, INC.
and JOHN HARONIAN,
Plaintiffs,

v. C.A. NO. 04-418T

STATE OF RHODE ISLAND AND
PROVIDENCE PLANTATIONS, and
JEFFREY J. GREER, in his capacity as
the Associate Director of the Department
of Business Regulation,
Defendants,

**OBJECTION TO MOTION FOR PRELIMINARY INJUNCTION**

Now come defendants and object to the motion for preliminary injunction filed by plaintiffs. A memorandum and exhibits in support hereof are attached.

Respectfully Submitted,

Defendants
By their Attorney,

PATRICK C. LYNCH
ATTORNEY GENERAL

Rebecca Tedford Partington

Rebecca Tedford Partington #3890
Deputy Chief – Civil Division
150 South Main Street
Providence, RI 02903
Tel: (401) 274-4400 ext. 2303
Fax: (401) 222-2995

**CERTIFICATION**

I, the undersigned, hereby certify that I mailed a true copy of the within postage pre-paid, first class mail, on this 18th day of February, 2005 to those indicated below:

Melissa J DiFonzo

Robert J. Roughsedge, Esq.
Lawson & Weitzen, LLP
88 Black Falcon Avenue, Suite 345
Boston, MA 02210-1736

18

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

WINE & SPIRITS RETAILERS, INC.
and JOHN HARONIAN,
Plaintiffs,

v. C.A. NO. 04-418T

STATE OF RHODE ISLAND et al.
Defendants,

## MEMORANDUM IN SUPPORT OF OBJECTION TO MOTION FOR PRELIMINARY INJUNCTION

## I. INTRODUCTION AND PROCEDURAL HISTORY

In 1934, shortly after prohibition was repealed, Rhode Island enacted a regulatory framework for the manufacture and sale of alcoholic beverages. Included in this statutory scheme was a prohibition of "chain store organizations." *See,* R.I. Gen. Laws §§3-5-10, 11. The statute further specifically delegates the authority to determine what constitutes a chain store organization to the Department. That statute was recently amended to further define the prohibition against chain store organizations, including prohibiting franchising. R.I. Gen. Laws §3-5-11.1 (copy attached). Plaintiffs seek a preliminary injunction against enforcement of the prohibition. Plaintiffs have offered little factual or legal basis to substantiate their claims and, in fact, the Defendants offer facts which rebut their characterization of Plaintiffs' business as a mere consultant. Injunctive relief, a drastic remedy, should therefore not be granted.

The Franchise Offering Circular and the Franchise Agreement are the starting points for determining the precise nature of the relationship between the parties. Relevant portions are excerpted in the Affidavit of Maria D'Allesandro, **Exhibit 1**. It is clear that

a chain store organization as well as a franchise relationship presently exists as defined by the Legislature, and much more than simply giving business advice is at issue.

The Department conducted an investigation and public hearings into the issue in December 2003. Numerous factors for consideration were specified in the Notice of Public Hearing. Representatives from franchisees appeared at the Department and provided information as set out in the Affidavit of Jeffrey J. Greer, **Exhibit 2**. These facts contradict Plaintiffs' contention that their role is solely that of advisor, rather, they strongly indicate that a prohibited chain store organization exists. Further correspondence from counsel received during the hearing period indicates that preferential prices were being negotiated and offered based on a Douglas store's status as such, which would be determinative that a prohibited chain store organization exists. *See,* December 9, 2003 correspondence to Jeffrey J. Greer, p. 10-11, **Exhibit 3** ("The franchisor provides advice and assistance in obtaining the best price and inventory levels for each product. The franchisor assists in negotiations with wholesalers, but does not purchase the product for any franchisee or require any franchisee to purchase any product. There is nothing in the law that prevents two or more licensees from discussing prices with each other and a wholesaler. This activity happens all of the time.") In addition, joint advertisements appear regularly on behalf of several stores. **Exhibit 4.**

## II. ARGUMENT

Plaintiffs have the burden of proving that they are entitled to injunctive relief. With the deference usually afforded to validly enacted statutes, coupled with the plenary power given to the State by the Twenty-First Amendment, the Plaintiffs face more obstacles than the usual litigant seeking injunctive relief. Coupled with the complete lack

of a factual or legal foundation for their arguments,[1] the inescapable conclusion is that injunctive relief should not be granted.

**A. The Legislation is Presumed to be Constitutional**

"All laws regularly enacted by the Legislature are presumed to be constitutional and valid" City of Pawtucket v. Sundlun, 662 A.2d 40, 45 (R.I. 1995). It is well settled that this Court should "approach constitutional questions with great deliberation, exercising [it's] power in this respect with the greatest possible caution." DEPCO v. Brown, 659 A.2d 95 (R.I. 1995). It is incumbent upon the Court to give effect, if possible, to a State statute. United Nuclear Corp. v. Cannon, 553 F.Supp.1220 (D.R.I. 1982). Accordingly, a Court must "make every reasonable intendment in favor of the constitutionality of the legislative act." City of Pawtucket, 662 A.2d at 45. These maxims are an outgrowth of the understanding and respect given by one branch of government to the other—the wisdom or necessity of a law is for the legislature to determine, and not for the Court. FCC v. Beach Communications, Inc.,, 508 U.S. 307 (1993).

In reviewing the constitutionality of enacted statutes, this Court has noted that "[b]ecause of the broad plenary power of the general assembly, [the] evaluation of legislative enactments has been extremely differential; moreover, [courts have] interfered with such enactments only when the legislation at issue could be palpably and unmistakably characterized as an excess of legislative power." Kennedy v. State, 654 A.2d 708 at 711 (R.I. 1995). Courts "will not invalidate a legislative enactment unless the party challenging the enactment can prove beyond a reasonable doubt . . . that the

[1] The Complaint is not verified, and the only affidavit offered in support of the Motion is that of Plaintiffs' counsel regarding what he perceives to be the lack of enforcement by DBR.

statute in question is repugnant to a provision in the Constitution." City of Pawtucket, 662 A.2d at 45 (emphasis in original). A party challenging the constitutionality of a statute must satisfy the heightened burden of proving beyond a reasonable doubt that the statute in question is unconstitutional to obtain a ruling in its favor. Gorham v. Robinson, 57 R.I. at 7, 186 A. at 837.

**B. The Twenty-First Amendment**

Since its passage in 1933 repealing prohibition, the Twenty-first Amendment has been deemed to confer broad powers on the states in the area of liquor distribution and sales within their borders. California Retail Liquor Dealers Association v. MidCal Aluminum, Inc., 445 U.S. 97 (1980); North Dakota v. United States, 495 U.S 423 (1990). That Amendment is the sole grant of power by the Constitution to the states, the remaining amendments curtailing the power of states to engage in various activities. In Larkin v. Grendels Den, Inc., 459 U.S. 116 (1982), a case dealing with the Twenty First Amendment and its interaction with the Establishment Clause of the First Amendment, the United States Supreme Court stated: "Given the broad powers of the states under the Twenty-first Amendment, judicial deference...is especially appropriate in the area of liquor regulation." 459 U.S. 121, 122.

**C. This is Not a First Amendment Case**

Plaintiffs attempt to put all of their eggs into the First Amendment/temperance basket, presumably to elevate the level of scrutiny to be applied to this legislation under the equal protective clause. However, as the facts set out above clearly indicate, the relationship here is much more than simply giving business advice to clients. Further, the statute provides that "Notwithstanding anything contained in this chapter to the contrary,

this act shall not be construed as to prevent the utilization of duly licensed professionals rendering services as independent contractors." Simple business advice would presumably fit within this exception. However, the reality of the relationship involved is clearly more than simple business advice, implicating not only the alcoholic beverage control laws of the state, but other important state interests as well.

For example, the General Assembly enacted the Rhode Island Antitrust Act, R. I. Gen. Laws Chapter 6-36, in order to promote competition and to prohibit unreasonable restraints of trade and monopolistic practices. The state antitrust statutes are to be construed in harmony with judicial interpretations of comparable federal antitrust statutes insofar as practicable. R. I. Gen. Laws § 6-36-2(b). The comparable federal antitrust statutes include Section I of the Sherman Act, 15 U.S.C. § 1 which prohibits concerted action that unreasonably restrains trade and Section 3 of the Clayton Act, 15 U.S.C. §14, which prohibits concerted activity that would lessen competition or tend to create a monopoly.

The purpose of the antitrust laws is to protect competition, not competitors. UXB Sand & Gravel, Inc. v. Rosenfeld Concrete Corp., 599 A.2d 1033 (R.I. 1991). Conduct is analyzed under the antitrust laws either under a per se standard or rule of reason standard. Per se analysis is narrowly limited to cases of price fixing, group boycotts and the like. Id. at 1036. The rule of reason analysis requires that the effects of the alleged violations be balanced so that pro-competitive effects are compared with anti-competitive effects. Id. at 1037.

A franchise relationship is not exempt from the reach of the antitrust laws, but must be analyzed under the rule of reason approach. See e.g. Eichman v. Fotomat Corporation,

880 F. 2d 149 (9th Cir. 1989); Kidd v. Bass Hotels and Resorts, Inc., 136 F. Supp. 965 (E.D. Ark. 2000).

C. **The Legislation is Constitutionally Permissible**

Plaintiffs mistakenly would have this Court believe that temperance is the sole interest touted by the State in this instance. As stated above, even Title 3 is not limited to temperance, but also exists to ensure the reasonable control in the traffic of alcoholic beverages. R.I. Gen. Laws § 3-1-5. As part of that grant of authority to control the traffic in alcoholic beverages, the assurance that the commercial aspects of the industry are operated under the conditions of free and unrestricted competition are worthy and constitutionally permissible goals. Nor is this legislation unusual. In our sister state of Massachusetts a chain of three stores, but no more, is allowed. Factors considered under that statutory scheme in determining whether a chain store relationship exists are, among other things, single group insurance policies covering employees of all corporations; sharing common bookkeeping offices; substantial intercompany dealings; and who the employees are hired by and work for. *See,* Cleary v. Cardullo's, Inc., 198 N.E.2d 281 (Mass. 1964). That statutory limit of three stores was upheld against an equal protection attack in Johnson v. Martignetti, 375 N.E.2d 290 (Mass. 1978). That Court correctly found that the regulatory scheme was aimed at the business relationships and their positive effect on commerce and competition:

> Concentration of retailing in the hands of an economically powerful few has been thought to intensify the dangers of liquor sales stimulations, thereby threatening trade stability and promotion of temperance. Regulation of the number of licenses issued, therefore, aims at controlling the tendency toward concentration of power in the liquor industry; preventing monopolies; avoiding practices such as indiscriminate price cutting and excessive advertising; and preserving the right of small, independent liquor dealers to do business.

Id. at 297 (citations omitted).

In Parham v. Oklahoma Alcoholic Beverage Control Board, 412 P.2d 142 (Ok. 1966), the Oklahoma Supreme Court upheld, against a dual constitutional attack[2] a rule requiring wholesalers to maintain minimum inventories of certain of the most popular brands of alcoholic beverages. In beginning its analysis, that Court stated:

> At the outset we must recognize that the liquor industry because of the very nature of its product requires strict control and close supervision. As a result, the Legislature by virtue of the police power of the State possesses broad powers to regulate and supervise all phases of traffic in intoxicating liquors. It is a generally accepted concept that 'the power of a state to regulate and restrict the liquor traffic' is far broader than the power to regulate or restrict ordinary businesses, because of its effect on the health and welfare of the public.

412 P.2d at147.

The rule requiring a fourteen-day inventory of the most popular brands was read as expressing an intent on the part of the Oklahoma legislature that, "...within the framework of strict regulation which the liquor industry by its nature requires, the commercial aspects of the industry shall be operated under the conditions of free and unrestricted competition." Id. at 148. The Court upheld the rule, because it was "...clear that under the voluntary franchise agreement adopted by the wholesalers the extensive competition heretofore existing between wholesalers selling the same brands of liquor would be destroyed." There was no doubt in that case that the rule was specifically designed "to combat the voluntary franchise system. However, we make no determination of the wisdom of a liquor franchise system, be it voluntary or involuntary. That is a matter for determination by the Legislature and the people of the State of

[2] Unconstitutional delegation of powers and due process.

Oklahoma." Id. at 149. The legislative purpose, as exists in the case *sub judice*, was unrestricted commercial competition.

In Granite State Grocers Assoc. v. State Liquor Comm'n., 289 A.2d 399 (N.H. 1972), a prohibition against any person holding more than two off-site beverage permits was held not to deprive owners of the chain stores of their equal protection rights, nor did it violate the federal commerce clause. The prohibition in that case was similar to that here—with New Hampshire allowing a chain store of two, instead of the absolute prohibition here. In examining that scheme, the New Hampshire Court wrote that "The obvious purpose of this well-rounded regulatory system is to supervise and to fractionalize the beverage industry...". The Court noted that "at least twenty states similarly restrict the number of alcoholic beverage permits. Such statutes have been held constitutional as serving a public purpose in the two states where the question has been considered." Id. at 65 (citations omitted). The lament of the Plaintiffs in this case is the same as in Granite State, and was rejected: "Regulations against concentration in the alcoholic beverage business necessarily discriminate against chain stores....Discrimination based on size is not unconstitutional so long as it serves a bona fide public purpose....The legislative motives in enacting economic and trade regulations, particularly in the regulation of alcoholic beverages, may require less stringent scrutiny and justification than in other socalled personal-rights decisions." Id. at 66.

The assurance of equitable basis for competition was held enough to immunize a statute against an equal protection challenge in Reinfeld v. Schieffelin & Co., 466 A.2d 563 (N.J. 1983). The following rationale applies with equal force in this case:

> The ultimate goal sought to be attained by the statute in question, as in the entire scheme of liquor legislation, is the protection of the public through

> the promotion of temperance and elimination of the racketeer and bootlegger. In order to accomplish this purpose the statute seeks to achieve as far as necessary the independence of wholesalers from distillers. A wholesaler dependent upon a distiller for a supply of sought-after merchandise might be tempted to comply with the non-legitimate desires of the distiller if the latter were free to discontinue the supply at will. For the purpose of strengthening the wholesaler's resistance if confronted with a distiller's wish to over-stimulate sales and thus negate the public policy in favor of temperance or a desire to engage in other prohibited acts, *e.g.,* tie-in sales, the statute seeks to prevent the distiller from arbitrarily closing the source of supply to a wholesaler.

Id. at 408. The same is true here—the fortunes of the franchisees' are inextricably intertwined with that of the Plaintiffs, who control the day-to-day operations of each store. "However inconvenient the statute might be to [the franchisor's] and [the franchisees'] trade, even "bona fide business policy in the field of liquor traffic must yield to the policy of the State." Id. at 568 (citation omitted). In rejecting an equal protection challenge, the New Jersey Court correctly recognized that "Liquor dealers are not a suspect class, nor is liquor distribution a fundamental right. This Court has recognized that 'there is no common, inherent, natural or constitutional right to engage in the business of selling liquor.'" Id. at 412. In deciding that the statute was fundamentally and constitutionally sound, that Court decided that a legislature's "practically limitless" power to regulate the sale of intoxicating beverages accentuates the normal deference afforded by the "rational basis" test. Although that power was broad even before the passage of the Twenty-first Amendment, the latter has been read to give states plenary power to regulate the sale and distribution of liquor, and it permits classifications that relate to that regulatory function. The Court upheld the legislation as having a rational basis in the promotion of temperance, in that it would free from any

illegitimate demands that suppliers might make those wholesalers who have become dependent on a supplier. That rationale is easily applied here.

## III. CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Motion for Preliminary Injunction be denied.

Respectfully Submitted,

Defendants
By their Attorney,

PATRICK C. LYNCH
ATTORNEY GENERAL

Rebecca Tedford Partington #3890
Deputy Chief – Civil Division
150 South Main Street
Providence, RI 02903
Tel: (401) 274-4400 ext. 2303
Fax: (401) 222-2995

## CERTIFICATION

I, the undersigned, hereby certify that I mailed a true copy of the within postage pre-paid, first class mail, on this 18th day of February, 2005 to those indicated below:

Robert J. Roughsedge, Esq.
Lawson & Weitzen, LLP
88 Black Falcon Avenue, Suite 345
Boston, MA 02210-1736

2004 -- H 7817 SUBSTITUTE A AS AMENDED

LC01944/SUB A

# STATE OF RHODE ISLAND

**IN GENERAL ASSEMBLY**

**JANUARY SESSION, A.D. 2004**

AN ACT

RELATING TO ALCOHOLIC BEVERAGES -- LICENSES

Introduced By: Representatives T Brien, Corvese, Fox, Laroche, and Enos

Date Introduced: February 12, 2004

Referred To: House Corporations

It is enacted by the General Assembly as follows:

SECTION 1. Section 3-5-11 of the General Laws in Chapter 3-5 entitled "Licenses Generally" is hereby amended to read as follows:

**3-5-11. Licensing of chain stores.** -- (a) Licenses, except retailer's Class E, Class B, Class B-H, Class B-L, Class B-M, and Class B-V licenses, authorized by this title shall not be granted, issued, or transferred to or for the use of any "chain store organization," which term shall ~~mean~~ consist of any chain of retail or wholesale business or business organizations, and more specifically defined herein, including, without limitation, grocery stores, markets, department stores, and convenience stores, as well as retailers of alcoholic beverages, and which include chains in which one or more stores are located outside of the state.

(b) ~~What is a chain store organization is declared to be a question of fact, and the department is empowered to determine finally whether any applicant for the issuance, grant or transfer of a license is acting for or on behalf of a chain store organization or a store unit of a chain store organization.~~ The term "chain store organization" is defined to include, but not limited to:

(1) Any group of one or more holders of Class A liquor licenses who engage in one or more of the following practices with respect to the business conducted under such licenses, either directly or indirectly, or have any direct or indirect beneficial interest in the following practices:

(a) Common, group, centralized or coordinated purchases of wholesale merchandise.

(b) Common billing or utilization of the services of the same person or the same entity in

the management or operation of more than one liquor licensed business.

(c) Participation in a coordinated or common advertisement with one or more liquor licensed business in any advertising media.

(d) Coordinated or common planning or implementation of marketing strategies.

(e) Participation in agreed upon or common pricing of products.

(f) Any term or name identified as a chain or common entity.

(2) Any group of one or more liquor license holders who share any of the following common features, either directly or indirectly or acquire any direct or indirect beneficial interest in the following practices:

(a) The same director of a corporation, member of a LLC, LLP, partner in a general or limited partnership, trustee or beneficiary of a trust.

(b) The same individual or corporate owners.

(3) Any group of one or more license holders that is found to be a "chain store organization" as a factual matter by the department, as a result of an evidentiary hearing in connection with any application for the issuance, grant or transfer of a license, or upon the filing of a complaint by any member of the public.

(4) Upon a finding of violation of this section, the department shall be empowered to set a fine up to the amount of ten thousand dollars ($10,000) per violating licensee, revoke the license of the violator, or suspend the license of the violator for a period of time to be determined by the department. Additionally, the department shall issue a cease and desist order against the violating chain store entity(s) and may further order the dissolution of the violating chain store entity(s).

SECTION 2. Chapter 3-5 of the General Laws entitled "Licenses Generally" is hereby amended by adding thereto the following section:

**3-5-11.1. Liquor franchises prohibited.** – (a) To promote the effective and reasonable control and regulation of the Rhode Island alcoholic beverage industry and to help the consumer by protecting their choices and ensuring equitable pricing. Class A liquor license authorized by this title shall not be granted, issued, renewed or transferred to or for the use of any liquor franchisor or franchisee. Class A liquor license holders are expressly prohibited from utilizing the provisions of the Franchise Investor Act, 19-28-1 et seq.

(b) Any franchise agreements involving the retail sales of alcoholic beverages are hereby declared null and void and illegal as of the effective date of this section.

(c) Any franchise agreements involving the retail sales of alcoholic beverages shall be terminated by the franchisor or the franchisee within thirty (30) days of the effective date of this



10/12/04 14:29 FAX 401 222 6654 DEPT OF BUS REG 003

section.

(d) Upon finding of a violation of this section by either the franchisor or the licensee, the department shall be empowered to set a fine up to the amount of ten thousand dollars ($10,000) per violating franchisor or licensee, revoke the license of the violator or suspend the license of the violator for a period of time to be determined by the department. Additionally, the department shall have the power to revoke or suspend the franchise registration in accordance with section 19-28.1-18 and to order it to cease and desist from all operations that are violative of the provisions of this section.

Notwithstanding anything contained in this chapter to the contrary, this act shall not be construed as to prevent the utilization of duly licensed professionals rendering services as independent contractors.

SECTION 3. This act shall take effect on April 1, 2005.

LC01944/SUB A



10/12/04 14:29 FAX 401 222 6654 DEPT OF BUS REG 004

EXPLANATION

BY THE LEGISLATIVE COUNCIL

OF

A N A C T

RELATING TO ALCOHOLIC BEVERAGES -- LICENSES

***

This act would clarify the prohibition against chain liquor stores and expressly declares that Class A liquor license holders cannot enter into franchise agreements.

This act would take effect on March 1, 2005.

LC01944/SUB A

**EXHIBIT 1**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

WINE & SPIRITS RETAILERS, INC.
and JOHN HARONIAN,
Plaintiffs,

v. C.A. NO. 04-418T

STATE OF RHODE ISLAND AND
PROVIDENCE PLANTATIONS, and
JEFFREY J. GREER, in his capacity as
the Associate Director of the Department
of Business Regulation,
Defendants,

**AFFIDAVIT OF MARIA L. D'ALESSANDRO**

1. I hold the position of Associate Director & Superintendent of Securities in the Rhode Island Department of Business Regulation. Franchise Offerings and Franchise Agreements are filed with the Securities Division of DBR, including those of Wine & Spirits Retailers, Inc., plaintiff in this matter.

2. A Franchise Offering Circular dated March 30, 2004 and filed by Wine & Spirits Retailers, Inc. indicates that Douglas Wine and Spirits, Inc. had changed its corporate name to Wine & Spirits Retailers, Inc., and that FOC contains the following language:

   - **Cover Page:** "The franchisee will operate a Douglas Wine & Spirits retail outlet engaging in the business of selling alcoholic beverages for consumption off the premises. The initial franchise fee is $10,000."

   - **Item 1, p. 1:** "We will sell and grant you a franchise to operate once a state liquor license is obtained, a retail wine, spirits, and related merchandise business, which features a wide assortment of products associated with the business of selling alcoholic beverages at retail. WE also may provide, but we are not required to provide, business development and management techniques and systems utilized by Wine & Spirits and its predecessor since 1977."

   - **Item 1, p. 2:** "We are experienced in the management and marketing of stores engaged in the retail sale of alcoholic beverages through Tri-State Group, Inc., another management company owned by the same principals. "

- **Item 2:** The President and Director is listed as John Haronian; the Vice President and Director is listed as Kathleen Haronian; the Vice President of Operation and Director is listed as Craig Power; and the Vice President of Marketing and Director is listed as John DeLeo.

- **Item 6:** In addition to the $10,000 franchise fee paid by the franchisee, a monthly royalty fee is paid based on gross receipts; a monthly advertising and promotion fee; a transfer fee at the time of transfer; a renewal fee at the time of renewal; all costs of training; and an audit fee.

- **Item 8:** "We will provide you with a list of approved and required inventory items, a list of approved vendors, a plan-a-gram of all departments, a store layout, sample reports and an operations manual as part of your franchise package. We have the sole right to approve suppliers of product to your business. We may require you to discontinue the use or sale of any product or item, which does not meet the standards of quality established by us. We reserve the right to develop certain proprietary materials including promotional materials, signs, etc. that may be available only from us on a fee or no fee basis including a reasonable markup at our sole discretion."

- **Item 8:** "Specifications exist regarding exterior and interior construction, fixtures and design; signs; displays and other promotional material; hours of operation; related items bearing our trademarks, service marks, names and slogans. These standards are formulated and modified at our sole discretion."

- **Item 11:** Provides in part that Wine & Spirits will, prior to the opening of a franchised store, to designate the franchisee's territory; identify the "equipment, signs, products, materials and supplies required for the Business, identify authorized and optional products and services you must or may provide to customers and designate or approve suppliers of services, equipment, signs, products, materials and supplies."

- **Item 11:** Provides in part that Wine & Spirits will provide the Franchisee with opening assistance in conducting an opening advertising, promotion and marketing program, to include opening assistance for five days after the initial training commencing on the first day prior to the date scheduled for opening and on the scheduled opening date itself. This assistance includes providing one member of Wine & Spirits' operational staff to assist the franchisee.

- **Item 11:** Further states that Wine & Spirits issues and modifies standards (not defined) for its franchisees, which may, at their discretion, be changed.

- **Item 11:** Requires franchises, franchisees and affiliates to contribute to an Advertising and Promotion Fund on a monthly basis. Wine & Spirits "will direct all programs that the Fund finances, with the sole right to determine the creative concepts, materials and endorsements used and their geographic, market and media

placement and allocation. ... Depending on the material, our employees and public relations agencies will prepare advertising."

- **Item 11:** The Advertising Fund will be used to cover costs of Douglas' "...reasonable salaries, administrative costs and overhead we incur in administering the Fund and its programs, including conducting market research, preparing advertising and marketing materials and collecting and accounting for contributions."

- **Item 12:** "During the initial term of the franchise, you are granted an exclusive territory in which you can operate one (1) retail location marked by geographic boundaries, determined by a total area population of at least 25,000 people. Douglas will not operate stores or grant franchises for a similar or competitive business within your area. Should you desire to relocate your business within your territory during the term of your franchise agreement, you must put such a request in writing to us with sufficient justification for such a relocation. Douglas reserves the right to approve or disapprove your request."

- **Item 12:** "No other Douglas Wine & Spirits Franchise will be allowed within the circumference of the protected territory."

- **Item 13:** Wine & Spirits grants the right to "operate a wine and spirits business under the service marks DOUGLAS WINE & SPIRITS."

- **Item 16:** "In order to ensure the uniformity and high quality product of the DOUGLAS WINE & SPIRITS business, you are required to follow the restrictions and specifications regarding inventory and services offered by you at your location. You are restricted to sell only products or services previously approved in writing by us. We may suggest prices on certain inventory items, however all pricing decisions are ultimately yours to make."

- **Item 22:** states: "At all times the franchised business shall be operated as an independent entity. The franchise agreement will not be construed to create a master-servant, employer-employee, independent contractor or agency relationship between franchisor and franchisee or among francisees, nor will the overall franchise operation be conducted so as to create a chain store operation."

3. The Franchise Agreement marked "Revised 04 01 2004 clean" indicates that the Franchisor is Wine & Spirits Retailers, Inc., d/b/a Douglas Wine & Spirits, and contains the following language (in addition to similar language as set out above):

- **Section 1.1** states "Franchisor hereby grants to Franchisee, subject to the terms and conditions hereof, the right and franchise to establish and operate a retail store engaged in the business of selling alcoholic beverages for consumption off the premises ... and Franchisee hereby undertakes the obligation to establish and operate the store under the name "Douglas Wine & Spirits"...".

- **Section 5.10** states "Franchisee will equip the Store with computer equipment, point of sale and other necessary software, telephones and facsimile equipment in accordance with Franchisor's current requirements and specifications."

- **Section 5.15** provides that "Franchisor may inspect Franchisee's records and the Store to determine if Franchisee is performing in accordance with this Agreement, without providing any prior notice to Franchisee."

- **Section 6.2** states "Franchisor shall provide Franchisee with such training and assistance in the operation of the Store and the business franchised hereunder as well as in advertising and promotion in connection therewith as Franchisee may request and Franchisor deems appropriate in its sole discretion…".

- **Section 6.5** provides that "Franchisor shall furnish Franchisee with an initial supply of such accounting, administrative and other forms and supplies to be used in the operation of the Store and the business franchised hereunder, as Franchisor deems appropriate."

- **Section 8.1** requires that "Franchisee may place and maintain a display advertisement which meets Franchisor's requirements…in the Yellow Pages telephone directory published by the regional telephone company which provides local telephone service in the territory. Additionally, Franchisee may place and maintain a display advertisement that meets such requirements in any other telephone directory (similar to the Yellow Pages) that is circulated in the territory. Franchisee may participate in a joint listing, the cost of which shall be shared equally by Franchisee and other participating Franchisees."

- **Section 11.1** provides that "Franchisor has a proprietary interest in certain confidential information and know-how consisting of operating and purchasing procedures, supplier lists, pricing formulae, and other methods, techniques, formats, specifications, procedures, information, and/or systems for the development, operation and franchising of businesses using the System (Confidential Information).

- **Section 11.2** provides that "Franchisee acknowledges and agrees that Franchisor would be unable to protect the Confidential Information against unauthorized use or disclosure if Franchisee were permitted to hold interests in any other business offering alcoholic beverages for consumption off the premises at retail. Therefore, during the term of this Agreement, neither Franchisee (nor any of its owners, if applicable) shall have any direct or indirect interest as an owner, investor, partner, lender, director, officer, employee, consultant, representative or agent, or in any other capacity, in any business that engages in any aspect of the offer, sale, or distribution of alcoholic beverages for consumption off the premises at retail, except for other businesses approved by Franchisor…".

- **Section 13.2** requires that the "Franchisor shall be named as an additional insured on all insurance policies covering risks which may attach to the Franchisor."

- **Sections 14.1 and 14.2** provide that the Agreement is fully assignable by Franchisor, however, the Franchisee may not transfer without the Franchisor's approval.

- There are numerous sections allowing for termination by the Franchisor, but none by the Franchisee.

Maria D'Alessandro
Associate Director & Superintendent of Securities

Subscribed and sworn to before me this 18 day of February, 2005.

Notary Public
My Commission Expires:

EXHIBIT 2

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

WINE & SPIRITS RETAILERS, INC.
and JOHN HARONIAN,
Plaintiffs,

v. C.A. NO. 04-418T

STATE OF RHODE ISLAND AND
PROVIDENCE PLANTATIONS, and
JEFFREY J. GREER, in his capacity as
the Associate Director of the Department
of Business Regulation,
Defendants,

**AFFIDAVIT OF JEFFREY J. GREER**

1. I hold the position of Associate Director of the Division of Commercial Licensing and Regulation at the Rhode Island Department of Business Regulation. In that capacity, on behalf of DBR, I am authorized to exercise general supervisory jurisdiction over alcoholic beverage matters in the state.

2. In late 2003, it was determined that public hearings should be held, inquiring into what factors should be incorporated into a regulation defining "chain store operation" in accordance with R.I. General Laws § 3-5-11. The core concerns addressed were including but not limited to the following:

    - Two (2) or more licensees that have the same owners, officers, stockholders, partners, members (limited liability company), employees, independent contractors, parent corporation, trustees, or beneficiaries of a trust.
    - A Class A licensee is engaged in any activity, including through a third-party, that centralizes executive control among two (2) or more Class A licensees. (i.e. bookkeeping, employee hiring, benefit packages).
    - A Class A licensee has a franchise agreement.
    - A Class A licensee has a management agreement with a third-party entity that manages more than one (1) Class A liquor store within or outside Rhode Island.

- A Class A licensee has an agreement with a third-party which provides for a royalty payment is based upon gross or net sales or gross or net profit.
- A Class A licensee has an agreement with a third-party that manages more than one (1) Class A liquor store within or outside Rhode Island that provides for a monetary penalty against the Class A licensee for failure to meet sales and/or profit projections.
- A Class A licensee has an agreement with a third-party that manages more than (1) Class A liquor store within or outside Rhode Island that provides for a monetary penalty against Class A licensee as liquidated damages if the Class A licensee terminates the agreement.
- A Class A licensee has an agreement with a third-party that manages more than (1) Class A liquor store within or outside Rhode Island that delegates the exclusive authority to approve or disapprove alcoholic beverage products to the third-party.
- Owners of Class A retail stores have an agreement to collectively negotiate purchases of alcoholic beverages from licensed wholesalers.
- A Class A licensee has an agreements with other Class A retailers to issue and accept each other's gift certificate's discount cards and other promotional items.
- A Class A licensee provides loans or financing to other Class A licensees.
- Class A licensees have the same individual or entity manage day-to-day operations of more than one (1) Class A liquor store.
- More than one (1) Class A licensee uses a common trademark or trade name.
- Class A licensee enter into arrangements to produce joint advertising.
- Any other factors raised that are deemed relevant.

3. In conjunction with that public hearing process, the following facts were offered by interviewees:

- Tri-State is a corporation owned by John Haronian, and shares an address with Wine & Spirits, Inc., the plaintiff in this matter;
- Tri-State manages people, payroll, accounting, and benefits for the franchisees;
- Tri State gets a fee from the stores, based on revenues;
- Invoices are sent to the individual franchisees, then forwarded to Tri-State for payment;
- Invoices are paid by Tri-State using checks signed with signature stamps in the possession of Tri-State;
- Tri-State provides health insurance, bookkeeping and payroll functions for the franchisee Douglas Liquor stores;
- All employees are on Tri-State's payroll;
- Payments are made to Tri-State for hiring assistance;
- There is an operations manual required to be followed by managers of the stores;

- Representatives of Tri-State deal with specials offered by wholesalers and then passes this information along to the franchisees;
- Monthly bills for the store are paid by Tri-State;
- Douglas stores call or consult with Tri State on a day-to-day basis;
- Tri-State writes the check for all Douglas franchisee accounts;
- The computer system (Spirits 2000) may be used throughout the franchise;
- Tri-State and Douglas are located at the same address;
- No bills are taken care of by the stores themselves;
- The managers of the stores have no checkbooks, they deliver bills and invoices to Tri-State;
- The presidents of the franchisees may work together on certain prices and profit margins;
- Franchise meetings are held quarterly;
- Franchisor inspects the stores randomly;
- Employees are sometimes shared between stores; and
- Print and radio advertising is joint.

4. My understanding of Title 3 of the General Laws of the State of Rhode Island, and what I bear in mind in enforcing that title, is that its goal is the furtherance of temperance, and the reasonable control of the traffic in alcoholic beverages. R.I. Gen. Laws §3-1-5. The efficiencies that come from chain stores mean that they will sell more product, and that is contrary to both the legislative intent and the goal of temperance.

Jeffrey Greer
Associate Director of Commercial Licensing

Subscribed and sworn to before me this 18th day of February, 2005.

Notary Public
My Commission Expires: 9-12-05

**EXHIBIT 3**

The franchisor provides advice and assistance in obtaining the best price and inventory levels for each product. The franchisor assists in negotiations with wholesalers, but does not purchase the product for any franchisee or require any franchisee to purchase any product. There is nothing in the law that prevents two or more licensees from discussing prices with each other and a wholesaler. This activity happens all of the time.

In joint advertisements, licensees frequently advertise that the same prices are available at either location. *See* attached advertisements of Liquor Shoppe and 1776 Wine & Spirits, attached as Exhibit B. Where more than one location is advertising the same prices in the same advertisement it can be assumed that they each received the same price from the wholesaler. Even without a franchise relationship, licensees are free to negotiate together. Any exclusion of franchisees from this practice, but not other licensees, would be a violation of the franchisee's equal protection rights.

There is no evidence that the Legislature intended to allow wholesalers to have an advantage over retailers in negotiations. The Legislature clearly stated that one of its purposes was to restrict the profits of the wholesalers. Today, two wholesalers control approximately 70% of the product. Any measure taken to restrict the bargaining power of the retailers without a commensurate restriction on wholesalers would be a departure from the Legislative intent.

* * *

DOUGLAS WINE & SPIRITS, INC.

By its attorneys,

Robert J. Roughsedge, RI 5876
LAWSON & WEITZEN, LLP
88 Black Falcon Ave., Ste. 345
Boston, MA 02210
617-439-4990

**EXHIBIT 4**

LET US PAY YOUR HEATING BILL

WINDOWS: replace those old drafty windows with our ULTRAMAX R 10 WINDOWS and we pay your highest month heating bill*

SIDING & WINDOWS: purchase our high energy efficient siding & window package and we will pay your entire year heating bill**

Offer is limited to the first 10 Home Owners.

Call 401-829-8391 today

HIS HOME IMPROVEMENT SERVICES, INC.

www.homeimprovementservicesinc.com

SIDING • WINDOWS • DOORS



SATISFACTION GUARANTEED
FINANCING AVAILABLE
CREDIT CARDS ACCEPTED

*limited to single family homes, minimum of 10 windows.
**limited to single family homes special energy package ultramax R 10 and Charter oak elite complete home installation.
Prior sales excluded. Offer good at presentation only.

# Final Ira

BAGHDAD, Iraq (AP) — Iraq announce the final results of national elections today, a spoke election commission said.

Farid Ayar said on Al-Arabi yesterday that the commission this morning to finalize some issues and then announce the fir the afternoon. The results will be official after three days.

"We will give three days to results, hear any disputes, and th be officially declared final," Ayar

DOUGLAS WINE & SPIRITS
ALL STORES INDEPENDENTLY OWNED & OPERATED

1661 Mineral Spring Ave., N. Prov.
1450 Smith St., N. Prov.
1235 Wampanoag Tr., E. Prov.
900 Victory Highway, N. Smithfield
453 Atwood Ave., Cranston
39 Putnam Pike, Johnston
1380 Hartford Ave., Johnston

15% OFF any 6 BOTTLES of LAY-DOWN WINE (excluding sale items)

OPEN SUNDAYS 12-6 PM
WWW.DOUGLASWINE.COM

$.69 POLAR MIXERS All Types 1L

$19.99 OBERGLAS White Wine or All Purpose Goblet 6 Pk

WINE

$8.99 C.K. MONDAVI All Types 1.5L

$9.99 MARTINI & ROSSI Asti

$27.99 MOET CHANDON White Star

$10.99 LUNA DI LUNA All Types 1.5L

$9.99 KORBEL Brut-Extra Dry Chardonnay

2/$15.00 DELICATO All Types 1.5L

$8.99 SUTTER HOME Chard-Merlot Cab-P Grigio 1.5L

$6.99 FREIXENET Cordon Negro Brut or X-Dry

All 750ml

2/$13.00 SUTTER HOME White Zin-SB White Merlot 1.5L

$8.99 J. LOHR Chardonnay 750ml

Your Valentine Celebration Center

$9.99-1.50 Mail-in Rebate $8.49 CAVIT Pinot Grigio & All Other Types 1.5L

2/$16.00 750ml Mix & Match BLACKSTONE All Types

2/$8.40 BERINGER White Zin White Merlot