UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

WINE AND SPIRITS RETAILERS, INC. and
JOHN HARONIAN

v. C.A. No. 04-418-T

STATE OF RHODE ISLAND AND PROVIDENCE
PLANTATIONS, and JEFFREY J. GREER, in
his capacity as Associate Director of
the Rhode Island Department of Business
Regulation

**MEMORANDUM AND ORDER**

ERNEST C. TORRES, Chief Judge.

Wine & Spirits Retailers, Inc. (W&S) brought this action to declare unconstitutional a Rhode Island statute prohibiting the retail sale of alcoholic beverages by chain stores and/or franchise businesses. The case, presently, is before this Court for consideration of W&S's request for a preliminary injunction prohibiting the State from enforcing the statute.

The issue presented is whether the statute violates W&S's First Amendment right to freedom of speech or its Fourteenth Amendment right to equal protection. After an evidentiary hearing and for the reasons hereinafter stated, this Court answers those questions in the negative; and, therefore, denies W&S's motion for a preliminary injunction.



23

**Background Facts**

Since 1933, Rhode Island, like many other states, has statutorily prohibited the retail sale of alcoholic beverages by "chain store organizations." R.I. Gen. Laws § 3-5-11; see Granite State Grocers Assoc. v. State Liquor Comm'n, 289 A.2d 309, 402 (N.H. 1972) (observing that at least twenty states, plus New Hampshire, restrict the number of alcoholic beverage permits that may be held by a single person or group). The prohibition applies to holders of Class A licenses issued to those who operate liquor stores but it does not apply to holders of other classes of licenses issued to restaurants and private clubs. Until recently, Rhode Island's statute did not define the term "chain store organization" but the Department of Business Regulation which was charged with responsibility for enforcing the statute interpreted that term to mean two or more stores having common ownership.

Approximately seven years ago, W&S, which, itself, does not hold a Class A license, began enlisting independently-owned liquor stores to operate as its franchisees under the name Douglas Wine & Spirits. The terms of the franchise arrangement are set forth in the Uniform Franchise Offering Circular filed by Wine & Spirits with the Department of Business Regulation and in W&S's standard franchise agreement. Those terms include provisions that authorize W&S to designate the geographical territory in which the franchisee may operate; the inventory items that the franchisee is allowed or

required to carry; the vendors from which the franchisee may purchase those items; and the layout of the franchisee's store. The franchisee is required to pay an annual franchise fee and to contribute to an advertising and promotion fund controlled by W&S. In exchange, W&S agrees to grant the franchisee exclusive franchise rights within the assigned territory; to help the franchisee train its employees; and to advise the franchisee with respect to advertising, marketing, and other aspects of the franchisee's business.

On July 8, 2004, the Rhode Island General Assembly amended the statute to specify the kinds of activities that would cause a business to be classified as a "chain store organization" and, also, to prohibit the retail sale of alcoholic beverages by franchise operations. The effective date of the amendments was delayed until April 1, 2005, apparently, in order to afford existing franchisees an opportunity to bring themselves into compliance.

On September 29, 2004, W&S brought this action against the State of Rhode Island and Jeffrey Greer, in his capacity as Associate Director of the Rhode Island Department of Business Regulation, seeking to declare the statute unconstitutional. Several months later, in January 2005, W&S filed its motion for a preliminary injunction and shortly after the motion was scheduled for hearing, United Independent Liquor Retailers of Rhode Island

(UILR), an association of independent liquor stores, was granted leave to intervene as a defendant. On March 16, 2005, this Court conducted an evidentiary hearing and heard arguments by all parties.

## **The Preliminary Injunction Standard**

A preliminary injunction is considered an extraordinary remedy because it involves the granting of interim relief before the facts are fully developed by a full-blown trial on the merits. In determining whether a preliminary injunction should be granted, the Court must assess and balance the probability that the movant ultimately will succeed on the merits; any irreparable harm that the movant is likely to suffer if the injunction does not issue; any irreparable harm that the opposing party is likely to suffer if the injunction does issue; and the effect that the issuance or failure to issue an injunction may have on the public interest. Rosario-Urdaz v. Rivera-Hernandez, 350 F.3d 219, 221 (1st Cir. 2003); S.E.C. v. Fife, 311 F.3d 1, 8 (1st Cir. 2002).

## **Analysis**

I. Likelihood of Success

W&S mounts a two-pronged challenge to the statute. First, W&S argues that the statute violates its First Amendment right to freedom of speech and association because the statute prevents W&S from "[p]roviding paid marketing and management advice" to its franchisees and prohibits the retail sale of alcoholic beverages by

franchise organizations. W&S Mem. Supp. Mot. Prelim. Inj. at 8-9, 13, and 15. W&S also argues that the prohibition against franchising violates its Fourteenth Amendment right to equal protection because the prohibition applies to Class A licensees who sell alcoholic beverages for off-premises consumption but not to other categories of licensees who sell for on-premises consumption.

A. The First Amendment Claim

1. The Speech Claim

W&S's claim that the statute violates its freedom of speech is directed at R.I. Gen. Laws § 3-5-11(b)(1) which provides:

> (b) The term "chain store organization" is defined to include, but [*sic*] not limited to:
>
> (1) Any group of one or more holders of Class A liquor licenses who engage in one or more of the following practices with respect to the business conducted under such licenses, either directly or indirectly, or have any direct or indirect beneficial interest in the following practices:
>
> (i) Common, group, centralized or coordinated purchases of wholesale merchandise.
>
> (ii) Common billing or utilization of the services of the same person or the same entity in the management or operation of more than one liquor licensed business.
>
> (iii) Participation in a coordinated or common advertisement with one or more liquor licensed business in any advertising media.
>
> (iv) Coordinated or common planning or implementation of marketing strategies.
>
> (v) Participation in agreed upon or common pricing of products.
>
> (vi) Any term or name identified as a chain or common entity.

More specifically, in its memorandum, W&S argues that the

prohibition against common planning or implementation of marketing strategies contained in subsection (b)(1)(iv) prevents W&S from "providing paid marketing and management advice" to its franchisees. W&S Mem. Supp. Mot. Prelim. Inj. at 8-9, 13, and 15. During oral argument, W&S also contended, for the first time, that its freedom of speech is infringed by the prohibition against "coordinated or common advertisement" contained in subsection (b)(1)(iii).

The short answer to W&S's challenge to the prohibition against common planning or implementation of market strategies is that subsection (b)(1)(iv) does not, in any way, prevent W&S from "providing paid marketing and management advice." What it prohibits is concerted activity on the part of Class A licensees to engage in such practices. W&S does not hold a Class A license and remains free to provide licensees with planning and/or marketing advice which, during the hearing, it described as advice regarding marketing, methods of doing business, what products to sell, and how to set up a store. The fact that the statute may have the collateral effect of rendering less valuable any marketing advice that suggests common advertising does not infringe on W&S's freedom of expression any more than a prohibition against the sale of liquor to minors would infringe on W&S's "right" to dispense advice on how a licensee could more effectively market liquor to minors. While the Constitution may protect one's right to counsel others

regarding the conduct of their affairs, it does not guarantee that particular kinds of conduct that one might desire to recommend must be sanctioned by the law.

W&S relies on Bd. of Trustees of the State Univ. of New York v. Fox, 492 U.S. 469 (1989) but that case is readily distinguishable from this one. Fox involved a regulation that directly prohibited private commercial enterprises from operating on state university campuses, Fox, 492 U.S. at 471, and was interpreted to prevent tutoring, medical consultations and the rendition of legal advice to students in their dormitories, id. at 482. By contrast, subsection (b)(1)(iv) does not contain any such prohibition. It leaves W&S free to provide marketing and management advice and even advice regarding coordinated planning and implementation of marketing strategies. It merely prevents Class A licensees from acting in concert to engage in such activities.

Nor does the prohibition against coordinated or common advertisement contained in subsection (b)(1)(iii) restrict W&S's freedom of speech. That subsection, too, applies only to common advertising by Class A licensees. W&S describes its role with respect to such advertising as, simply, presenting proposed ads to franchisees and assisting in placing the ads. Indeed, the prohibition against common advertising does not prevent even the licensees, themselves, from advertising. In this respect, the

prohibition is distinguishable from the ban on the advertisement of liquor prices that was held unconstitutional in 44 Liquormart, Inc. v. Rhode Island, 517 U.S. 484 (1996) because, here, no restrictions have been placed on the right of individual Class A licensees to advertise or on the content of their advertisements. What subsection (b)(1)(iii) prohibits is the concerted activity of placing common advertisements which the evidence shows requires agreement among licensees with respect to what products will be advertised and what price will be charged for those products. In this regard, the prohibition against common advertising has no greater impact on licensees' freedom of expression than "an injunction against price fixing" may have on "the freedom of businessmen to talk to one another about prices." Nat'l Soc'y of Prof'l Engineers v. United States, 435 U.S. 679, 697 (1978).

Put another way, a statute that prohibits certain types of conduct does not run afoul of the First Amendment simply because words may be among the means used in furtherance of that conduct. See R.A.V. v. City of St. Paul, Minnesota, 505 U.S. 377, 389 (1992). ("[W]ords can in some circumstances violate laws directed not against speech but against conduct."). That is especially true when the conduct consists of what might be perceived as anti-competitive commercial practices. Thus, boycotts by the members of a professional association may violate anti-trust laws even though they have an expressive component or are based on statements

contained in the association's code of ethics. See, e.g., Fed. Trade Comm'n v. Superior Court Trial Lawyers' Ass'n, 493 U.S. 411, 430-32 (1990) (attorney association's boycott of assignment to cases involving indigent defendants); Nat'l Soc'y of Prof'l Engineers, 435 U.S. at 697 (ban on competitive bidding by engineering association); Wilk v. American Medical Ass'n, 895 F.2d 352, 357-58, 371 (7th Cir. 1990) (medical association's boycott of chiropractors based on association's code of ethics). Similarly, a newspaper's First Amendment rights are not infringed by an anti-trust law prohibition against refusing advertisements from businesses that also advertise with competing radio stations. Loraine Journal Co. v. United States, 342 U.S. 143, 155-56 (1951).

2. The Association Claim

W&S's claim that the Rhode Island statute violates its freedom of association is directed primarily[1] at R.I. Gen. Laws § 3-5-11.1(a) which provides:

> To promote the effective and reasonable control and regulation of the Rhode Island alcoholic beverage industry and to help the consumer by protecting their choices and ensuring equitable pricing. Class A liquor license authorized by this title shall not be granted, issued, renewed or transferred to or for the use of any liquor franchisor or franchisee. Class A liquor license holders are expressly prohibited from utilizing the provisions of the Franchise Investor Act, § 19-28-1 et seq.

---

[1]W&S also contends that the restrictions in § 3-5-11(b) violate its associational rights. However, for the reasons previously stated in rejecting W&S's "speech" claim, § 3-5-11(b) does not violate its association rights either.

The arguments in support of this claim are not as well developed as the arguments regarding W&S's speech claim. W&S describes the associational right at stake as the right of a franchisor and franchisees to associate for economic purposes. However, W&S concedes that there is little authority on the subject and this Court does not find W&S's arguments persuasive for several reasons.

First, the kinds of association most clearly protected by the First Amendment are associations "for the purpose of engaging in those activities protected by the First Amendment - speech, assembly, petition for the redress of grievances, and the exercise of religion." City of Dallas v. Stanglin, 490 U.S. 19, 24 (1989). While the First Amendment also may protect the rights of businesses to associate for economic purposes, it does not confer any right to engage in particular kinds of concerted economic activity. Rather, the constitutional limitations on a state's power to regulate such activity derives from other provisions, such as the due process and equal protection clauses.

The source of Constitutional protection is important because state regulation affecting First Amendment rights is subject to greater scrutiny than the regulation of economic activity and the burden is on the state to justify the regulation.[2] By contrast,

---

[2]With exceptions for certain categories of speech, such as obscenity, pornography, and "fighting" words, content-based regulations of (noncommercial) speech are "presumptively

under the equal protection clause, the constitutionality of state regulation of economic activity is judged under a rational relationship test and the party challenging the regulation must overcome the presumption of rationality enjoyed by state statutes. Hodel v. Indiana, 452 U.S. 314, 331-32 (1981).

Here, the ban on the franchise sale of liquor does not prevent W&S and/or Class A licensees from associating for the purpose of exchanging or expressing ideas or for any other purpose except engaging in concerted economic activity. In this respect, the ban on franchise sales of alcoholic beverages is similar to the ban on the sale of alcoholic beverages by chain stores which has been upheld by nearly every court in which the constitutionality of such bans have been challenged. See, e.g., Johnson v. Martignetti, 375 N.E.2d 290 (Mass. 1978) (upholding statute establishing limit of three liquor licenses per "person or combination of persons" against equal protection and due process challenges); Granite State

---

invalid," R.A.V., 505 U.S. at 382-83, and the government bears the burden of establishing that the regulations are necessary to serve a compelling state interest, id. at 395. Even content-neutral regulation of the time, place and manner of speech must be "narrowly tailored to serve a significant governmental interest" and "leave open alternative channels for communication." Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989). Restrictions on commercial speech that is not misleading and advertises lawful activity also are subject to heightened scrutiny: the government must establish that its interest in the restrictions is substantial, that the regulation directly advances the asserted interest, and that the regulation is not more extensive than necessary to serve that interest. Lorillard Tobacco Co. v. Reilly, 533 U.S. 525, 554 (2001).

Grocers Assoc., 289 A.2d 399 ( N.H. 1972) (upholding prohibition against any person holding more than two "off-sale" beverage permits against equal protection challenge under New Hampshire constitution); Grand Union Co. v. Sills, 204 A.2d 853 (N.J. 1964) (upholding statute designed to limit retail liquor licenses to two per person against due process and equal protection attacks). But see Casey's General Stores, Inc. v. Nebraska Liquor Control Comm'n, 369 N.W.2d 85 (Neb. 1985) (holding statutory prohibition on acquiring beneficial interest in more than two alcoholic beverage retail licenses violated equal protection clause).

There is no basis in either law or logic for prohibiting a single person or entity from operating multiple liquor stores and engaging in common purchasing and marketing activity while, at the same time, permitting franchisees, who independently own liquor stores, to do the same. Indeed, there is even less reason for allowing a number of independently operated licensees to engage in such joint activity because it may have the effect of reducing competition. As previously stated, in order to place common advertisements, W&S's franchisees must agree upon the price to be charged for the products advertised and W&S's franchisee arrangement restricts the territory in which a franchisee may operate.

B. The Equal Protection Claim

W&S claims that the prohibition against franchise sales of

alcoholic beverages violates its Fourteenth Amendment right to equal protection because it irrationally discriminates. Specifically, W&S points to the fact that the prohibition applies only to Class A licensees who sell alcoholic beverages for off-premises consumption and not to holders of other classes of licenses who sell for on-premises consumption. W&S Mem. Supp. Mot. Prelim. Inj. at 16.

The Equal Protection clause protects against governmental classifications that are arbitrary and treat some groups of individuals less favorably than others who are similarly situated. See Tapalian v. Tusino, 377 F.3d 1, 5 (1st Cir. 2004) ("The Equal Protection clause contemplates that similarly situated persons are to receive substantially similar treatment from their government."). Of course, that does not mean that any regulation that treats one group differently from another violates equal protection. Courts have recognized that classifications are not only permissible but necessary in any form of governmental regulation. See Cotter v. City of Boston, 323 F.3d 160, 168 (1st Cir. 2003) (the equal protection clause "does not mandate that every citizen be treated identically, rather, it requires an adequate explanation for treating groups differently."); United States v. Craveiro, 907 F.2d 260, 265 (1st Cir. 1990) ("Legislative classification or 'drawing lines' does not violate equal protection when it distinguishes persons as dissimilar on some permissible

basis in order to advance the legitimate interests of society.").

The test for determining whether a state statute violates the Equal Protection clause depends on the type of classification and the nature of the activity regulated. If the statute burdens "fundamental rights" such as voting rights or employs "suspect" classifications such as race, a "strict scrutiny" test is utilized in determining its constitutionality. Kittery Motorcycle, Inc. v. Rowe, 320 F.3d 42, 47 (1st Cir. 2003). On the other hand, if the statute simply regulates economic activity conducted by business entities, it is judged under the less stringent rational basis test. Id. As the Supreme Court has said:

> Social and economic legislation . . . that does not employ suspect classifications or impinge on fundamental rights must be upheld against equal protection attack when the legislative means are rationally related to a legitimate government purpose. Moreover, such legislation carries with it a presumption of rationality that can only be overcome by clear showing of arbitrariness or irrationality.

Hodel, 425 U.S. at 331-32. Put another way, such a statute passes muster under the Equal Protection clause unless the party challenging it demonstrates that there is no legitimate purpose for the statute or that it does not amount to a reasonable means of achieving that purpose. See Fed. Communications Comm'n v. Beach Communications, Inc. ("F.C.C."), 508 U.S. 307, 315 (1993) (on rational basis review, "those attacking the rationality of the legislative classification have the burden to negative every

conceivable basis which might support it" (internal quotation omitted)); Kittery Motorcycle, 320 F.3d at 47 (under rational basis standard, the government's classifications "bear[] a strong presumption of validity" and "the state . . . need only articulate some 'reasonably conceivable set of facts' that could establish a rational relationship between the challenged laws and the government's legitimate ends." (internal quotations and citations omitted)).

It is clear that the Rhode Island statute at issue in this case is purely "social and economic legislation" and that it "does not employ suspect classifications or impinge on fundamental rights." Therefore, it must be evaluated in accordance with the rational basis test.

As a threshold matter, W&S fails to carry its burden of explaining why it is arbitrary or irrational to prohibit franchise sales of alcoholic beverages by Class A licensees but not by other classes of licensees. Here, the failure to tender such an explanation is especially important because it seems apparent to even a casual observer that significant differences exist between the relatively small number of retailers who exclusively sell unlimited quantities of alcoholic beverages for off-premises consumption to persons who may or may not be the ultimate consumers and the much larger number of restaurants and clubs that dispense alcoholic beverages in measured quantities, often accompanied by

food, for on-premises consumption.

Even if restaurants and clubs are viewed as comparable to liquor stores, the fact that the ban on franchise sales applies only to liquor stores does not, by itself, establish a denial of equal protection. It is settled law that, in addressing what it may perceive as a problem, a state legislature may proceed "'one step at a time,'" Montalvo-Hueras v. Rivera-Cruz, 885 F.2d 971, 981 (1st Cir. 1989)(quoting Williamson v. Lee Optical, 348 U.S. 483, 489 (1955)), and that "'[i]t is no requirement of equal protection that all evils of the same genus be eradicated or none at all,'" Mills v. State of Maine, 118 F.3d 37, 47 (1st Cir. 1997) (quoting Railway Exp. Agency, Inc. v. People of State of New York, 336 U.S. 106, 110 (1949)). See Montalvo-Hueras, 885 F.2d at 981 ("The legislature need not approach goals on an all-or-nothing basis . . . . 'The legislature may select one phase of one field and apply a remedy there, neglecting the others.'" (quoting Williamson, 348 U.S. at 489)). In assessing an equal protection challenge under the rational basis test, the relevant inquiries are whether the regulation has a legitimate governmental purpose and whether it is a rational means of achieving that purpose.

Because of the broad police powers that states possess, "[p]ublic safety, public health and public morals are legitimate government purposes, but they are not the only ones. Virtually any goal that is not forbidden by the Constitution will be deemed

sufficient to meet the rational basis test." See Erwin Chemerinsky, Constitutional Law, § 9.2 (2d ed. 2002). The difficulty arises in identifying the purpose of a particular regulation and determining whether the regulation is rationally related to the achievement of that purpose.

The Supreme Court has been extremely deferential to states in addressing both of these questions. In deciding whether a statute has a legitimate governmental purpose, the Supreme Court has gone so far as to state that, when it adopts legislation, a legislature need not "articulate its reasons for enacting a statute" as long as some legitimate purpose can be identified. F.C.C., 508 U.S. at 315. Furthermore, the classification chosen "may be based on rational speculation unsupported by evidence or empirical data." Id. at 315. That standard has been criticized as overly deferential and dissenters have urged a less deferential standard for determining whether a statute has a legitimate purpose when no purpose is expressed at the time of enactment. See id. at 323 n.3 (Stevens, J., dissenting) ("Judicial Review under the 'conceivable set of facts' test is tantamount to no review at all."); Schweiker v. Wilson, 450 U.S. 221, 244-45 (1981) (5-4 decision) (Powell, J., dissenting) ("[T]he Court should receive with some skepticism post hoc hypotheses about legislative purpose, unsupported by the legislative history. When no indication of legislative purpose appears other than the current position of the [government], the

Court should require that the classification bear a 'fair and substantial relation' to the asserted purpose.").

Here, § 3-5-11.1(a) does express the purposes of the prohibition on franchise sales of alcoholic beverages. Those purposes are stated to be:

> To promote the effective and reasonable control and regulation of the Rhode Island alcoholic beverage industry and to help the consumer by protecting their choices and ensuring equitable pricing.

While rather general, those purposes seem clearly legitimate, on their face. The more difficult task is ascertaining whether the prohibition is rationally related to achieving those purposes.

For the most part, the parties simply make conflicting assertions about the impact or lack of impact that they maintain franchising has on liquor sales, the market power of wholesalers and competition among Class A retailers. W&S Mem. Supp. Mot. Prelim. Inj. at 17-18; UILR Memo. in Opp. at 11-12. Most of those assertions are nothing more than unsupported conclusions. Moreover, they do not address the effect of franchising on consumer choices and the prices charged to consumers which are two of the principal objectives recited in the statute.

The scant evidence that has been presented indicates that joint buying enables franchisees to obtain volume discounts from liquor wholesalers. However, there is no evidence as to whether those discounts are passed on to consumers in the form of lower

prices; or, if so, what effect reduced prices may have on consumption or the ability of independent retailers to compete with franchisees.

There, also, is some evidence that franchising may restrict consumer choice. Thus, the evidence shows that W&S controls many aspects of the manner in which franchisees conduct their businesses ranging from what products they may sell to the territories in which they may operate. In addition, in order to place common advertising, all participating franchisees must agree as to what products are advertised and what prices will be charged for those products.

In short, given the considerable deference accorded to legislative judgments regarding regulation of economic matters and the absence of any evidence, in this case, that the Rhode Island statute is arbitrary or not rationally related to achieving a legitimate governmental purpose, the likelihood that W&S, ultimately, will succeed on the merits of its claim appears rather remote.

II. Balancing the Harms

The evidence is equally sparse with respect to what harm W&S might suffer if a preliminary injunction does not issue and what harm the state and independent retailers might suffer if a preliminary injunction does issue. Mr. Haronian, W&S's principal, did testify that, like Humpty Dumpty, if the existing franchise

arrangement is dismantled, it would be difficult or impossible to put it back together again. However, once again, little evidence was presented to support that assertion. On the other hand, neither the State nor UILR presented any evidence regarding the impact that the failure to issue a preliminary injunction might have on consumers or independent retailers.

Since a scintilla of evidence outweighs an utter lack of evidence, the balance of harms tips in favor of W&S. However, the degree to which the scale tips is reduced by the fact that the harm is, at least partially, self induced. As already noted, the statute was adopted on July 8, 2004 but did not become effective until April 1, 2005. Presumably, W&S was aware even before the date of enactment that the legislation was being seriously considered but waited until January 18, 2005 to seek a preliminary injunction. While W&S's actions certainly cannot be characterized as dilatory, the delay, nevertheless, has contributed to the present sense of urgency. See Jordache Enterprises, Inc. v. Levi Strauss & Co., 841 F.Supp. 506, 521 (S.D.N.Y. 1993) (party's delay in bringing motion for preliminary injunction "undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no irreparable injury." (internal quotation omitted)).

III. The Public Interest

In this case, the public interest does not perceptibly weigh

either in favor of or against granting a preliminary injunction. Clearly, the public has an interest in the proper regulation of competition and alcoholic beverage sales; but, it also has an interest in the freedom of businesses to conduct their affairs lawfully, efficiently and in a manner that best serves consumers. What is not so clear is whether these interests will be served or disserved by the issuance of a preliminary injunction. If anything, given the improbability that W&S ultimately will succeed on the merits of its claim, this factor appears to weigh in favor of the defendants.

**Conclusion**

For all of the foregoing reasons, W&S's motion for a preliminary injunction is denied.

IT IS SO ORDERED:

Ernest C. Torres
Chief Judge

Date: April 8 , 2005



FILED